IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TANGALA CARTER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. NO. 1:19-cv-588 |
| | § | |
| | § | |
| CALIFORNIA GRILL, LLC  d/b/a | § | |
| FOXY'S CABARET | § | |
| | § | JURY DEMANDED |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Tangala Carter, who is Black, was subjected to the racial slur "nigga" by three white co-workers and a white manager, on a daily basis while she worked as a server at Foxy's Cabaret.  Statement of Facts at ¶3-8, 12, 15.  When she asked them not to use that word around her, they used it even more.  *Id.*  When she complained to the manager on duty about a particular employee using the slur, he said he would talk to the employee in question, but the employee continued using the slur.  *Id.* at ¶5.  When she spoke with the General Manager to report the use of the slur as well as disparities in job assignments between Black and White servers, he began treating her worse than he had before, displaying disinterest, ignoring her, and, on one occasion, knocking her cell phone out of her hand.  *Id.* at ¶13.

Things only got worse for Ms. Carter after she began objecting to the racial slurs and disparate treatment.  Her work schedule was reduced from five days per week to three; she was

not permitted to work behind the bar, which was a more lucrative assignment than working the floor as a server; and, eventually, Defendant stopped giving her customers to wait on. *Id.* at ¶16-19.

On the night of December 29, 2017, Defendant would not allow Ms. Carter to work behind the bar, and would not assign her to wait on any tables. *Id.* at ¶19. She attempted to wait on someone she knew who was seated in Defendant's VIP area, but she was denied entry by security, while white servers were permitted to enter. Ms. Carter went and spoke with one of the managers, and told him that she would like to leave for the day, since she was not being allowed to work. *Id.* The manager told her that if she left, she would be abandoning her job, and would be disciplined for doing so. *Id.* Faced with the choice of either remaining at work with nothing to do and no way to make money (since her compensation came from tips) and being disciplined for leaving, Ms. Carter had no choice but to resign her employment with Foxy's. *Id.*

Given these facts, a reasonable jury could easily find that Ms. Carter was subjected to a pervasive racially hostile work environment, and was constructively discharged by Defendant's failure to stop the racial slurs and by a pattern of retaliatory conduct beginning with demoting her from her position at the bar to only serving tables, then not allowing her to serve tables, and prohibiting her from waiting on anybody at all. Defendant's Motion for Summary Judgment ignores nearly all of the evidence of harassment, discrimination, and retaliation presented by Ms. Carter, and portrays what facts it does mention in the light most favorable to itself. Defendant's summary judgment should therefore be denied.

## II.     ARGUMENT

### A.     Foxy's subjected Ms. Carter to a racially hostile working environment

The elements of a racially hostile work environment claim are:  (1) Plaintiff belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; [and] (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.  *Caldwell v. Lozano*, 689 F. App'x 315, 322 (5th Cir. 2017) (brackets and citation omitted).  There is no dispute that Ms. Carter belongs to a protected group, as she is Black.  *See* Exh. 2.

### 1.     Ms. Carter was subjected to unwelcome harassment based on race

The Fifth Circuit has held that "[c]onsistent racial slurs are certainly based on race." *Melvin v. Barr Roofing Co.*, 806 F. App'x 301, 309 (5th Cir. 2020).  Employees, including management, used the word "nigga" toward and around Ms. Carter on a daily basis.  Statement of Facts at 3-8, 12, 15.  Ms. Carter made it clear to both the individuals who used the racial slurs and to management that the harassment was unwelcome.  *Id.*  She asked the employees who used the slurs not to do so, told them that the use of that word toward Black people was offensive to her.  *Id.*  She complained to management about the slurs on at least two occasions.  *Id.*  A reasonable jury could thus find the use of the slurs "unwelcome" and "based on race."

### 2.     "Affected a term, condition, or privilege of employment.

For harassment to have "affected a term, condition, or privilege of employment," it must be "sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.' " *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428,

434 (5th Cir. 2005) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). A plaintiff "must subjectively perceive the harassment as sufficiently severe or pervasive, and this subjective perception must be objectively reasonable." *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003). Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000), *abrogated on other grounds by Burlington*, 548 U.S. at 53. In some cases, "a single incident of harassment" may be sufficiently severe to give rise to a claim; "a continuous pattern of much less severe incidents of harassment" may do so as well. *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 400 (5th Cir. 2007). Courts consider the circumstances as a whole, and "[n]o single factor is determinative." *Id.* at 399. As the Fifth Circuit stated in *Melvin* earlier this year, "[w]e have held that African-American plaintiffs subject to racial slurs and derogatory comments over the course of three years sufficiently alleged severe or pervasive harassment." *Melvin v. Barr Roofing Co.*, 806 F. App'x 301, 309 (5th Cir. 2020)(citing *Walker*, 214 F.3d at 626). An environment may be perceived as hostile if it demonstrates "a communal effort to define who is welcome in the workplace." *Butler v. Ysleta Independent School Dist.*, 161 F.3d 263, 269–70 (5th Cir. 1998) (finding that public circulation of pornographic materials in the workplace "mark[ed] the workplace as an area in which masculinity is appropriate or even constitutive"); *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) (finding employer's routine use of racial slurs to demean African American employee until employee felt forced to resign).

The racially offensive conduct in this case - white employees' daily use of the racial slur "nigga" both around and directed to Ms. Carter - rises to the level of conduct found by the Fifth Circuit and other courts in this Circuit to create a hostile work environment. *See, e.g. Farpella–Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996) (trial court properly refused to grant a judgment notwithstanding the verdict where the evidence revealed that plaintiff's supervisor commented about her proclivity to engage in sexual activity or made "similarly offensive" remarks, sometimes in front of co-workers, two or three times a week for six months); *Alzuraqi v. Group 1 Auto., Inc.*, 921 F. Supp. 2d 648, 660 (N.D. Tex. 2013) (refusing to grant summary judgment on plaintiff's hostile work environment claim where plaintiff, who was of Palestinian descent, was subjected to racial or ethnic slurs three to four times per week during a six-month period); *Davis v. Matagorda Cty.*, No. 3:18-CV-00188, 2019 WL 1015341, at *7 (S.D. Tex. Mar. 4, 2019), *report and recommendation adopted*, No. 3:18-CV-00188, 2019 WL 1367560 (S.D. Tex. Mar. 26, 2019), *appeal dismissed sub nom. Davis v. Anders*, No. 19-40306, 2019 WL 5067295 (5th Cir. July 26, 2019) (repeated use of racial slurs, including following complaints to defendant's human resources department, state a claim for racially hostile work environment).

Ms. Carter's testimony makes it clear that the harassment to which she was subjected affected a term, condition, or privilege of employment. There can be no dispute that the harassment was "pervasive," as it happened almost every time that Ms. Carter went to work, and often multiple times during her shifts. Statement of Facts at ¶3-8, 12, 15. She testified that white employees' near constant use of the word "nigga" at work made her feel uncomfortable, sad, and depressed at work, and that made it harder for her to be good at her job, because being a

server required her to have a good attitude and to be pleasant and fun. Exh. 1 at ¶7. Before she made her reports to management about the slurs, she was hesitant to work collaboratively with the white employees who used the slurs, because she did not wanted to be subjected to them. *Id.* After she made her reports, those same employees refused to work collaboratively with Ms. Carter as well, making it harder for her to do her job. *Id.* at ¶12. The "terms, conditions, and privileges" of Ms. Carter's employment were affected both by the pervasive nature of the harassment and by the interference in the performance of her job duties that it caused.

Thus, while Defendant claims that "Ms. Carter's [hostile work environment] claims are primarily buttressed on the claim that one coworker and one manager used a racial epithet in her presence," (Def. Motion at 8) that statement fails to account for the frequency of the use of the slurs, the fact that there were four employees, including a manager, who used the word "nigga" toward Ms. Carter, and that the employees continued doing so after Ms. Carter asked them to stop, and then asked management to get them to stop. The fact that they used the slur nearly every time they worked together would easily allow a jury to find that Ms. Carter was subjected to a hostile work environment.

### 3. Employer knew of the harassment and failed to take prompt remedial action

Ms. Carter's testimony establishes that Foxy's knew of the harassment and failed to take prompt remedial action. She reported the racial slurs to two different members of management, including the General Manager of Foxy's, and the slurs continued after those reports. And Foxy's did not even provide Ms. Carter with any information on how to make a complaint about discrimination, or even a policy prohibiting racial discrimination at Foxy's. Statement of Facts at ¶9. Those facts satisfy the Fifth Circuit's standards for proving that the employer failed to take

prompt remedial action. *See, e.g. Melvin*, 806 F. App'x at 309–10 ("Melvin stated that he complained multiple times about the harassment to Hawkins and Galloway, yet "to [his] knowledge, no actions were ever taken to stop the harassment or slurs." Melvin also stated that employees, including Hawkins, continued to make derogatory comments after Melvin complained. A jury could conclude that Barr Roofing failed to take remedial action if, after Melvin complained, his coworkers—including his supervisor—continued to use racial slurs in the face of Melvin's request to the contrary. Accordingly, a fact issue exists about whether Barr Roofing took action to remedy the harassment."). While Defendant claims that "Importantly, Plaintiff only brought this situation up to the General Manager, Tommy Perkins, one time and he addressed her complaints," the fact that Mr. Perkins spoke with Ms. Carter when she asked him to meet with her about the racial slurs does not mean that he took remedial action. Remedial action means getting the slurs to stop, and they did not. As Ms. Carter testified, the slurs got worse, not better, after her complaints. Exh. 1 at ¶5, 6, 15.

### B. Foxy's constructively discharged Ms. Carter

"A constructive discharge occurs when the employer makes working conditions so intolerable that a reasonable employee would feel compelled to resign." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). In determining whether an employer's actions constitute a constructive discharge, the Fifth Circuit examines the following factors: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not. *Id.*

In this case, a reasonable jury could easily find that Foxy's constructively discharged Ms. Carter. The path to constructive termination began with white employees' persistent and pervasive use of the racial slur "nigga" toward and around Ms. Carter. It continued with management's practice of assigning more difficult and menial tasks, such as cleaning, to Ms. Carter and the other Black waitress, but not to the White waitresses. Exh. 1 at ¶8. When Ms. Carter complained of these practices to Foxy's managers, and ultimately to the General Manager, her complaints led not to correction of the violations, but instead to the slurs increasing and the General Manager becoming hostile towards her, even physically. Exh. 2 at 2. Ms. Carter's complaints also directly affected her compensation and earning opportunities at Foxy's. Her hours were cut, and management instituted a practice of assigning white waitresses to wait on customers, allowing them to refuse table assignments to Ms. Carter. Exh. 1 at ¶16, 19. By December 2017, on her reduced schedule, Ms. Carter was not permitted to work behind the bar, and when she worked the floor, was not permitted to wait on customers from whom she could earn tips. *Id.* The final straw happened when she attempted to wait on someone she knew in the VIP area, and was not permitted to enter the area. Exh. 1 at ¶19. Unable to earn any tips, since she could not get any tables assigned to her, and not permitted to work at the bar, Ms. Carter went to the office and told the manager that she was going to leave for the night, only to be told that she would be disciplined for doing so. *Id.* At that point, no reasonable person would have remained in the job.

These facts would allow a reasonable jury to conclude that Foxy's constructively discharged Ms. Carter. The facts of this case show more egregious conduct on the part of Foxy's than those in *Balderas v. Frontier Enterprises, Inc.*, No. 5-16-CV-00479-FB-RBF, 2018 WL

835207, at *6 (W.D. Tex. Feb. 12, 2018), where the Court denied summary judgment on the plaintiff's constructive termination claim based on the plaintiff's showing that "she made numerous reasonable, but ultimately unavailing, attempts during her employment to halt the harassment in accordance with Frontier's anti-harassment policy." The *Balderas* court went on to hold that "[c]ourts have found under sufficiently similar circumstances that an employer's repeated inaction or deliberate indifference may justify a finding of constructive discharge." *Id*. (*citing Griffin v. Delchamps, Inc.*, 176 F.3d 480, 1999 WL 155682, at *11 (5th Cir. Mar. 12, 1999) (concluding that the evidence was "more than sufficient" to support the jury's finding of constructive discharge where plaintiffs made numerous complaints about the "severe and degrading" harassment perpetrated by their male co-workers over a period of several months, which were ignored, and plaintiffs testified that after each complaint the offensive behavior continued unabated); *Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568, 574 (8th Cir. 1997) (reasonable jury could find that the "continuing harassment and management's indifference" rendered plaintiff's working conditions so intolerable she was forced to resign); *Jurgens v. EEOC*, 903 F.2d 386, 390 (5th Cir. 1990)(finding of constructive discharge does not require a plaintiff to prove that the employer imposed intolerable working conditions with the "specific intent" to force the employee to resign)). *See also Gonzalez v. Smith Int'l, Inc.*, 899 F. Supp. 2d 622, 641 (S.D. Tex. 2010)(issue of fact as to constructive discharge based on routine use of racial remarks and statements to Hispanic employees that they should leave to make work for non-Hispanic workers). Here, Ms. Carter has shown more than that she attempted unsuccessfully to cause the racial harassment to stop. She showed that not only did it not stop after she complained of it repeatedly, but that her complaints resulted in her being unable to earn

a living at Foxy's, and then being threatened with disciplinary action if she refused to remain at the establishment despite not being allowed to work.

Defendant contends in its Motion for Summary Judgment that Ms. Carter's claims are "barred" because she resigned her employment. Def. Motion at 6-8. Defendant claims that although Ms. Carter may have had "fewer customers" as a result of management's actions, that would not justify her resignation. *Id.* Defendant further contends that Ms. Carter did not make sufficient attempts to rectify the situation. These arguments fail. Ms. Carter resigned after months of attempting to get Foxy's to address the racial slurs to which she had been subjected, without success, and after management responded to her complaints of discrimination by making it harder, and ultimately nearly impossible, for her to earn any money there. As Ms. Carter testified, on the night she resigned, she was not being permitted to wait on anybody, and so told the manager on duty "I'm ready to go, you know, because I'm being kept from waiting on customers." Exh. 1 at ¶19. The manager then told Ms. Carter to fill out a document stating that she was abandoning her job. Ms. Carter told him that she was not abandoning her job, but she was not being allowed to work. *Id.* He told Ms. Carter that if she left, she would be given a write-up. *Id.* Ms. Carter did not want to be disciplined for leaving, but she could not make any money without customers to wait on, so she told Dan that she was resigning my employment with Foxy's.

Thus, it was not simply a matter of Foxy's reducing the number of customers Ms. Carter could wait on - it was that, after months of being subjected to racial slurs and trying to get them to stop, Ms. Carter's ability to earn compensation was reduced to almost nothing, and when she said she could not stay at work with nobody to wait on, she was told she would be disciplined for

leaving. Foxy's put Ms. Carter in the position of having to remain on the job while making no money, or being disciplined for leaving, giving her no choice but to resign her employment. No reasonable person in the same position would have done differently, and, thus, Ms. Carter's claims are not "barred" by her decision to resign. Accordingly, summary judgment should be denied as to Ms. Carter's constructive discharge claim.

Respectfully submitted,

/s/ Kell A. Simon
Kell Simon
Texas Bar No. 24060888
THE LAW OFFICES OF KELL A. SIMON
501 North IH 35, Suite 111
Austin, Texas 78702
(512) 898-9662
(512) 368-9144 (Fax)

ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

By my signature hereunder affixed, I certify that a true and correct copy of the foregoing document has been transmitted to all parties of record **via CM/ECF**, on this 13th day of November, 2020, addressed as follows:

DARRELL L. BARGER
dbarger@hartlinebarger.com
BRIAN S. RAWSON
brawson@hartlinebarger.com
STEPHANIE ROARK
sroark@hartlinebarger.com
ROY B. MCKAY
rmckay@hartlinebarger.com
HARTLINE BARGER LLP
1980 Post Oak Blvd, Suite 1800 Houston, TX 77056
(713) 951-4250
(713) 652-2419 facsimile

/s/ Kell A. Simon
Kell A. Simon
