IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

TANGALA CARTER,                    )
                                   )
            Plaintiff,             )
                                   )
VS.                                )   C.A. NO. 1:19-CV-588
                                   )
CALIFORNIA GRILL, LLC              )
d/b/a FOXY'S CABARET,              )
                                   )
            Defendant.             )


ORAL AND VIDEOTAPED DEPOSITION OF
TANGALA CARTER
OCTOBER 16, 2020
(REPORTED REMOTELY VIA ZOOM)


ORAL AND VIDEOTAPED DEPOSITION OF TANGALA

CARTER, produced as a witness at the instance of the

Defendant and duly sworn, was taken in the above-styled

and numbered cause on Friday, October 16, 2020, from 10:04

a.m. to 1:47 p.m., before Kari J. Behan, CSR, RPR, CRR, in

and for the State of Texas, reported by computerized

stenotype machine, with the witness participating from her

residence, Austin, Texas, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record

herein.



**Page 2**

```
1              A P P E A R A N C E S
2
   FOR THE PLAINTIFF (VIA ZOOM):
3
       KELL A. SIMON, ESQ.
4      KELL A. SIMON LAW OFFICES
       501 North IH 35
5      Suite 111
       Austin, Texas  78702
6      (512) 898-9019
       kell@kellsimonlaw.com
7
8
   FOR THE DEFENDANT (VIA ZOOM):
9
       ROY B. MCKAY, ESQ.
10     HARTLINE BARGER LLP
       1980 Post Oak Boulevard
11     Suite 1800
       Houston, Texas  77056
12     (713) 951-4250
       rmckay@hartlinebarger.com
13
14 THE VIDEOGRAPHER:
15     Patrick Blaskopf
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1              I N D E X
                                           PAGE
2  EXAMINATION OF TANGALA CARTER:
3
4      BY MR. McKAY...........................     4
5      CHANGES AND SIGNATURE..................   140
6      REPORTER'S CERTIFICATION...............   142
7
                  * * *
8
           E X H I B I T   I N D E X
9
   EXHIBITS                                PAGE
10
       Exhibit 1..........................    10
11       (Notice of Deposition)
12     Exhibit 2..........................   122
         (November 4th Correspondence)
13
       Exhibit 3..........................   127
14       (EEOC Charge March 11, 2019
15     Exhibit 4..........................   129
         (Affidavit of Taylor Ratcliff)
16
       Exhibit 5..........................   129
17       (Affidavit of Tommy Perkins)
18     Exhibit 6..........................   131
         (Affidavit of Placide Benoit)
19
20
21
22
23
24
25
```

**Page 4**

```
1              PROCEEDINGS:
2      (Friday, October 16, 2020, at 10:04 a.m.)
3          THE VIDEOGRAPHER:  We are now on the record.
4  The date today is October 16th, 2020, and the time is
5  approximately 10:04 a.m.  This is the video-recorded
6  deposition of Tangala Carter being taken in the matter of
7  Tangala Carter versus California Grill, LLC, et al, Case
8  No. 1:19-CV-588.  This matter is being heard in the U.S.
9  District Court, Western District of Texas, Austin
10 Division, and the deposition is being held remotely.
11         My name is Patrick Blaskopf, a legal
12 videographer representing GPS Court Reporting.  The court
13 reporter is Kari Behan, also with GPS.
14         At this time, counsel will be noted on the
15 stenographic record, and our court reporter can swear in
16 the witness, and then we can proceed.
17             TANGALA CARTER,
18 after having been first duly sworn by the above-mentioned
19 Certified Court Reporter, was examined and testified as
20 follows:
21             EXAMINATION
22 BY MR. McKAY:
23     Q.  Ms. Carter, my name is Roy McKay, and I represent
24 Foxy's in a lawsuit that you have been filed -- that you
25 have filed.
```

**Page 5**

```
1          Do you understand that?
2      A.  Yes.
3      Q.  Would you go ahead and first just state your name
4  for the record?
5      A.  Tangala Carter.
6      Q.  Ms. Carter, have you ever given a deposition
7  before?
8      A.  No.
9      Q.  Okay.  So we're going to first just go over a
10 couple ground rules --
11     A.  Okay.
12     Q.  -- so go ahead and -- and -- and just -- I'll go
13 through some things, tell me if you don't understand any
14 of them.  Some of them are different than normal life;
15 some are pretty normal, you know.
16         Number one, you are under oath today.  Do
17 you understand that?
18     A.  Yes.
19     Q.  And the penalty of perjury applies to your
20 testimony?
21     A.  Yes.
22     Q.  One thing that -- it's a little less true in
23 federal court.  I normally would say in state court we can
24 use your full deposition at trial as though it were your
25 testimony.  It's not as true in federal court, but we
```



**Page 6**

1 probably can. It's a little more of a balancing act.
2       But it's important that you testify, you
3 know, fully, truthfully, and to the best of your ability
4 today because we could potentially use this testimony at
5 trial as your testimony.
6       Do you understand that?
7   A. Yes.
8   Q. Do your best -- and you're doing great so far --
9 to let me finish my question even if you already know the
10 answer. Even if you know what I'm about to ask you, let
11 me finish the full question before you answer. Okay?
12   A. Yes.
13   Q. That's both because there might be something key
14 that I'm trying to get in there. There might be an
15 important factor that you need to know about before you
16 answer that could change your answer, but also for the
17 court reporter's benefit.
18       So you can't see her anymore; you saw her
19 for a minute. She went -- blacked her screen, didn't want
20 us looking at her, which I understand. And that's normal,
21 and she is good to do that. But she is there, and she
22 is -- she's -- if you could see her, you'd see, rapidly,
23 those fingers moving. She is typing all the words we say.
24 And if we -- if I don't let you finish answers, which I
25 may do -- and I apologize now for it -- or you don't let

**Page 7**

1 me finish a question, what that does is, instead of it
2 being words, words, words, words, words, words, and a
3 good-looking transcript, we get a word, a word, a word, a
4 word, a word, a word, a word, and it's very hard to follow
5 the transcript. Okay?
6   A. Okay.
7   Q. It also makes it really hard for her because if
8 she -- you know, it's hard enough to type at the speed one
9 person talks. If two people are talking, it's basically
10 impossible.
11       If you don't understand any question I ask
12 you today, just tell me. I'm glad to rephrase it, re-ask
13 it, explain it, whatever you need so that you understand
14 it. Okay?
15   A. Okay.
16   Q. If you don't understand a question and you don't
17 tell me about it and you answer it, then, we, the judge,
18 and the jury, are going to have to assume you understood
19 it because you answered it. Make sense?
20   A. Yes.
21   Q. Do your best -- you're -- you're -- I think
22 you're going to do great at this, but do your best to
23 answer with a "yes" or a "no" or another verbal word-based
24 response, not a "uh-huh," "uh-uh," or "this" or "that"
25 (indicating). We all do that. That's normal

**Page 8**

1 conversation. That's one of the weird things in a
2 deposition.
3       Because the court reporter is taking down
4 what you say, she can't take down a head nod as well, and
5 she has to guess whether you meant a "yes" or a "no," and
6 that could mean that Kell and I have to fight later: No,
7 no, that was a up-and-down head nod; no, side to side.
8 And it's -- it's -- we want to avoid that. Okay?
9   A. Okay.
10   Q. And also, I may occasionally say: Was that a
11 "yes," or was that a "no"? Normally what I'm trying to do
12 is make sure I had a clear answer and a clean record.
13 That doesn't mean I'm trying to say you're lying or that
14 -- that -- you know, "Was that a 'yes'" doesn't mean I
15 think that you're not telling the truth or you need to
16 change your answer. It's usually trying to get a clear
17 record. Okay?
18   A. Okay.
19   Q. I like to highlight that because sometimes get
20 offended at that or get confused, and I want to -- want
21 you to know why.
22       I'll give you the next instruction. It's
23 worked about once in a -- in history. Every other time,
24 someone pauses after, and still it doesn't work, but --
25 and actually, we're in federal court, so Kell can actually

**Page 9**

1 -- can theoretically object more than just form. I don't
2 care of he objects form or more; it doesn't really matter
3 at this point. But if he objects, unless he tells you to
4 not answer -- and I don't think I'll draw any of those --
5 listen to him, give him a chance, stay out of his way so
6 that it gets clean on the record, but then just go ahead
7 and answer the question and ignore him. It's for us and
8 the Court. Okay?
9   A. Okay.
10   Q. If he doesn't want you to answer, he will let you
11 know.
12   A. Okay.
13   Q. I think that's it.
14       Is there anything -- any medication or any
15 other reason that -- that you're on today or that's
16 affecting you today that would prevent you from giving
17 full, honest testimony here today?
18   A. No.
19   Q. The one other thing, we are on video, and that's
20 great, and it makes things a lot easier. In some ways, it
21 also makes things harder. One thing that's going to
22 happen is we're going to have technical issues. That
23 could mean that I drop, you drop, the video gets stuttery,
24 the audio gets stuttery. And I may not you hear you; you
25 may not hear me. If that happens, just -- let's work



1 together. Tell me if you can't hear me; I'll do the same.
2 We may have to re-ask questions; we may have to restate
3 answers. Whatever we have to do, we'll do. Okay?
4     A. Okay.
5     Q. Every once in a while, it will kind of drop or
6 something will happen. Usually, you can fix that by just
7 refreshing your browser, and we -- we'll try to do that.
8 But we'll -- we'll figure it out, and just work with me.
9     A. Okay.
10     Q. The only other thing, I'm going to go ahead and
11 share -- so I've got some documents that I was able to
12 upload, and we'll go through some documents as we go
13 through this. And before we start, I want to go ahead and
14 give you kind of a -- a walkthrough of how that looks just
15 to make it easier and to help you when we get to them for
16 real questioning.
17     So I have shared a document and marked it as
18 Exhibit 1. Do you see that?
19     A. Not yet. It's still loading.
20     Q. Understood.
21     And that's one thing you'll have to -- if it
22 loads for me faster or it loads for you faster, we'll have
23 to just communicate and say: Hold on. Let it load.
24     Just tell me whenever it's loaded.
25     A. Okay.

1     Q. Is it up?
2     A. Not yet.
3     There it is.
4     Q. Okay. And we -- okay.
5     So there's really -- we're not going to go
6 over what I -- what I attached right now. Do you see what
7 it is, though?
8     A. Yes.
9     Q. What is it?
10     A. It's United States District Court for the Western
11 Direct of Texas, Tangala Carter versus California Grill
12 LLC, Foxy's Cabaret. It looks kind of -- and it's the
13 summons and civil action.
14     Q. And then if you --
15     A. Do you want me to read the whole --
16     Q. No. If you're good. If -- if you -- if you were
17 to scroll down, you'd see that the -- next is the
18 complaint. This is the complaint you filed in this case.
19     A. Yes, I can see that.
20     Q. Okay. So you see at the bottom right, there's --
21 on that first page, there's an exhibit sticker for
22 Exhibit 1?
23     A. Yes.
24     Q. Okay. The most important thing I want to do is:
25 If you see -- this is kind of like a Word or -- or Adobe

1 or whatever, kind of, browser here. It's an independent
2 browser, and at the top, there's a plus/minus where you
3 can change zoom. Do you see that?
4     A. Yes.
5     Q. And you can either scroll with your mouse, or
6 there's the little scroll bar on the side. You can use
7 that to go up and down.
8     Do you see that?
9     A. Yes.
10     Q. Okay. I -- I just wanted to make sure that you
11 were able to use it. The -- the important thing is some
12 of these remote depos are done on Zoom, and when we do
13 that, we have to share our screen. You have to look at
14 exactly what I'm looking at. That has benefits and
15 negatives.
16     Here, this platform, which I -- I frankly
17 like a little more, it allows us to independently look at
18 the document ourselves, but the one downside to that is
19 you and I will have to communicate about what we're
20 looking at just to make sure we are on the same page.
21 Okay?
22     A. Okay.
23     Q. So just keep in mind, like, if you're looking at
24 page 3 or, you know, a -- paragraph 14 or something,
25 rather than just saying: What I'm looking at blah, blah,

1 blah, how to use -- to direct us and the jury to what
2 you're looking at, and I'll try to do the same. Okay?
3     A. Okay.
4     Q. I think that's it -- most -- I don't think we're
5 going to have very many long exhibits. There's a couple,
6 but nothing -- nothing more than a page or three, so we
7 should be good there.
8     So I'm going to start -- the way this will
9 work, I'm going to just first ask you about your
10 background a little bit. We're going to just talk about
11 you; then we will probably talk about your employment at
12 Foxy's; then I would anticipate we'll talk about, kind of,
13 the allegations that you've made in this case, including,
14 you know, EEOC stuff and then the filing of the suit, up
15 to there.
16     Then we will probably talk about
17 post-Foxy's, things I don't know about, you know, work
18 history, where -- where you're working now, if anywhere;
19 what you've been doing during COVID, things like that.
20 That's generally where I expect us to go. I just like to
21 give you that highlight now so that you know, as we're
22 going along kind of where we're at. Okay?
23     A. Okay.
24     Q. If you need a break at any point, just let me
25 know. We will -- I'll probably ask you to finish the



1 question on the table, maybe even a follow-up or two,
2 depending on what we're talking about, but then we can
3 take a break and come back when you're comfortable.  Okay?
4     A.  Okay.
5     Q.  I don't think this will be that long, but
6 normally, we try to take a break every hour or so.  I'll
7 probably get through one of those, maybe -- maybe to two,
8 may- -- probably not to three, is my best estimate, but
9 you never know.  It depends at lot on you.  Some witnesses
10 -- I think you're going to be very quick and to the point.
11 Some people are a little harder to get there, and it takes
12 a lot longer.  But we'll -- we'll get there either way.
13 Okay?
14     A.  Okay.
15     Q.  Where do you live?
16     A.  In Austin, Texas.  I stay at 15433 FM 1325.
17     Q.  Is that a home?
18     A.  It's an apartment.
19     Q.  And you say "stay at."  Let -- are -- do you --
20 are you on the lease?
21     A.  Yes.
22     Q.  Okay.  How long have you had that apartment?
23     A.  It's been a year and a half.
24     Q.  Do you live with anyone else there?
25     A.  No.

1     Q.  Have you lived alone that entire year and a half?
2     A.  No.  My daughter has lived here, but she moved to
3 Houston.
4     Q.  She what?  I'm sorry.
5     A.  She moved to Houston.
6     Q.  How old is your daughter?
7     A.  She is 23.
8     Q.  What's your daughter's name?
9     A.  Travigon Carter.
10     Q.  Before you lived in the current apartment, where
11 did you live in Austin?
12     A.  I lived off of Cheddar Loop.  That's 1833 Cheddar
13 Loop Road in Austin.
14     Q.  Was that an apartment also?
15     A.  Yes.
16     Q.  What was the apartment number; do you know?
17     A.  It was 924, I think.
18     Q.  How long -- how long did you live in that
19 apartment?
20     A.  It was a year.
21     Q.  And what I'm going to try to do is kind of get
22 back to a couple years before you started working at
23 Foxy's.
24         When did you -- wha- -- what date do you
25 remember you started working at Foxy's?

1     A.  If I can recall, it was in either June -- June,
2 July, or August.  I don't -- I don't want to say the wrong
3 thing.  I can't really recall.
4     Q.  So summer?
5     A.  Yeah.  It was -- it was around the -- the summer
6 or coming to the end of the summer.
7     Q.  Of what year?
8     A.  That was 2017.
9     Q.  Do you --
10     A.  Yes.  Was it 2017?
11         Yes, it was 2017.
12     Q.  When did you leave Foxy's?
13     A.  I know it was December -- it was a little bit
14 after Christmas, so it was December 2017.
15     Q.  So you were there about a half a year?
16     A.  Yes.
17     Q.  We've talked about -- about two years back, so
18 we're probably the -- the apartment we just talked about,
19 were you at that apartment at any point when you were
20 working at Foxy's; do you remember?
21     A.  The Cheddar Loop?
22     Q.  Yes.
23     A.  Yes.
24     Q.  Okay.  What -- where do you live before Cheddar
25 Loop?

1     A.  I was living in Round Rock.  I had a duplex out
2 in Round Rock.
3     Q.  Do you remember the address?
4     A.  Not -- no, not right off the top of my head.
5     Q.  Understood.
6         You were renting a duplex or a half of a
7 duplex?
8     A.  Yes.
9     Q.  How long were you in that duplex?
10     A.  A year.
11     Q.  Where did you grow up?
12     A.  In -- on the east side of Austin, Texas.
13     Q.  Where did you go to high school?
14     A.  Reagan High School.
15     Q.  Did you graduate?
16     A.  No.
17     Q.  What -- what was the last year you completed?
18     A.  Ninth grade.
19     Q.  Why did you leave school?
20     A.  I got pregnant.
21     Q.  Is that the daughter we've talked about?
22     A.  Yes.
23     Q.  Do you have any other children?
24     A.  No.
25     Q.  Did you ever obtain a GED?



1    A.   Yes.
2    Q.   When was that?
3    A.   In 2010.
4    Q.   Have you done any schooling or -- you know,
5  including trade schools, obtain certifications, anything
6  like that, since you left high school?
7    A.   Yes.
8    Q.   What have you done?
9    A.   I went to ACC.  I was studying to be a registered
10  nurse.
11    Q.   Did you complete that program?
12    A.   No.
13    Q.   When was that?
14    A.   I started in 2010.  The last class I took was
15  actually in 2017, I think.  That was in the spring of
16  2017.
17    Q.   Are you planning to go back and try to finish
18  that at some point?
19    A.   Ye- -- yes.
20    Q.   It's just hard to balance working, living,
21  getting school done, all of that?
22    A.   Yes.  And those classes are kind of hard.
23    Q.   Understood.
24         How much more do you need to finish the
25  program; do you know?

1    A.   Well, I went to -- I started going to Temple
2  College because the prerequisites were -- you know, had
3  less than ACC.  So I actually have one class I have to
4  complete, and then I can go into the program.
5    Q.   I -- there was a little bit of feedback for me
6  when -- when you were saying that answer.
7         Could you repeat it?  I'm sorry.
8    A.   Yes.  I started going to Temple College because
9  they had fewer prerequisites than Austin Community
10  College.  So I only have one class to complete at Temple,
11  and I can go into the nursing program.
12    Q.   Okay.  So you need to complete one more class at
13  Temple, then you will be able to enter the actual nursing
14  program?
15    A.   Yes.
16    Q.   How long does the nursing program run?
17    A.   Roughly two years.
18    Q.   So if everything goes right, in about 2022 you
19  should be a registered nurse and able to work in that
20  career?
21    A.   Yes, finger crossed.
22    Q.   I -- I -- I wish the best for you.  I hope, you
23  know, maybe -- maybe being locked in with COVID, maybe
24  there's ways to -- to focus more in -- and more
25  opportunities to get it done.  You know, it certainly has

1  reduced the social lives and the other distractions in
2  life in some way.
3    A.   Yes.  Yes.
4    Q.   So I -- I -- I hope you can get that done and --
5  and move into that career in a couple of years.
6    A.   Thank you.
7    Q.   For work history -- you know, you had to drop out
8  in 9th grade.  I presume you had to start working at about
9  that time?
10    A.   Yes.
11    Q.   What -- what sort of jobs did -- did you hold?
12  You know, let's just kind of walk through.  There may --
13  we may not talk about every job, but talk about your first
14  jobs, where you worked, what -- what you did.
15    A.   My first job was at H-E-B when I was 14.  I was
16  just a greeter at the door.  You know how people walk in,
17  they say:  Hi, welcome to HEB, and then I would go get
18  baskets.
19         My second job was at Chuck E. Cheese.  We
20  all know what that consists of.  I was mainly -- I'm kind
21  of tall, so they always made me get in the Chuck E. suit,
22  which was very hot.
23         But -- and any other jobs after that, I
24  started doing home healthcare with my best friend's
25  great-grandmother.  So I really, really enjoyed doing

1  that.  That's when I decided:  Hey, you know, I kind of
2  want to do, you know, something in the nursing field.
3         And then I kind of accidentally got into
4  waitressing, and I liked it.  I mean, it gives you a
5  opportunity.  You know, if you need gas money at that
6  time, you know, you get the opportunity to make money, you
7  know, the same day, so, you know --
8    Q.   Right.
9    A.   -- you typically don't have to wait, you know, to
10  get a check, even though you do wait to get a check.  But
11  you can still, you know, have a little cash, you know, if
12  you need to buy groceries or get gas or, you know, buy
13  any anything else.  So I -- I've tried to stick to
14  waitressing, you know, until I get finished with
15  schooling.
16    Q.   What was your first waitressing job?
17    A.   My first waitressing job, it was actually a -- a
18  very long time ago.  I was, like, 17.  It was, like, a
19  little hole in the wall, a pool hall.  It was over off of
20  the Rundberg.  It was called "The Cue Club."  It was kind
21  of different, but I made a lot of tips there, and I really
22  enjoyed it.
23         I -- I like people, like, you know, being
24  able to meet people, talk to people and it -- it was
25  really fun for me.



1    Q.   How long do you work at that establishment?
2    A.   It stayed open for roughly about five months.
3    Q.   Okay.  So not very long?
4    A.   Yeah, it -- it wasn't open very long.
5    Q.   Where did you go to work next?
6    A.   After that, I did the assisting my friend's
7  grandmother because she actually went into the hospital,
8  and when she got out, because she stayed there for a
9  while, I went back to helping her.
10   Q.   Where did you work next after that?
11   A.   I went to Flextronics -- well, at the time, it
12 was Solectron.  I don't know if you -- if y'all heard of
13 that.  It's kind of like mechanical-assembly-type jobs.
14   Q.   How long did you work there?
15   A.   It was a temporary assignment, so it was, like,
16 two-and-a-half months.
17   Q.   Were you working through, like, a temporary
18 agency?
19   A.   Yes.
20   Q.   Do you remember what agency that was?
21   A.   It was Adecco.
22   Q.   And just so we can kind of orient ourselves
23 because we're -- you know, we're talking about, you know,
24 a -- a number of years in your work history here --
25 where -- what time period are we at, generally?

1    A.   I'm sorry.  With --
2    Q.   Whe- -- when you were working at the -- at the
3  temporary agency or this position, what -- what year are
4  we at or more -- you know, if you don't know the exact
5  year, kind of, what time range are we at?
6    A.   '99-2000.
7    Q.   Okay.  So we're -- we're -- these are -- these
8  are still your early years of your working history?
9    A.   Yes.
10   Q.   So early 2000s, what sort of positions were you
11 working?
12   A.   I was mainly doing the -- the temporary things.
13 So they would bounce me through just material handling.
14 That's when that kind of stuff, kind of, really started
15 coming out.  So they would just send us to different, you
16 know, sites to do, like, the material handling.
17   Q.   And what do- -- what exactly does "material
18 handling" mean?
19   A.   They just had us in their -- they wouldn't tell
20 us what it was.  It was top secret so -- let's say a
21 keyboard, say they would send us something that we would
22 assemble, and we would put one piece of it on and send it
23 down the line.  That was basically it.
24   Q.   When did you stop working -- when did you stop
25 working in the temporary agencies?

1    A.   That was in 2006.  I think they kind of started
2  fizzling out by then a little bit.
3    Q.   What did you do after that?
4    A.   I went back to doing private care/home health.
5    Q.   How long did you do that?
6    A.   Two years.
7    Q.   Did you say two years?
8    A.   Yes.
9    Q.   Okay.  Every once in a while -- I think your
10 connection is not the best.  It's not bad, but it's not
11 the best, and I can tell that because there's a little --
12 I don't know if you can it for me, but there's a little --
13 kind of looks like a wireless symbol on the bottom right.
14 It's --
15   A.   I see it.
16   Q.   -- what your cell phone would look like.  And
17 you're -- you're at two bars, but it's green.  And so
18 green is good.
19   A.   Okay.
20   Q.   But every once in a while, it's just not 100
21 percent clear.  So if you can do your best to just
22 annunciate, as I would yell at my children, but just --
23 just do your best to be as clear as you can.  It's
24 still -- I don't think you're going to be able to fix it.
25 It's every -- every once in a while.  It's not often, it's

1  not a problem.
2         I just want to let you know that each time
3  I'm kind of like "huh," it's just because there's a
4  technological issue and your words aren't coming through
5  perfectly clear, so I don't want you to be offended by
6  that or think that I'm, you know, not hearing you or
7  something.
8    A.   Okay.  And -- and I've heard that the service
9  over here is very, very, very bad, so I'm sorry about
10 that.
11   Q.   No.  You're -- that is not on you at all, and we
12 will make it work, as I said at the beginning.  And I can
13 also tell because your -- your -- the video is just slight
14 bit choppy.  It's not bad; it's coming through.  We got no
15 issues.
16   A.   Okay.
17   Q.   But -- so I'm going to have to --
18   A.   Okay.
19   Q.   -- re-ask you some things, or sometimes I don't a
20 word just because of it.  So, again, just bear with me
21 each time I -- I have to ask you that.
22        So if you could -- so we're -- we're in
23 2006ish.  After that, where did you go to work?
24   A.   I went back to the home health -- the home
25 healthcare, the private care.



**Page 26**

1     Q. And you said you did that for a couple of years?
2     A. Yes.
3     Q. We're in the late 2000s. So let me start -- I'm
4 going to started adding a question, essentially how much
5 you were making at these -- at these places.
6        So what was your pay at -- when you were
7 doing home healthcare?
8     A. It was -- it depended on the insurance, so it
9 was, roughly, about 9.25 an hour.
10     Q. And how many hours a week?
11     A. I was doing eight -- I mean, 40 hours a week, I'm
12 sorry. Eight hours a day, 40 hours a week.
13     Q. After you stopped doing the home healthcare work,
14 where did you go?
15     A. I actually injured myself, so I was out of work,
16 you know, for a -- a while.
17     Q. How did you injure yourself? Just -- and I don't
18 want -- need all the details, but generally.
19     A. Just normally -- doing normal stuff, daily stuff,
20 and ruptured my Achilles tendon.
21     Q. How long were you out of work?
22     A. It was a few years. It was about three years.
23     Q. During that three-year period -- during that
24 three-year period, what -- what would you do for money?
25 Were you on Social Security or -- or some other

**Page 27**

1 assistance?
2     A. Eventually, I got the -- SSI.
3     Q. The disability payments?
4     A. Yes.
5     Q. That was a fun and long and involved process, as
6 normal?
7     A. Yes.
8     Q. Understood.
9        So we're probably around 2010 now when
10 you're able to rejoin the workforce. Is that about right?
11     A. Yes.
12     Q. In 2010, what did you go back to -- where did you
13 go back for work?
14     A. In 2010, I actually started going to school.
15     Q. Understood.
16     A. Yes.
17     Q. Were you -- were you working at the same time you
18 were going to school, or were you just -- were you able to
19 just go to school for a period of time?
20     A. I was just able to just go to school for a period
21 of time.
22     Q. Was that because you were still receiving the
23 benefits for SSI, or were you -- you know, did you have
24 someone else helping you?
25     A. Yes, I was receiving benefits from SSI.

**Page 28**

1     Q. When did you rejoin the workforce?
2     A. I rejoined 2014. Yeah, it was 2014.
3     Q. You said 2014?
4     A. Yes.
5     Q. Okay. In 2014, where did you go back to work?
6     A. That's when I started working at the Elks Lodge.
7     Q. And what is the Elks Lodge?
8     A. It's like -- kind of like a club for members, but
9 on certain nights, they open up to the public. You know,
10 you can drinks and -- and food on certain nights.
11     Q. Were you a server?
12     A. Yes.
13     Q. How long did you work at Elks Lodge?
14     A. I worked there for two years.
15     Q. What was your rate of pay there? I presume 2.25
16 or whatever the -- minimum server wage is?
17     A. Yes.
18     Q. Do you remember how much that was at that time?
19     A. It was 2.10.
20     Q. Plus tips?
21     A. Yes.
22     Q. How much would you make, all told, counting tips
23 and -- and the wages? How much would you make on an
24 average week?
25     A. I would make about, roughly, 350 to 400.

**Page 29**

1     Q. Is that before taxes?
2     A. Yes.
3     Q. So -- and I know that's harder for servers
4 because you've got, you know, the tips and -- and -- and
5 those come in directly, and then taxes come later and all
6 of that.
7        But your -- your gross pay was somewhere
8 between 350 and $400 a week?
9     A. Yes.
10     Q. Why did you leave the Elks Lodge?
11     A. Well, they actually closed for a little while.
12 They had some other issues going on, so they closed for a
13 little while.
14     Q. What did you do when they closed?
15     A. Nothing.
16     Q. Did you go look for a new job?
17     A. Not really because I knew that they were going to
18 be opening again, so...
19     Q. Understood.
20        Did you end up going back to them when they
21 reopened, then?
22     A. Yes, I went back. Not long, though.
23     Q. I'm sorry. I cut you off a little bit, and then
24 it got choppy.
25        How long?



**Page 30**

1  A. I went back for a little while longer.

2  Q. Do you remember how long?

3  A. It was a few months. Yeah, it was a few months.

4  Q. Why did you leave there?

5  A. I had some personal issues going on, and I -- I

6 actually had surgery, so...

7  Q. What type of surgery?

8  A. That's kind of private.

9  Q. Understood.

10       Let -- let me ask it -- I -- I don't

11 necessarily need to know the exact -- well, you're not

12 seeking any -- you know, personal injury is not what this

13 case is about, so I don't need all the details.

14       But can you tell me how long you were laid

15 up, how long you were recovering, or, you know -- you

16 know, how impactful the surgery was?

17  A. I was recovering for about a full two months.

18 Yeah, it took about a full two months for me to get back

19 to 100 percent.

20  Q. After your surgery, where did you go -- where did

21 you go for work next?

22  A. I wasn't back to the Elks.

23  Q. Okay. So just to make sure I understand: Were

24 you at Elks during three different time periods before

25 they closed?

**Page 31**

1  A. Oh, yes.

2  Q. Before your surgery and then after your surgery?

3  A. Yes.

4  Q. After your surgery, how long were you at Elks?

5  A. I worked at the Elks all the way up until

6 September of 2017.

7  Q. Were you still working at the Elks when you were

8 working at Foxy's?

9  A. Yes.

10  Q. So you had both jobs at the same time?

11  A. Yes.

12  Q. Why did you decide to -- to also start working at

13 Foxy's while you were still working at Elks?

14  A. Well, the Elks was just -- the Elks has always

15 been one to two days a week. It was -- because it was a

16 private lodge. So during the week, they were doing other

17 things, so it's just one to two days a week for four hours

18 a day so it really wasn't that much. But, you know, it

19 was so many people that I knew that went in there that's

20 how I was able to, kind of, make the money.

21       So Foxy's, you know, I -- I knew some people

22 there, and it provided a lot more income for, you know,

23 things that I wanted to do.

24  Q. At any other point when you were working at Elks,

25 were you working somewhere else?

**Page 32**

1  A. No.

2  Q. Okay. So Foxy's was the first time you had

3 worked at -- at two places at the same time since coming

4 back to the workforce in 2013-2014?

5  A. Yes.

6  Q. How much were you making at Elks again?

7  A. It was 2.10, plus tips, so it was, like, roughly

8 3 to 400.

9  Q. When you were working at Foxy's, how much were

10 you making?

11  A. Ohh. A night?

12  Q. Yes, that -- that's fine.

13  A. On a good night, I could bring in at least 1200.

14  Q. On a bad night?

15  A. Maybe 3, almost 3.

16  Q. If we were to try to figure out what the average

17 was, was it somewhere, like, dead in the middle? Was it

18 closer to the low end? Closer to the high end? Wha- --

19 what would be the average?

20  A. It's closer to the high end.

21  Q. Okay. Somewhere -- are -- are you saying you

22 could make somewhere in, maybe, 7-, $800 a night as an

23 average?

24  A. Yes.

25  Q. And that's in the about six months you were at

**Page 33**

1 Foxy's, right?

2  A. Yes.

3  Q. We will talk more about actually being at Foxy's,

4 so I'm going to skip over it right now.

5       After --

6  A. Okay.

7  Q. After you left Foxy's -- well, scratch that.

8       Before you left Foxy's, you left the -- the

9 Elks Lodge?

10  A. Yes.

11  Q. Why did you leave Elks Lodge?

12  A. I mean, I was kind of making a lot more money at

13 Foxy's, so...

14  Q. So you left to make -- because you could make

15 more money working more nights at Foxy's?

16  A. Yes.

17  Q. After you left Foxy's, wher- -- where did you

18 find your next job?

19  A. I didn't, actually. It took a while for me to

20 find something.

21  Q. Where did you work next?

22  A. Instacart.

23  Q. Instacart.

24  A. Yes.

25  Q. When did you start working at Instacart?



1     A.  This was just November of last year.
2     Q.  November of 2019?
3     A.  Yes.
4     Q.  What is your position at Instacart -- what was
5  your position at Instacart?
6     A.  I just do -- I don't know what they call it.  I
7  shop and deliver.  That's -- I don't know what they call
8  it.  I guess customer service.
9     Q.  Are you still doing that?
10     A.  Yes, from -- from time to time.
11     Q.  What is the pay for that?
12     A.  It's hard to say because it -- it kind of varies
13  from, you know, what people order.  So it's kind of hard
14  to say, like, what you'll make, but roughly, I can make,
15  say, $75 a day.
16     Q.  How lo-- how many hours do you work on one of
17  those days?
18     A.  Put together, maybe six.
19     Q.  So you're making $75 over six hours?
20     A.  Yes.  It's kind of -- it's kind of weird because
21  you actually have to go in the store, shop for the items,
22  and then drop them off.  So it's kind of -- the time --
23  the way the time adds up, like, it doesn't, kind of, make
24  sense, but it's kind of weird how it goes.
25     Q.  Have you looked for other jobs in the serving

1  industry?
2     A.  Oh, yes, of course.
3     Q.  Where have you applied?
4     A.  I've have applied at Bare, The Yellow Rose,
5  Palazio -- there was another one -- XTC, and a few
6  restaurant jobs, but I didn't have any luck there.
7     Q.  When did you -- when did you put in these
8  applications?
9     A.  After I was forced to leave Foxy's.
10     Q.  All right.  Are you talking early of 2019?
11     A.  No, this was around the --
12     Q.  Or 2018?
13     A.  Yes, 2018, early 2018.
14     Q.  Since early 2018, what restaurants have you
15  applied to?
16     A.  I went to Trudy's, Chili's, Baby A's, Pappadeaux,
17  and that's all I can remember right now.
18     Q.  Did you have any interviews with any of these?
19  Do you know why any of them didn't hire you?
20     A.  I have no idea.  I didn't even receive a call
21  back from anyone.
22     Q.  The next couple of questions I'm going to ask,
23  I'm going to be careful how I ask them.  Be careful how
24  you answer them, okay?  Listen to my actual question and
25  answer the question I'm asking.  Okay?

1     A.  Okay.
2     Q.  Did you do anything to prepare for today's
3  deposition?
4     A.  I don't understand.
5     Q.  Right.
6         Did you do anything to prepare?  That would
7  include meeting with anyone, even your attorney -- I'm
8  only asking did you, I'm not asking for any details.  Did
9  you meet -- either virtually or together meet with any --
10  him, look at any documents, anything like that?
11     A.  Of course.
12     Q.  Did you do anything, other than meeting with your
13  attorney or someone from his office, to prepare for your
14  deposition?
15     A.  No.
16     Q.  Did you talk about the deposition with anyone
17  else, like, your daughter or anyone?
18     A.  No.
19     Q.  Did you look at any documents to prepare for the
20  deposition?
21     A.  No.
22     Q.  So the only thing you did is just meet with your
23  attorney, and that's it; is that fair?
24     A.  Yes.
25     Q.  Are you in contact with anyone who works at or

1  has worked at Foxy's?
2     A.  Yes.
3     Q.  Who is that?
4     A.  My -- this girl named Kiara, she used to work
5  there.
6     Q.  Do you know her last name?
7     A.  Smith.
8     Q.  Do you have her phone number?
9     A.  Yes.
10     Q.  Is that how you communicate?
11     A.  Yes.
12     Q.  Okay.
13         MR. McKAY:  I don't know if we already have
14  that one, Kell.  If you'll just check and make sure we --
15  we have it.
16         MR. SIMON:  Yeah.
17         MR. McKAY:  We probably do.  I don't want to
18  diverge.
19  BY MR. McKAY:
20     Q.  But when was the last time you talked to her?
21     A.  About two weeks ago.
22     Q.  Have you talked to her about this lawsuit at all?
23     A.  No, not lately.
24     Q.  Has she -- what I want to make sure:  Has she
25  said anything about any alleged discrimination she



1  suffered at Foxy's or anything like that?
2      A.   Yes.
3      Q.   What has she told you?
4      A.   I don't know if I'm able to discuss that.
5      Q.   You are, or your attorney would tell me you --
6  would tell you otherwise.
7      A.   Oh, okay.  Well, she -- basically, the same
8  thing.  I mean, I had given her my attorney's information.
9  Of course, she had some personal things that was going on,
10  but we're -- along the same lines of what my complaints
11  are.
12      Q.   Do you know any specifics of what her -- her
13  allegations were?
14      A.   It's the same.  I mean, just use of the "N" word,
15  calling us stupid, making us do things, like, clean and --
16  and -- she worded it as treating us like slaves.  I don't
17  -- I don't like to say that, but I mean, that's -- that's
18  basically what it felt like.
19      Q.   Anyone else that you're in contact with or have
20  been in contact with that worked or works at Foxy's?
21      A.   I would see people, but I don't -- I'm not in
22  contact with them like that.
23      Q.   You don't have a --
24      A.   And this girl, Lauren, I'm -- I keep in contact
25  with her, but I don't talk to her as much as I talk to

1  Kiara.
2      Q.   Lauren, what's -- do you know Lauren's last name?
3      A.   Yockey.
4      Q.   Do you have her phone number as well?
5      A.   I have her old number.  I don't know -- I don't
6  know if she still has that same number.
7      Q.   Understood.
8            Has she -- have you talked to her about any
9  of your complaints, or has she had any complaints about
10  alleged discrimination at Foxy's?
11      A.   Well, she is Caucasian, so she -- she doesn't
12  have any complaints, but she knows, you know, about what
13  was going on while -- while I was there, so...
14      Q.   All right.  Anyone else?
15      A.   No.
16      Q.   Have you ever been married?
17      A.   Yes.
18      Q.   Are you currently married?
19      A.   No.
20      Q.   Who wa-- what was your -- the name of your
21  husband, and when did your marriage end?
22      A.   My marriage ended in 2011, and his name was Tommy
23  Lee Cathey.
24      Q.   And we already discussed you only have the one --
25  the one child; is that correct?

1      A.   Yes.
2      Q.   Other than the -- the job you currently have,
3  have you had any other work or any -- or received payment
4  or sums of money from any other source since you left
5  Foxy's?
6      A.   No, just SSI.  That's it.
7      Q.   Are you still on SSI?
8      A.   Yes.  They knew about Foxy's.
9      Q.   Do you still receive the same amount or, you
10  know, more or less the same amount you've been receiving
11  since 2010?
12      A.   Yeah.  So it's a little lower, but it's roughly
13  the same amount.  It's just a few dollars lower.
14      Q.   Okay.  I think we're just about to enter Foxy's.
15  Let me go ahead -- we're -- we're not quite at an hour,
16  but because this is probably going to be one of the longer
17  topics, let --
18      A.   Okay.
19      Q.   -- let's go ahead and take a break now, take five
20  minutes, whatever you need, and then we'll start talking
21  about, you know, when you went to Foxy's.
22      A.   Okay.
23            MR. McKAY:  So I'm just going to turn my
24  stuff off.  I'll come back in five minutes or so.
25            THE WITNESS:  Okay.

1            (Brief recess taken.)
2            THE VIDEOGRAPHER:  We are back on the
3  record.  The time is approximately 10:59 a.m.
4            Counsel, you may proceed.
5  BY MR. McKAY:
6      Q.   Ms. Carter, how did you learn about an
7  opportunity at Foxy's?
8      A.   Through a friend of mine; his name is Sleepy.  I
9  cannot tell you his real name.  I don't know it.
10      Q.   How did you know him?
11      A.   I met him through a mutual friend of ours named
12  Michael Blaylark [phonetic].
13      Q.   What -- what did you learn from Sleepy?  How did
14  -- how did you learn about the opportunity?  What do --
15  what do you remember of the conversation?
16      A.   Sleepy, he was DJ'ing there.  He had just got a
17  -- a job DJ'ing there.  He was, like:  Hey, you know, I
18  know this guy that works there, and, you know, they need a
19  couple waitresses.  And I was like:  Oh, okay.  Well, tell
20  them I'll stop by.
21            And he gave me his number, and I actually
22  called him -- the guy's name was Kevin that worked at
23  Foxy's.  And I called him, he told me to come in, fill out
24  the paperwork, and basically, I was hired.
25      Q.   Is Kevin the person who was your manager?

**Page 42**

1      A.  I can't really say he was my manager.  I think he
2  was just a -- a manager that was there at the time that
3  was, like, hiring people.  But I can't say he was, like,
4  specifically my manager.
5      Q.  Was there a waitress manager at Foxy's, or was
6  there -- was that not a specific -- you know, was there
7  not a specific manager over the wait staff?
8      A.  At the time, there wasn't a specific manager over
9  the wait staff.  It was just a number of managers there.
10  If you needed to speak to them, you just grabbed somebody
11  and -- and talked to them.
12      Q.  What did -- was Kevin there the entire time you
13  were at Foxy's?
14      A.  No.
15      Q.  Did he leave?
16      A.  Yes.
17      Q.  Do you know when or -- and/or why he left?
18      A.  I can't remember exactly when, and I don't know
19  why.  I -- I don't want to say this, 'cause I don't know
20  if it's true, but I heard he was let go at Foxy's, and he
21  was able to work at another establishment that's
22  associated with Foxy's.
23      Q.  What you heard is basically he was moved clubs?
24      A.  Yes.
25      Q.  Okay.  Do you remember when that was?

**Page 43**

1      A.  No, I don't.
2      Q.  Who worked with -- well, you were hired by -- by
3  Ke- -- by Kevin; is that correct?
4      A.  Yes.
5      Q.  Do you remember -- you don't remember off the top
6  of your head what day that was, correct?
7      A.  No.
8      Q.  You just know --
9      A.  Yeah, no, I don't.
10      Q.  Just sometime in the summer of 2017?
11      A.  Yes.
12      Q.  When you were hired at Foxy's, tell me about the
13  training you received.  Who gave it to you and what --
14  what training did you receive?
15      A.  It was just basic training of how, you know,
16  things worked.  I got training from Erica, and it was
17  another girl.  I forgot her name.  I -- I forgot her name.
18  I'm horrible with names.  I forgot her name.
19      Q.  Was the training done by the wait staff, then,
20  not by a manager?
21      A.  Yes, it was by wait staff.
22      Q.  Okay.  What was the training -- what do you
23  remember from the training?  Just give me the overview of
24  what you remember.
25      A.  I remember just, you know, basically saying how

**Page 44**

1  to handle customers and just the duties that needed to be
2  done at the end of the night.  That was, you know,
3  basically self-explanatory, you know, what to do.
4      Q.  What are some of those things?  Can you give me
5  any of the specifics?
6      A.  Of which part?
7      Q.  Both.
8      A.  Of how to handle customers?
9      Q.  Yes.
10      A.  Oh, well, the -- handle customers, of course,
11  when a customer comes in, you seat them, or sometimes if
12  they want to go to the VIP, you know, you say:  Hey, you
13  know, there's a VIP section.  It costs X, Y and Z, you
14  know, to get in VIP.  And you ask them, you know:  Do
15  y'all want a ice chest?  Sometimes they bring in, you
16  know, beer and things like that, and ask them if they want
17  sodas, you know, mixers.  And that's basically it.  And go
18  check on them, you know, throughout the night.
19          And on the other end, you know, at the end
20  of the night, of course, we were just responsible for
21  picking up what was on the tables.  That was it.  Making
22  sure the tables were clean.  That -- that's it.
23      Q.  Did you have any training about the -- the kind
24  of the operations of the actual floor, the -- and -- and
25  the wait staff during service hours?

**Page 45**

1      A.  Not really.  It was just people come in, and if
2  you're available to -- to wait on them, then that's what
3  you did.
4      Q.  Ms. Carter, I don't know if you can still hear
5  me.  Your -- your -- your screen just went black, and I'm
6  getting the red bars that say you don't have service.
7          So can you hear me?
8      A.  Yes.
9      Q.  Okay.
10      A.  Can you not see me?
11      Q.  I cannot currently see you.
12          THE VIDEOGRAPHER:  Yes.  Counsel, I have
13  lost her on video as well.
14          THE WITNESS:  Oh.  Oh, my God.  I can see
15  myself.  I don't know what --
16          MR. McKAY:  No, it -- it happens.  It's
17  actually not a big deal at all.  What I'll ask you to do
18  is -- the thing that often fixes it -- if you would just
19  hit the "Refresh" button on your browser, and I'll do the
20  same.
21          THE WITNESS:  Okay.  Okay.
22          (Pause in proceedings.)
23          THE VIDEOGRAPHER:  Okay.  I have her back.
24          MR. McKAY:  I do too.
25          THE WITNESS:  Okay.  I can see y'all too.



1     THE VIDEOGRAPHER: And, Counsel, I never
2  went off the record, so whenever you are ready.
3     MR. McKAY: Okay.
4  BY MR. McKAY:
5     Q. Okay. I just needed a second myself.
6     All right. So you didn't really get any
7  training is your testimony regarding, kind of, operations
8  of how the floor worked?
9     A. No, I didn't.
10    Q. Did you ever talk to anyone about how, you know,
11 tables -- who handled what tables, things like that?
12    A. At the beginning, there wasn't any assigned
13 tables or specific areas that we worked. It's just if you
14 were available when a customer came in, then you handled
15 that customer.
16    Q. And -- and that's exactly what I -- what I was
17 trying to understand because that is my understanding.
18 I'll -- I'll represent to you that's my understanding.
19       The way it generally worked is: Customers
20 were served on a first -- first server to get to them and
21 to try to serve them, they -- they served them. That's
22 it.
23       Is that -- is that how it worked?
24    A. Yes. Yes, when I first started, that's how it
25 worked.

1     Q. Are you saying that changed?
2     A. Yes.
3     Q. When do you allege that changed?
4     A. Of course, it was after I made my complaint it
5  changed.
6     Q. In what way? Who told you it changed? How did
7  it change?
8     A. I saw it change.
9     Q. But how? In what way?
10    A. Customers would come in, and certain managers
11 would already have a waitress assigned to them.
12    Q. What do you mean by that?
13    A. Well, when the customer comes in, the waitress
14 would already be in the section. The manager would say:
15 Hey, I'm bringing, you know, some customers in that, you
16 know, is willing to spend money, and there would already
17 be a waitress assigned to that table or to those people.
18    Q. What do -- what do mean by "assigned," though?
19 I'm -- I'm not understanding that.
20    A. Well, they started assigning certain waitresses
21 to people that they knew would come in and spend money.
22    Q. But I -- I understand that --
23    A. They would pick certain --
24    Q. Go ahead.
25    A. They would pick certain waitresses to say: Hey,

1  you know, I know these people, I know they're going to
2  spend money, so you take care of them. So nobody else
3  would be able to get -- to take care of those customers.
4     Q. So this was for regulars; is that -- or -- or,
5  you know, I don't know if we want to call them "regulars,"
6  but people who are -- specifically people who had come
7  into the club previous times or frequently; is that true?
8     A. Well, who -- it's -- yes. It could be that or
9  who they assumed had money or who they assumed would spend
10 money.
11    Q. When do you allege this began?
12    A. I know it happened -- it started happening after
13 my complaint, so it was maybe a few months after I
14 started.
15    Q. Do you -- what specific managers do you allege
16 where doing this?
17    A. I know for a fact Dave and Taylor. I know -- I
18 know they were doing it.
19    Q. Did you go to the general manager and talk to him
20 about this?
21    A. I can't remember if I mentioned that. I don't
22 want to say "yes" or "no." I can't remember if I
23 mentioned that part of it.
24    Q. Did you ever go to him to say: Hey, I'm
25 concerned this is retaliation, or something like that; I

1  want you to fix it; I want you to do something; I need you
2  to get involved?
3     A. Not the general manger, but I spoke to Dan. I
4  mentioned something about it to him --
5     Q. Who is Dan?
6     A. -- the night that we -- he was one of the
7  managers.
8     Q. So you mentioned it to him on -- on your last
9  night?
10    A. Yes.
11    Q. And I'm getting just a little bit of a, kind of,
12 delay in the video, so it makes it -- you're good; don't
13 worry about it; nothing you could do anyway. But it -- it
14 makes it sometimes where I think you're done because I see
15 a body movement and then a different audio.
16       So if I get -- if I ask you questions or ask
17 you to resay something, that might be why. Okay?
18    A. Okay.
19    Q. I just like to try to keep you as advised as to
20 what we're doing and why we're doing it when I'm -- you
21 know, the technical issues that we are having. They're --
22 it's not a big deal, but they're -- I -- I probably will
23 have to ask you to restate things occasionally.
24    A. Okay.
25    Q. And I just lost you on the video.



1      A.  Oh, well...

2      Q.  It's fine.  It's just occa- -- it's just --

3      A.  It's weird.

4      Q.  All it is -- so what it is, is you -- the audio

5  only takes so much bandwidth and the video takes so much

6  more.  And so when your connection drops below, you know,

7  a certain amount of bandwidth, it just automatically cuts

8  of the video so that the audio stays on.  That's -- that's

9  all it's doing.

10     A.  Oh, okay.

11     Q.  So if you will just try to refresh, we're -- we

12  may just -- you know, when the video cuts out, we may just

13  keep going, as long as you can hear me and I can hear you.

14  I --

15     A.  Okay.

16     Q.  I'd rather do that.  But go ahead and refresh

17  really quickly just to see if it fixes it.

18     A.  (Witness complies.)

19          THE VIDEOGRAPHER:  And, Counsel, that time I

20  did not lose her.

21          MR. McKAY:  Okay.

22          I have you back.

23          THE WITNESS:  I can see you guys.

24          MR. McKAY:  Okay.

25          THE WITNESS:  Okay.

1          MR. McKAY:  And we're still on?

2          THE VIDEOGRAPHER:  Yes.

3          MR. McKAY:  Then we'll just keep going.

4  BY MR. McKAY:

5      Q.  So you -- the only time you can specifically

6  remember bringing up the assignment of tables to any of

7  the other managers is on the last night you were working

8  there; is that fair?

9      A.  Yes.

10     Q.  Okay.  Then let me -- I -- I'm trying to do our

11  best to keep it a little bit chronological, so I'm going

12  to step back a little bit.  Okay?

13     A.  Okay.

14     Q.  So when you first start, the way it works at all

15  tables is, the first waitress to get to the table serves

16  the table; is that correct?

17     A.  Correct.

18     Q.  Now, is that true -- does that mean they could

19  serve that round, or is only that waitress able to serve

20  that table from then on?

21     A.  It's -- it's kind of hard -- a person can

22  initially, you know, see the table and serve them and

23  someone can tap you from another table and say:  Can you

24  grab me this?  You can't say no because I'm, you know,

25  working this table.

1          So you may start out at a table, and then

2  somebody else may end up bringing them something else out

3  there while they're doing something else.  So it was kind

4  of hard for -- and that's just anywhere -- for --

5      Q.  Right.

6      A.  -- you know, one person to just --

7      Q.  Right.

8      A.  -- you know, deal with that -- with that certain

9  table.

10          If it's not crowded, usually, it'll -- you

11  know, you'll, you know, stay with that person or whatever.

12  And then when other people, you know, come in, you'll just

13  keep going with the flow.

14     Q.  And -- and that -- what -- what I'm trying to

15  understand -- I think I understand, but let me make sure I

16  do.

17          It -- it doesn't sound -- you weren't

18  instructed by any of the management as to how you would

19  specifically deal with a table.  In other words, you

20  weren't ever told by management:  Well, if there's ever

21  another server who has been there, you can't go over there

22  to serve them or anything like that, right?

23     A.  No- -- no, the managers didn't tell me that.

24  Some of the waitresses did.  But the managers never told

25  me.

1      Q.  Okay.  So the -- and that's kind of what I was

2  trying to understand.

3          The way -- as far as what you heard from the

4  managers -- well, essentially, from the managers you heard

5  nothing; it was just a free for all, whatever was going

6  on.  They didn't tell you one way or another on the

7  tables; is that fair?

8      A.  Yes, that's fair.

9      Q.  But the waitresses kind of -- there were kind

10  of waitress -- I don't even want to say "agreements," but

11  kind of, they told you what they believed the correct way

12  to do it was, and that was, essentially, if someone else

13  was already at the table, it was their table as much as

14  possible; is that fair?

15     A.  Yes.

16     Q.  And I say "as much as possible" because if a

17  customer taps you on the shoulder, you're going to help

18  them, or if a customer says, "Can you help me," you're

19  going to help them, and then you might help them more and

20  more depending on what goes on throughout the night?

21     A.  Yes.

22     Q.  And a waitress may say:  Hey, I need some help

23  with this table, or, Hey, can you check this table for me?

24  You-all would do that occasionally as well; is that fair?

25     A.  Ye- -- yes.



1  Q.  When you started working at Foxy's, how many
2  waitresses were there?
3  A.  Five.  That I knew of, five.
4  Q.  And you -- you knew of a total of five?
5  A.  Yes.
6  Q.  How many -- how many days per week were you
7  working at Foxy's?
8  A.  When I first started, three.
9  Q.  Did that change as time went on?
10  A.  Yes.
11  Q.  How many days a week were you working the most --
12  when you were working the most at Foxy's?
13  A.  Five.
14  Q.  How long -- how -- how -- for what period of time
15  did you work five days at Foxy's?
16  A.  I worked five days for about a month and a half.
17  Q.  When was that?
18  A.  That was maybe, like, three weeks after I
19  started.  Like, I was -- I was -- I'm a good waitress, so
20  they knew I could, like, handle -- I could really handle
21  the club by myself, and they knew that.  So they were
22  like:  Oh, we need you on these days, so yeah.
23  Q.  After that month and a half, how many days a week
24  were you working?
25  A.  The first half or after the five days when it

1  went down?
2  Q.  Exactly.  When it went down.  When it went down.
3  A.  Well, they took me down to three.
4  Q.  Do you know why?
5  A.  What I was told, because it was something I
6  posted on Facebook, and I didn't reach out to them about
7  my concerns sooner.  That's what I was told.
8  Q.  And you were taken down to -- you are allegation
9  is you were taken down to three days a week?
10  A.  Yes.
11  Q.  How -- did you stay working three days a week for
12  the rest of your time at Foxy's?
13  A.  Yes -- yes and no.
14  Q.  What's the "no" part?
15  A.  I had -- I had Mondays, and I was on the schedule
16  to work.  When I showed up, there was someone else there.
17  I was still able to work, but I wasn't doing the job that
18  I was assigned to do, so I still went in to work Mondays.
19  Q.  What do you mean by that?
20  A.  What do you mean, like a job assignment?
21  Q.  Yes.
22  A.  Well, on Mondays, I was supposed to work the bar,
23  and I was scheduled to work.  When I went in, there was
24  somebody else back there, and I'm like:  Okay.  And I was
25  told:  Okay, you can work the floor.

1  But on Mondays, as you can imagine, it's not
2  like regular, normal club, so there wasn't really any
3  money to make on the floor, but I still tried it, so...
4  Q.  I'm sorry.  Could you repeat that?  Can you
5  repeat what --
6  A.  Which part?
7  Q.  -- you were doing -- what the issue was.
8  A.  I'm sorry.  The issue was I was scheduled to work
9  the bar on Mondays --
10  Q.  Okay.
11  A.  -- and when I went in, there was somewhere else
12  there, and I was told I could work the floor, which the
13  floor really doesn't have much money on Mondays, but I
14  tried it, though.
15  Q.  When you -- when you say "work the bar," do you
16  mean as a bartender or serving in the bar area?
17  A.  It's serving in the bar area, but you still get
18  4.25 for working behind the bar regardless of whether you
19  have customers or not.  But if you're on the floor, you're
20  kind of the at mercy of tips.  You get what I'm saying?
21  Like, that's where you make the majority of your money, so
22  -- so I wanted the bar because I knew I was at least
23  making something from the bar.
24  Q.  When you say "4.25," do you mean 4.25 an hour?
25  A.  Yes.

1  Q.  Okay.  So behind the bar, you would be making
2  about $2 more an hour, plus whatever tips you get; whereas
3  the floor, it's going to be more variable.  It could be a
4  lot more if someone some -- came in and was really
5  spending, but it also could be a lot less if the floor is
6  empty?
7  A.  Yes.
8  Q.  Was this all throughout on Mondays after you went
9  down from five days, or was it only one Monday or a couple
10  Mondays?  I didn't understand that for certain.
11  A.  It was throughout Mondays.
12  Q.  Okay.  How did you -- why did you believe you
13  were scheduled to be on the bar and not on the floor
14  originally?
15  A.  I had always been on the bar.
16  Q.  Okay.  So --
17  A.  I was scheduled on the bar.
18  Q.  You were scheduled on the bar?
19  A.  Yes.
20  Q.  Like, was there a written scheduled that assigned
21  out where the different servers would be?
22  A.  Yes.
23  Q.  Okay.  And it had you listed as the server in the
24  bar area, correct?
25  A.  Yes.



1    Q.   Do you remember exactly when --
2    A.   Yes.
3    Q.   -- this was?
4    A.   It was around the end of November, beginning of
5  December.
6    Q.   Okay.  So this -- this occurred right near the
7  end?
8    A.   Yes.
9    Q.   Do you remember how many weeks you were at Foxy's
10 after this started?
11   A.   After what started?  When they took me down from
12 the bar?
13   Q.   Yeah.  Whatever -- whatever this -- the change in
14 your Mondays, was that -- were you there about two or
15 three more weeks after that?
16   A.   Yes.  It was -- it was about almost three weeks.
17   Q.   So for three Mondays, then, is it fair to say
18 that you thought you would be on the bar, but you were on
19 the floor instead?
20   A.   Yes.
21   Q.   Okay.  Are you able to quantify what the
22 difference in money you made those nights is, though?
23   A.   Yes.
24   Q.   And how would you do that?
25   A.   Of course I would -- if I was at the bar, I would

1  be making -- I'm sorry -- 4.25, plus, of course, the
2  little tips.  On the floor, I -- we would probably make,
3  what, 25, 30 bucks.  It's a Monday, like, unless you have
4  people, you know, on a whim coming in there, you know,
5  wanting to spend money on Mondays, it's, like, Mondays was
6  a really slow night.  So the bar, you know, of course, it
7  gave me a opportunity to make something because I was
8  getting 4.25.
9    Q.   Understood.
10   A.   So the bar -- I was getting tips.
11        I'm sorry.  Go ahead.
12   Q.   Sorry if I cut you off.  The video looked like
13 you were done, and that's -- that's what I mean when I was
14 trying to highlight that earlier.  I'm not trying to cut
15 you off.  It looks like you're done, it pauses for me, and
16 so I start talking.
17   A.   Okay.
18   Q.   The difference -- is the difference in money,
19 though, then, on those Monday night probably -- how long
20 was the shift?  Six hours?  Eight hours?
21   A.   It was usually six hours.
22   Q.   So that's a $12 differential in just straight
23 pay, correct?
24   A.   Yes.
25   Q.   The tips, would those be about the same because

1  it was empty either way?
2    A.   It de- -- at the bar, it -- you could make more
3  tips at the bar either way, because it's BYOB, so of
4  course you can't bring in things like juice and soda, so
5  if you have two people in there and they have a bottle, of
6  course they are going to come up there and -- and buy
7  something to mix with.  You are going to get tipped at
8  the bar before you get tipped on the floor.
9         Does that make sense?
10   Q.   Yes and no.
11        I mean, they -- also, if they sit down,
12 though, you can come to them and say:  You've got a
13 bottle.  What of mixers do you want?  That -- I mean, that
14 was your job as a waitress on the floor, right?
15   A.   Yeah.  But if it's -- if it's not crowded, like,
16 they would just walk up to the bar and for some strange
17 reason, you know, if it's not people in there, they just
18 walk up to the bar.  I don't know, but if it's a lot of
19 people in there, it helps cause people sit down to secure
20 their seat, you know, or the table.  If it's -- there's
21 nobody in there, you know, you can get up and go to the
22 bar, get what you need and, you know, kind of sit down.
23   Q.   Management never told you, though, that you would
24 always be on the bar or the floor shift either way,
25 correct?

1    A.   Yeah, it was a set shift.  When they make a
2  schedule, it was set, like, bar, floor.
3    Q.   Right.
4         What I'm saying is that was for -- that's
5  done on a weekly basis, though, correct?
6    A.   Yes.
7    Q.   On those -- those -- and the video went off for
8  me, but I'm going to keep going as long as you can hear
9  me.
10   A.   Okay.
11   Q.   For -- for the two or three weeks that we are
12 talking about here on the Mondays, are you saying that the
13 schedules on all three of those weeks said you would be on
14 the bar on Mondays?
15   A.   Yes.  The schedule is set.  They try to do it for
16 two weeks out.  So if you, you know, needed some time off
17 or whatsoever, they did that so you can, you know, have
18 time to, you know, put in if you need a day off or
19 something like that.  That was the reason why they set the
20 schedule in order for people to, you know, be able to take
21 off, or I need to take off, and gives them time to cover
22 the shift.  So it was a set schedule for two weeks out.
23   Q.   Who was it that was covering the bar on those
24 evenings, on those Mondays when you were not on the bar?
25   A.   When I tell you it was some girl I had never

1 seen, I couldn't even tell you who she was.
2    Q.  Okay.  So she was new to you, correct?
3    A.  Yes.
4    Q.  Did you go up to the management and ask why she
5 was there instead of you?
6    A.  Yes.  I was like:  Hey, I'm scheduled to work the
7 bar, like, I even confirmed on the schedule that I'm on
8 the bar.  Like, what's going on?  And I really didn't get
9 a clear answer.
10    Q.  Who did you talk to?
11    A.  I talked to Dave.
12    Q.  And you said Dave.  What did Dave say?
13    A.  I really didn't get a clear answer.
14    Q.  What did he say to the best of your recollection,
15 though?
16    A.  Let me check on that.  I'll be -- I'll be back.
17 I'll let you know something in a minute.
18    Q.  And he never answered?
19    A.  Yeah, I never -- after I made my complaint, I
20 could never really get clear answers.  It was like no one
21 wanted to speak to me.
22    Q.  But as far as you know, then, this was a new
23 hire?
24    A.  Yes, as far as I know.  Yes.
25    Q.  So do you -- did you -- you didn't go up to

1 say -- the general manager and say:  Hey, why am I on a
2 different shift?  Or:  Did you hire someone new, and is
3 that why you're changing my shift?  And can we talk about
4 it?
5    A.  No, the general manager wasn't there at the time.
6 But I did ask --
7    Q.  On Mondays?
8    A.  Yeah.  At the time, quote/unquote, given us --
9 some girls, a specific manager to talk to, and Dave was --
10 (inaudible) -- that's why I talked to him, but I never
11 really got clear answers from him.
12    Q.  Did you go back and talk to him on the next week
13 when it happened again?
14    A.  At that point, I was just, like:  Okay.  This is
15 what it is, I'll see -- I'm not trying to talk to somebody
16 that doesn't want to talk.
17    Q.  On any event, though, this was just -- all of
18 what we're talking about is just on your Monday shifts,
19 right?
20    A.  Right.
21    Q.  Those were not big money-making shifts no matter
22 what, correct?
23    A.  It can depend, because when I first started on a
24 Monday, I made $300.  So it can just -- you can't really
25 say -- like, it's kind of hard to say:  Hey, you know,

1 it's going to be crowded this Monday, and it's not going
2 to be all Mondays.  The majority of Mondays it's not
3 crowded, but you may get some people that's from out of
4 town, it's, like, hey, you know, you -- you just never
5 know.
6    Q.  What was your average take home when you were
7 behind -- you were working the bar area on Monday, that --
8 not -- not the most, but the average?
9    A.  The average, I would average about almost 2.
10    Q.  And on the floor, you say you would only make 50
11 or so?
12    A.  Yeah, roughly about 50.
13    Q.  But that would also depend on who came in, and if
14 you happened to have a table actually sit down, and you
15 were able to get to them before they went to the bar, you
16 could make more?
17    A.  Yes.
18    Q.  Were there just two servers working on Mondays?
19    A.  It would usually just be the bar person and one
20 waitress, sometimes two.
21    Q.  So most of the time, or at least some of the
22 time, it would just be one person in the bar, one person
23 on the floor, but sometimes there would be a second floor
24 person?
25    A.  Yes.

1    Q.  Did you -- did you work weekends?
2    A.  Yes.
3    Q.  On weekends, how many servers were working?
4    A.  Ooh, at least six.
5    Q.  And when you talked, I think you said when you
6 first started there were five servers.
7          How many -- did -- did that number increase
8 as time went on?
9    A.  Yes.
10    Q.  By the time you left, how many servers were
11 working at Foxy's?
12    A.  Seven.
13    Q.  And that's -- that makes sense.  Because when you
14 were first told about the place, the DJ you knew said:
15 Hey, they are looking for more people; they are looking to
16 hire people; is that correct?
17    A.  Yes.
18    Q.  Did any of the servers leave Foxy's while you
19 were there?
20    A.  Yes.
21    Q.  Who left Foxy's while you were there?
22    A.  It was a server named Lucia.  She was actually
23 fired.
24    Q.  What was she fired for; do you know?
25    A.  She was assaulted by a customer, a guy customer,

1  and she defended herself, and the management -- I guess
2  they were upset about the altercation and they fired her.
3      Q.  When you say "assaulted," do you mean touched or
4  actually, like, attacked?
5      A.  He pushed her.
6      Q.  Okay.  He pushed her, and then what did she do?
7  Were -- were you there?
8      A.  Yes.
9      Q.  Did you see it?
10     A.  Yes.
11     Q.  Okay.  So what did you see?
12     A.  He -- she was walking by, and he pushed her,
13 like, I don't know if she was -- it was very crowded.  I
14 guess he felt like she was, like, too close to him.  She
15 was just walking by him, or she was coming to actually
16 hand me a cooler that -- a empty cooler that she had in
17 her hand, and he kind of pushed her and her neck -- turned
18 around and kind of, you know, slinged, like, that's a man,
19 you know, put his hands on a woman.  So in our mind, she
20 was just, like, I'm going to defend myself.
21     Q.  Okay.  So is it fair to say, then, from your own
22 perspective, someone pushed her, did not strike her, but
23 pushed her, and she responded by striking that person?
24     A.  Yes.
25     Q.  Okay.  So they fired her for that?

1      A.  Yes.
2      Q.  Anyone else leave Foxy's -- any other servers
3  leave Foxy's while you were there?
4      A.  No, not while I was there.
5      Q.  The -- the -- the seven-ish servers, and probably
6  eight given that one had left, can you give me the names
7  of each of those eight servers and their race?
8      A.  Ashley, Caucasian; Erica, Caucasian; Lauren,
9  Caucasian; Kiara, African American; Janelle, African
10 American; Tatiana, African American.  It was another girl
11 there -- I forgot her name -- she was Puerto Rican, I
12 think, you know, and Lucia was Spanish.
13     Q.  Who was it that was working behind the bar on
14 Mondays?
15     A.  The new -- the new person?
16     Q.  Yes.
17     A.  I don't -- I don't know her name, but she was a
18 Caucasian.
19     Q.  You never -- you never knew her name?
20     A.  No.
21     Q.  Was she fired -- was she hired essentially to
22 replace the fired server?
23     A.  No.  This was -- yeah, this was a while after
24 Lucia was -- was let go.
25     Q.  I know we talked about it a little bit, but I'd

1  like to go back your allegation that at some point
2  managers started kind of directing certain tables to
3  certain waitresses.
4            When did that happen?
5      A.  That happened -- let's see -- late September,
6  early November.  I don't want to get the times mixed up.
7      Q.  If --
8      A.  Around there.
9      Q.  September or October?
10     A.  September -- yeah, September, October, around
11 there.
12     Q.  What exactly did you see happen?  Like, what
13 exactly -- how exactly did it work?
14     A.  I would notice that -- okay.  The way the door
15 is, it's like a wall, and we can't see them until they
16 come from around, like a little -- it's like a little wall
17 part, and once they get, like, to the end of it, that's
18 when we can actually see them.  On the other side, it's,
19 like, tables right there, so you know, one day I'm like:
20 Okay.  I'm not getting any customers.  Like, what's going
21 on?
22            So I stepped on the other side because I
23 actually saw somebody, you know, and I'm standing over
24 there, and I see the manager, Dave, like, talking to the
25 Caucasian waitresses and he was doing like -- doing like

1  hand motions because some people are at the door.  And
2  when they walked up, you know, he was talking to them,
3  telling them -- you know, I guess they was saying:  Hey,
4  this is going to be your waitress, X, Y, Z.  And she
5  walked them inside the club.  And I'm like:  Okay.  I
6  didn't know that -- I didn't know these people.  Why
7  didn't he -- you know, table.  She had already had, like,
8  six tables.  And she actually told me:  These are my
9  people.  I got them.  Like, anything they need, I got
10 them.
11           And I've even went to the manager's table
12 and said:  Hey, you know, I don't have any tables.  Oh,
13 well this -- it's their customers, there is nothing --
14 nothing I can do about that.
15     Q.  Okay.  Now, let me unpack that a little bit.
16           One thing -- he was already talking to this
17 server when these people came in the door?
18     A.  Yes.
19     Q.  Was it normal for the managers to interact with
20 customers when they walked in the door?
21     A.  No, not like -- no.
22     Q.  Are you --
23     A.  Unless someone asked for a manager.
24     Q.  I'm sorry.  It cut out a little bit.
25     A.  Unless someone asked for a manager, I mean,

1  there's no need to -- to -- speak to a manager.
2      Q.  Right.  But wasn't it your experience -- didn't
3  you see managers, especially on regular customers, when --
4  when they would come in, managers would go up say hello to
5  them and -- and talk to them and -- and welcome them into
6  the club?
7      A.  I mean, they would speak:  Hey, how you doing?
8  And go on about their business, but I mean, assigning a
9  waitress to certain customers, no.
10     Q.  Well, did you actually hear whatever was said
11  during the conversation?
12     A.  No, I don't hear it, no.
13     Q.  So all you know, though, is that he said -- waved
14  customers over, talked to them while a waitress was
15  standing there, and then she left with those customers;
16  that's it, right?
17     A.  Yes, yes.
18     Q.  You don't know what the conversation was, right?
19     A.  No.
20     Q.  You don't know if -- if the customers, while
21  standing there talking to the manager, said:  Hey, we'd
22  like to have this person serve us?
23     A.  No, I don't know that.
24     Q.  How -- when else do you remember it occurring?
25  Can you give me any other specific examples of this

1  occurring?
2      A.  Yes.  There was a rapper, a local rapper, that
3  came into the club, and I was told to go do something,
4  something random, and he was escorted up to VIP.  I tried
5  to go up to the VIP; there were two security guards there.
6  They stood there, and I'm like -- you know, I'm going to
7  go over here to see, you know, if he needs something.  Oh,
8  we can't let you through.  Okay.
9          So two of the Caucasian waitresses walked
10  up.  They didn't even say anything.  I'm standing close
11  enough to -- to -- they didn't say anything to the
12  security guard, and he stepped aside and let them walk
13  through.
14     Q.  Let me -- let me try to understand this a little
15  bit, and I think I know what you're talking about.
16          Did this happen on the last night you were
17  there?
18     A.  Yes.
19     Q.  Okay.  Because this was in your charge,
20  generally.  So I wanted to make sure that we were talking
21  about the same time.
22          When this occurred, those two -- you're
23  saying security guards.  Do you know if they came in with
24  that rapper?
25     A.  No.  They didn't.  We had -- we -- well, Foxy's

1  had -- I don't know if they were contract.  I'm pretty
2  sure they were.  It was contract security guards they had
3  standing outside.
4      Q.  And two of them came inside?
5      A.  Yes.
6      Q.  Okay.  So tho- -- those two outside security
7  guards came in with this rapper, and then stood at the
8  entrance to VIP and kept you out?
9      A.  Yes.
10     Q.  Okay.  You don't know their names, though, right?
11     A.  No, I don't know the security guards names, but I
12  actually know the rapper personally.
13     Q.  What -- what's his name?
14     A.  His name is Wesley Weston.  He goes by Little
15  Flip.
16     Q.  Have you talked to him about that night?
17     A.  I haven't talked to him about that -- the night.
18  Of course, I mentioned it, but we haven't talked in
19  detail, but when we made eye contact, he was like -- he
20  threw his hands up like, and I just shook my head, and he
21  was just -- he just shook his head like:  What's going on?
22     Q.  Did you go talk to any of the managers about
23  that?
24     A.  Oh, yes, I did.
25     Q.  Who?

1      A.  I talked to Dan.
2      Q.  To Dan?
3      A.  Dan, yes.
4      Q.  What did Dan -- what did you tell Dan?
5      A.  I told Dan, you know, I'm -- I'm not feeling
6  this.  You know, I'm just not feeling this.  I'm -- I'm
7  ready to go, you know, because I'm being kept from waiting
8  on -- on customers, and he basically told me to go to the
9  office, fill out stating that I'm abandoning my job.
10     Q.  Okay.  You didn't specifically tell him about
11  what happened in the VIP, then; you just -- you generally
12  told him you're not feeling like you're being given an
13  opportunity.  Is that fair?
14     A.  That's fair, yes.
15     Q.  Okay.  Then -- then you go into the office, and
16  he says:  If you leave your -- and this is in your charge,
17  so I'm going to walk you through it from what I read from
18  the charge.  If I'm wrong tell me.
19          That -- that you go into the office and say:
20  I have -- you know, I want to leave.  He says if you do,
21  it'll be job abandonment, and you say:  But I'm not
22  abandoning my job.  Is that more or less it?
23     A.  Yes.
24     Q.  Then at that point, it says:  Well, if you leave
25  it will still be a write-up; is that correct?

1    A.  Yes.
2    Q.  You then read -- resigned and said:  I quit?
3    A.  Yes.
4    Q.  Had you just left and not told him you quit, you
5  would have only gotten a written warning; you would not
6  have been terminated.  That was your understanding,
7  correct?
8    A.  I -- yeah, from my understanding, I -- yes.
9    Q.  You chose to quit at that point?
10    A.  Oh, yes.
11    Q.  You did not go to talk to the general manager or
12  any other of the managers about what was happening that
13  night, correct?
14    A.  Correct.
15    Q.  Any other specific occasions you can remember
16  where customers were directed to some specific waitress
17  and not to you?
18    A.  It's a lot of times.  I mean, customers have even
19  told me, like, it's -- it's so many that I can't -- I
20  can't put a -- a -- a timestamp on it.  I mean, it was the
21  group of guys -- what was his name -- it may come to me a
22  little later.
23            But, I mean, he spent a lot of money in the
24  club, and he actually told me:  Oh, I have been told by
25  the managers and the waitresses if -- you know, you or the

1  other black girl, and -- I quote him:  If you or the other
2  black girl are here, to tell y'all that we are already
3  being taken care of.
4            And this -- this is coming from customers.
5    Q.  When do you allege this occurred?
6    A.  Just like I said, I can't put a stamp on it
7  because it happened so many times, like --
8    Q.  And --
9    A.  After my initial complaint -- I'm sorry.  I don't
10  know if it's lagging.  I'm sorry.
11    Q.  It's a little bit.  You paused -- part of it, I
12  think, is just normal pauses, and then it lags a little
13  bit, and I think you're done.  So you're welcome -- you
14  tell me to shut up if I -- if I do talk over you.
15            But you don't -- you don't, as we sit here,
16  remember that customer's name?
17    A.  I forgot his name.  Like I say, I'm horrible with
18  names.  If I -- I could -- if I could see a face one time,
19  I could remember, but names -- what is his name?  Oh, my
20  God.
21    Q.  You don't have any contact information for that
22  customer, do you?
23    A.  No.  It's just someone that, you know, I would
24  see him come in the club often.
25    Q.  Before the night you quit, do you allege you

1  weren't getting any tables or that the tables were
2  reduced?  What -- what are your exact allegations about
3  the working conditions?
4    A.  Of the night that I quit?
5    Q.  Before that.  We have talked about that night.
6  But let's talk, like, the week or two weeks or three
7  weeks.
8    A.  Before that, it was just, of course, the tables.
9  I mean, I -- I wasn't getting any, you know, tables.  Of
10  course, the language continued.  You know, the blatant
11  disrespect, being ignored, being bumped into, you know,
12  without -- you know, people saying excuse me, you know,
13  things like that.  It was, you know, more things that led
14  up to me quitting, not just, you know, one thing.
15    Q.  I know.  And we'll talk more about that.  I have
16  got your charges.  I'm going to look through those with
17  you.  I'm try -- just trying to understand.  I'm really
18  focusing on your tables and things like that right now.
19            What -- what exactly are your allegations
20  about your tables on the weeks, the days, leading up to
21  your termination, or your -- your quitting?
22    A.  I felt like I was -- I was being held back from
23  helping certain customers that were in there spending
24  money because they were already assigned, per se, to a
25  waitress.

1    Q.  What percentage of customers are you alleging
2  this occurred with?
3    A.  Maybe about 20, 25 percent of customers.
4    Q.  Okay.  And they would just be assigned to a
5  certain waitress?
6    A.  Yes.
7    Q.  Is it your allegation that was only the Caucasian
8  ones?  Because we have talked -- there are women of -- you
9  know, African American women, Latino -- or Latino women.
10            Are you saying it was only the Caucasian
11  women or just everyone but you?
12    A.  Only the Caucasian women.
13    Q.  Okay.  So it's your allegation that the managers
14  were directing these -- about 20 percent of the customers
15  to Caucasian waitresses?
16    A.  Yes, and when I say "20 percent of the
17  customers," you have to think about, you can have a -- a
18  club like that with a full house but only 20 percent of
19  them are spending money.  You understand that?
20            So that 20 percent that's spending money,
21  those went to the Caucasian waitresses.
22    Q.  And it's your allegation the managers somehow
23  knew that when they walked in the door, it would be
24  spending money?
25    A.  Oh, yeah.  They can kind of -- you can kind of



1 tell, you know -- I don't -- I don't know if y'all have,
2 you know, really been to places like that. You can kind
3 of tell who is there to -- to spend money, and who is
4 there just to sit and lurk.
5      Q. Did you ever hear any of the conversations with
6 these customers and the servers?
7      A. Oh, yes.
8      Q. Like -- and I mean when they walked in. Were you
9 ever there when the manager was talking to these customers
10 and the server?
11      A. I've heard one conversation with Dave, and one --
12 it was one customer, and the waitress had walked off, but
13 I actually heard one conversation.
14      Q. What do you allege happened there in that
15 conversation?
16      A. He was telling the guy, which is -- is -- it's
17 kind of crazy because the guy he was talking to is friends
18 with my brother. So he was telling him: Hey, we've
19 already got a -- a waitress for you. You know, some of
20 the other girls, I'm not going to say that they are lazy,
21 but this is the best waitress.
22           And he actually told me, and I'm like:
23 Well, okay. I don't think he knows that this guy actually
24 knows me, and he knows my brother.
25      Q. What is -- what is the guy we are talking about?

1 Do you know his name?
2      A. Yes, I do. His name is Don. Don.
3      Q. Last name?
4      A. Yes, I do. I don't want to disclose that,
5 though.
6      Q. If you're -- I have to ask you to.
7           MR. SIMON: You can.
8           THE WITNESS: Oh, it's -- it's okay for me
9 to --
10           MR. SIMON: Yeah, it's fine.
11           THE WITNESS: -- to disclose his name?
12 Okay. His name is Jackson, last name.
13 BY MR. McKAY:
14      Q. Do you know his number or his contact
15 information?
16      A. I'm pretty sure I can get it.
17      Q. Okay. I'll ask you, if you can give me numbers
18 and names after that, and Kell may have given me some of
19 them already with numbers, and if he hadn't, he'll -- I
20 know he'll get me them?
21           MR. SIMON: I'll try.
22           MR. McKAY: He has to, and that's just the
23 way it works. So, Kell, if you'll handle whenever. We
24 can talk about that. I'm not -- I'm not worried.
25 BY MR. McKAY:

1      Q. Part of this is if you say someone knows
2 something, we may need to talk to them. We may need to
3 depose them to make sure that -- you know, see what they
4 say. So we got to know --
5      A. That's fine.
6      Q. And if we don't know who they are, then we are
7 going to go to the judge -- this is why Kell wants you to
8 give me the name -- we are going to go the judge and say:
9 She wouldn't tell me who it was, so you can't -- you can't
10 let that testimony in, and, you know, we are in -- federal
11 court are pretty good on that -- that sort of end.
12      A. You know people, when we're saying their name --
13 it's just I haven't told him, you know, what's going on.
14      Q. I do understand. Luckily, we are on a secure
15 platform, and this is just going to go -- this transcript
16 will just go to us, and I doubt anyone's going to be
17 spreading it around, so that should not be an issue.
18           I think we are about ready -- I think we
19 have talked about kind of the -- the, just, narrative part
20 that I want to talk through. I think what we can do now
21 is start looking at the allegations and the charge, and
22 really, we are going to go back through all this in that
23 because the way they worked. So let's take another quick
24 break, and then --
25      A. Okay.

1      Q. -- get back at it and talk about the documents.
2      A. Okay.
3           (Brief recess taken.)
4           THE VIDEOGRAPHER: We are back on the
5 record. The time is approximately 12:05 p.m. This is the
6 beginning of Media No. 2.
7           Counsel, you may proceed.
8 BY MR. McKAY:
9      Q. Ms. Carter, we are going to start -- I'm going to
10 start by resharing the complaint that we talked about
11 earlier. Okay?
12      A. Okay. Okay.
13      Q. If you would, just whenever it loads up, tell me,
14 and then we're -- we'll just go through it, and you can
15 start on the factual background that's on page 3 out of
16 10.
17      A. Okay. It's still loading.
18      Q. It's not a problem. You just tell me when you're
19 ready.
20      A. Okay. I don't know why it's taking so long.
21           Okay. You said page 3, right?
22      Q. Yeah. There's a heading "Factual Background."
23      A. That's kind of small.
24      Q. You -- so -- but -- that's why we did a little
25 earlier. If you see that plus/minus up top --



1    A.  Where I can make it bigger?
2    Q.  You can make it bigger.
3    A.  Okay.  Okay.  And you say you're on page 3?
4    Q.  Yes.  And if you look at the bottom right,
5  there's a 3 out of 10, do you see that -- or a something
6  out of 10?
7    A.  I don't see where you are.  I'm on page 3 of 8,
8  and I don't see --
9    Q.  So it's actually page 2 of 8, if you're looking
10 at the top right --
11   A.  Okay.
12   Q.  -- it'd be page 2 of 8 with "Factual Background."
13   A.  Okay.  Now I see it.  I thought it was on page 3.
14   Q.  And -- and when I'm referring to a 3 out of
15 number, if you look at the very bottom left of the
16 document, there's a little, kind of, overlay -- it's not
17 the document itself -- that tells you where you're at.
18 It's the program.
19        Do you see that?
20   A.  Actually, I don't.
21   Q.  Okay.  Some -- some witnesses don't see it.
22 You're not the first one.  So we will use the top right.
23        So we are on page 2 out of 8.
24   A.  Okay.
25   Q.  We are in the bolded Section 2, and I'm just

1  going to walk --
2    A.  Okay.
3    Q.  -- through the allegations of your complaint.
4  Okay?
5    A.  Okay.
6    Q.  We are going to probably get a lot more detail
7  actually talking about these with regards to -- to your
8  charges.  They have more -- well, more or less the same
9  thing, but, you know, that's what you did
10 contemporaneously, and I'll want to look at them.
11        So for the complaint, I'm probably just
12 going to -- I'm going to go over it and make sure
13 everything there you agree and ask some high-level
14 questions.  Then we are going to do this again with the
15 charges, but with probably a little more detail.  Okay?
16   A.  Okay.
17   Q.  I'm telling you that now, so that when we talk
18 about things here, if you need to tell me something,
19 great, but don't feel like I'm just skipping something
20 where you feel like you have something you need to tell
21 me.  We will get back to it.
22   A.  Okay.
23   Q.  So the first thing is that you began working in
24 June of 2017 as a waitress.  You agree with that?
25   A.  Yes.

1    Q.  I know you had a little bit of uncertainty about
2  exactly when you started.  But seeing that, you don't have
3  any reason to disagree that you started in June?
4    A.  No, I don't have a reason to disagree.
5    Q.  After you began working there, the next paragraph
6  states that you began having -- hearing people use the "N"
7  word while on shift, and it sounds like mostly you heard
8  that while people were singing along with the music.  Is
9  that true?
10   A.  Yes.
11   Q.  This is -- Foxy's is a nightclub, correct?
12   A.  Yes.
13   Q.  One of the things it has at all times is
14 relatively loud music playing, correct?
15   A.  Yes -- yes.
16   Q.  What sort of music did Foxy's -- as a general
17 type, what sort of music did Foxy's have playing?
18   A.  Rap and hip-hop, R&B.
19   Q.  It's a -- it's a club that caters to people who
20 want to listen to hip-hop, R&B, and similar types of
21 music, correct?
22   A.  Yes and no, depending on what -- you know, what
23 type of customers are there, they'll, like, kind of base
24 it off of, you know, what type of customers are there.
25   Q.  Right.  But it's not a club that was playing

1  country music, right?
2    A.  They play country songs.
3    Q.  And what I mean is their -- their baseline music
4  was -- well, and let me -- let me step that back.
5        You understand -- do you know who chose the
6  music?
7    A.  The DJs.
8    Q.  Okay.  This is a club -- it's an adult club, and
9  there were entertainers who would dance on stage, correct?
10   A.  Correct.
11   Q.  Do you know whether those entertainers selected
12 the music?
13   A.  Yes.  Sometimes for their stage set, they would,
14 you know, tip the DJ to play certain songs.
15   Q.  And so the entertainers, who were of all races,
16 ethnicities, and -- and backgrounds, correct?
17   A.  Correct.
18   Q.  They would decide, sometimes at least, what music
19 they wanted to play during their set -- there -- there are
20 usually two songs while they were on stage, and they would
21 tell the DJ:  Here's what I'd like you to play, and he
22 would play that?
23   A.  Correct.
24   Q.  And therefore, at the club, all sorts of music
25 could be played.  It would either be what the DJ wanted or



1  whatever any individual entertainer from any -- you know,
2  any background and any preference, what they may want to
3  play, correct?
4      A.  Correct.
5      Q.  That -- that -- depending on whether or not the
6  club actually has access to the song and it's in the
7  library, of course?
8      A.  Correct.
9      Q.  You would agree with me that song -- that hip-hop
10 artists use the "N" word in their song?
11             MR. SIMON:  Objection, form.
12             You can answer it.
13             THE WITNESS:  Correct.
14 BY MR. McKAY:
15     Q.  You would agree with me that there is a lot of
16 popular music -- and I don't mean the pop genre, but
17 popular hip-hop music -- it is not uncommon to hear the
18 "N" word used?
19     A.  No, it's not uncommon.
20     Q.  So it's not as if songs were specifically
21 chosen -- well, let me step back.
22             The -- the DJ, who is actually making these
23 decisions, was a friend of yours, wasn't he?
24     A.  Yes.
25     Q.  And what -- what was his ethnicity?  What's his

1  background?
2      A.  He's Puerto Rican.
3      Q.  About how often would you hear a song that the
4  "N" word would be used?
5      A.  Maybe once every few songs.
6      Q.  So it wasn't like every song, but it was just in
7  the rotation; it wasn't an uncommon thing?
8      A.  Right.
9      Q.  Did you ever go -- outside of Foxy's, have you
10 ever gone to clubs who play hip-hop or R&B music?
11     A.  Yes.
12     Q.  You would agree with me that it's also pretty
13 common to hear the "N" word used in the songs played at
14 those sort of clubs, correct?
15     A.  Correct.
16     Q.  You would also agree with me that it's not
17 uncommon for the customers of the -- of any club playing
18 that music to sing along?
19     A.  I'm sorry.  Can you repeat that?
20     Q.  You would agree with me it's not uncommon for
21 customers at any club playing music of any sort to sing
22 along?
23     A.  Oh, no, that's not uncommon.
24     Q.  It's -- and it's not uncommon to hear people
25 singing along and using the "N" word when they are singing

1  along with the song that uses that word?
2      A.  I -- it depends on who's singing the song when
3  the "N" word comes up.
4      Q.  Are hint -- you are hinting at it's more
5  appropriate or more acceptable for someone of an African
6  American background to do it than, say, a Caucasian?
7      A.  Oh, of course.  I have never heard any of my
8  personal friends, if a song was on, you know, or we hear a
9  song that had that word, they'll of course skip over it
10 and go to the rest of the lyrics.  They wouldn't make it a
11 point to say that word.
12     Q.  Understood.
13             But at clubs or other establishments where
14 customers are coming in and the music is played, you would
15 hear them use that word singing along, right?
16     A.  Customers?
17     Q.  Yes.
18     A.  I can't say I heard customers.
19     Q.  Okay.  So is it your --
20     A.  But I could --
21     Q.  Go ahead.  I'm sorry.
22     A.  No, I said I'm -- I wasn't paying attention, you
23 know, to the customers singing, I'm pretty sure.  Who
24 knows, some customers would, but, I mean, I don't -- I
25 can't say that they would or not.

1      Q.  And if we look at your complaint, though,
2  starting at 7, what you're really complaining of
3  originally is that you heard the waitresses singing along
4  with the music and using the "N" word?
5      A.  Yes.
6      Q.  Is it your allegation -- and I know we'll get to
7  talking about one of the managers, but I don't want to
8  talk about Taylor just yet.
9             But any of the other individuals who worked
10 at Foxy's, is it your allegation that any of them ever
11 used the "N" word to address you?
12     A.  Oh, yes.
13     Q.  Who?
14     A.  Ashley did it before.
15     Q.  Anyone else?
16     A.  You say you didn't want to speak about the
17 managers, but --
18     Q.  Right.  We'll talk about Taylor so --
19     A.  Ashley.
20     Q.  -- I'm not asking about Taylor right now.
21             Anyone other than Taylor?
22     A.  Oh, no, no.  Just Ashley.
23     Q.  When -- what -- when exactly and how exactly did
24 it happen with Ashley?
25     A.  Me and Ashley were actually cool, and I don't

**Page 90**

1 know if you understand the -- the lingo between, you know,
2 most African Americans, but you know, I came to work one
3 day, and she was, like: I'm just going to say the word.
4 She was, like: What's up my nigga? Like --
5     Q. In other words --
6     A. I looked back like (indicating).
7     Q. And you are welcome to continue that. I just
8 want to make sure I understand.
9         What you're saying is, essentially, she was
10 someone who you were friends with, and she made the
11 mistake that if not -- that is, unfortunately, not all
12 that uncommon of thinking because you're friends, it's
13 appropriate to use the word as a casual greeting?
14         MR. SIMON: Objection. Misstates prior
15 testimony, move to strike, not in evidence.
16         You can answer if you want, Tangala.
17         THE WITNESS: For -- for you to say it's not
18 uncommon, it's -- it's -- I -- like what you mean by that?
19 BY MR. McKAY:
20     Q. What I mean is we -- you are aware -- let me
21 re-ask it.
22         What I'm saying is --
23     A. Okay.
24     Q. -- she believed that because you were friends, it
25 would be appropriate or acceptable for her to address you

**Page 91**

1 in that way. Is that what your perception was?
2         MR. SIMON: Objection. Calls for the
3 witness to speculate.
4         THE WITNESS: Yes.
5 BY MR. McKAY:
6     Q. Was that a "yes"? I'm sorry. It kind of cut
7 out?
8         THE WITNESS: Do I answer that.
9 BY MR. McKAY:
10     Q. You can --
11         MR. SIMON: Yeah, you can answer it.
12         THE WITNESS: Yes.
13 BY MR. McKAY:
14     Q. And part of the reason -- and why I say not
15 uncommon or why I'm referring to something, it is not
16 unknown, and it is, in fact, relatively common within the
17 community of African American individuals when addressing
18 other people within the community to -- to refer to one
19 another using the "N" word? That doesn't mean you find
20 that acceptable, but that is a -- that is something that
21 happened, correct?
22         MR. SIMON: Objection, form.
23         You can answer.
24         THE WITNESS: Yes, that's something that
25 happened.

**Page 92**

1 BY MR. McKAY:
2     Q. Is that something you personally do or your
3 friends do?
4     A. Of course, my friends do it. I mean, sometimes I
5 may. I try not to do it, but I mean, sometimes I do.
6     Q. Understood.
7     A. But I try not to do it.
8     Q. And it happens that individuals who are friends
9 with you, who are not also of an African American descent,
10 white people or Hispanic people will occasionally think
11 that they are -- that it's okay for them to use the same
12 greeting that two African American individuals would use
13 for themselves. Is that --
14         MR. SIMON: Objection.
15 BY MR. McKAY:
16     Q. Is that fair?
17         MR. SIMON: Objection, form.
18         THE WITNESS: Correct.
19 BY MR. McKAY:
20     Q. With Ashley, in particular, did you talk to her
21 after she said that?
22     A. Yes.
23     Q. What did you say?
24     A. I told her: Hey, you know, that word coming
25 from, you know, people that aren't African American is

**Page 93**

1 offensive.
2     Q. And what did she say in response?
3     A. She said: Well, I have black friends, and I say
4 it around them all the time, and they don't have a problem
5 with it.
6     Q. What did you say?
7     A. I just told her: Okay. That's what you do with
8 your friends, but around me, especially at work, I -- I
9 don't want to hear it coming from anybody really.
10     Q. And did she ever address you by that word again?
11     A. No, she didn't say it to me, but she said it --
12 she made it a point to say it around me.
13     Q. In what way?
14     A. If she was greeting somebody else or speaking to
15 someone, explaining, you know, something to somebody,
16 she'll use that word. It'll come out, like, every other
17 word.
18     Q. Is this what you were talking about in
19 paragraph 9 of your complaint?
20     A. Oh, yes.
21     Q. But she never addressed you again using that
22 word, correct?
23     A. No.
24     Q. Did you go to any of the management to tell them
25 that she was using the -- that word, and that it was



1 uncomfortable to you?
2     A.  Yes.
3     Q.  Who did you go to talk about Ashley using that
4 word?
5     A.  I talked to Dan.  I kind of told him, you know,
6 what was going on.
7     Q.  You said Dan?
8     A.  Yes.
9     Q.  When was that?
10     A.  I can't remember the exact date.  I know it was
11 after I talked to her.  I can't remember the exact date.
12 And he had went out of town, so I remember it was -- he
13 had went of town the next day.  I forgot where he went.  I
14 can't remember the exact date.
15     Q.  You -- you talked to him one time?
16     A.  Yes, about Ashley saying that word.
17     Q.  What did he -- what was his response?
18     A.  Oh, he said:  Oh, I'll -- I'll talk to her.  You
19 know, I know it's a thing, but of course, it's not okay to
20 use that word, even if it is in the music.  So I was,
21 like:  Okay.  I felt kind of a little bit satisfied with
22 his reply.
23     Q.  And you never went back to him and said:  She's
24 still using it, correct?
25     A.  At that point, that didn't occur.

1     Q.  Let us go back -- so we kind of skipped a
2 paragraph.  We skipped Taylor.  And that was on purpose,
3 because I wanted to -- I think, he is going to be a bigger
4 part, and I wanted to go around that.
5         But let's talk about Taylor now.  In
6 paragraph 8, you make allegations about Taylor.  Would you
7 just tell me about that?
8     A.  Of course, at first me and Taylor, you know, were
9 cool.  He kind of, you know, knows some people that I
10 know, one of them, you know, being, of course, my brother.
11 And one day I showed up to work, and he was, like:  What's
12 up, my nigga?  And I'm like:  Taylor, like, no.  Don't do
13 that, please.  He's like:  Oh, no, I was just kidding
14 around.  Okay.  Well, you know that's just not okay with
15 me.  And that's basically it.
16     Q.  You trailed off just at the end there.  If you
17 could repeat, kind of, the last few words you said.
18     A.  I'm sorry.  What -- what part didn't you hear?
19 What was the last part --
20     Q.  Just go ahead.  It -- it may be better to start
21 again, because it was a little choppy for me, and I'm not
22 100 percent sure I heard it all.
23     A.  Me and Taylor, of course, was cool.  You heard
24 that part?
25     Q.  Yeah, I heard that part.

1     A.  Okay.  And, you know, he asked me:  What's up, my
2 nigga?  And I'm -- I'm like:  No.  Like, I don't feel
3 comfortable with you talking to me like that or you saying
4 that.  And of course:  I'm a slave.  My -- I grew up in
5 a -- in the urban neighborhood, I got black friends, and
6 this and that, and I always say it to them, and I'm just
7 like:  Okay.  Well, I'm not okay with you using that type
8 of language towards me.  And he basically didn't say
9 anything.  He was just, like, whatever.
10         THE VIDEOGRAPHER:  Counsel, I'm sorry to
11 interrupt.  I've -- I've lost Ms. Carter's video again.
12         MR. McKAY:  Okay.  Ms. Carter, if you could
13 just try refreshing again, and that's worked each time so
14 far.
15         THE VIDEOGRAPHER:  Okay.  I'm going to --
16 let me --
17         MR. McKAY:  Pat, if you'll just tell me if
18 you have it back.
19         THE VIDEOGRAPHER:  Of course.  Not yet.
20         THE WITNESS:  Nope.
21         Do you see me now?
22         (Off-record discussion.)
23         THE VIDEOGRAPHER:  All right.  And we are
24 still on the record, so whenever you're ready.
25         MR. McKAY:  You're good, Pat?

1         THE VIDEOGRAPHER:  Yes.  Thank you.
2         MR. McKAY:  We are back at it.
3 BY MR. McKAY:
4     Q.  We'll talk about Taylor some more.  You mentioned
5 you had a conversation with Taylor where he -- he -- you
6 allege he used the "N" word; you told him you weren't
7 comfortable with that, and he responded, essentially, you
8 know, he grew up in a -- in a -- in a less well-off area,
9 and had a lot of African American friends and thought it
10 was okay.
11         Is that a fair summary of what you just told
12 me?
13     A.  Correct.
14     Q.  What did you do next?
15     A.  At that point, I was, like, okay, well, maybe
16 he -- maybe he gets it and -- because most people, I
17 have -- I've had where most people be like:  Oh, I grew up
18 around such and such and won't say it again.  So I thought
19 that maybe he gets it.
20     Q.  And it's your allegation he did not?
21     A.  Oh, no.
22     Q.  What exactly would occur?
23     A.  Of course he would still do the:  What's up, my
24 nigga?  You know, he would be explaining:  Nigga this,
25 or -- or nigga that, and anything nigga, please, and



1 nigga, nigga, nigga. It's like -- it was like that.
2     Q. Did you complain about this to any other
3 managers?
4     A. Oh, yes, I spoke to --
5         THE STENOGRAPHIC REPORTER: I didn't get
6 that.
7         MR. McKAY: Yeah. It cut out right when you
8 spoke "to," and then it cut out for me.
9         THE WITNESS: I spoke to Tommy.
10 BY MR. McKAY:
11     Q. And who was Tommy?
12     A. He was the general manager.
13     Q. Okay. Did you speak to anyone other than Tommy?
14     A. No.
15     Q. Okay. What was your conversation -- do you
16 remember when you spoke to Tommy?
17     A. I don't remember exactly when, but of course, I
18 know what I spoke to him about.
19     Q. What did you talk to him about?
20     A. I just basically, you know, went to him and told
21 him: Hey, you know, Taylor has been using the "N" word a
22 lot, and I'm just not comfortable with playing games.
23     Q. What did -- what did Tommy say?
24     A. I'll talk to him.
25     Q. Did you ever go back to Tommy to say: Taylor had

1 not stopped using that word?
2     A. At that point, I really felt like nothing was
3 going to be done about it, so no.
4     Q. And this -- I'll represent to you I have seen --
5 you know, some information about that in other parts. But
6 that's not -- and so I'm not critiquing. But that's not
7 in your allegations in your complaint.
8         That's not in the "Facts" section, anything
9 about that conversation, is it?
10     A. I know it was something. I can't remember what
11 it was, but --
12     Q. It's in the charges.
13     A. -- he talked --
14     Q. It's in the charge that we are going to talk
15 about. I'm not -- I'm not trying to trip you up. I'm
16 just -- I'm just making sure that I'm not missing it.
17     A. Oh, okay. Yeah, I know I spoke to him, yeah.
18     Q. I -- I understand that. I'm just -- you -- you
19 don't see it in the complaint, do you?
20     A. No, I don't.
21     Q. Okay. Again, that's -- all I'm doing is walking
22 through these and -- and part of it, I'm mixing in things
23 that I know -- you know, where we led to, but we are just
24 walking through this over and over again through the
25 different documents. Don't worry if it's not there;

1 we'll -- we'll talk about it shortly. But --
2     A. Okay.
3     Q. -- next -- so if we go down to 11, you filed an
4 EEOC charge on December 7, 2017; is that correct?
5     A. Correct.
6     Q. And we -- the notice of that charge did not even
7 reach the club until December 21st; is that correct?
8         MR. SIMON: Objection.
9         THE WITNESS: Correct.
10         MR. SIMON: Calls for the witness to
11 speculate.
12 BY MR. McKAY:
13     Q. That's what you've alleged; you -- you've pled
14 that the notice reached the club on the 21st of December,
15 correct?
16     A. Correct.
17     Q. Then your next allegation is on December 29th.
18 You noticed that the managers were not assigning customers
19 to you?
20         MR. SIMON: Object to form.
21         THE WITNESS: Okay.
22 BY MR. McKAY:
23     Q. Is that -- is that what's an allegation?
24     A. Correct.
25     Q. Is that what we talked about earlier when we were

1 talking about the managers waving customers over?
2     A. Oh, yeah, it had gotten worse. At that point, it
3 was to where I had zero tables, none, not one.
4     Q. When we talked about that earlier, you said it
5 was about 25 percent of customers?
6     A. Uh-huh.
7     Q. Was that -- was it 25 percent on the night of
8 December 29th?
9     A. What -- I'm -- what are you -- what are you
10 saying?
11     Q. On the night of December 29th, how -- what
12 percentage of customers were being assigned to waitresses?
13     A. The paying customers?
14     Q. I --
15     A. (Inaudible.) I just had one customer.
16     Q. So you're cutting out a bit, and I can kind -- I
17 think I know what you're saying, but I probably need you
18 to reanswer it because I bet it's cutting out for Kari as
19 well?
20     A. Okay.
21         MR. McKAY: Kari, tell me if I'm wrong.
22         THE STENOGRAPHIC REPORTER: No, you're
23 correct. I think there's a TV on in the background or
24 something that's interfering also.
25         THE WITNESS: I don't have anything playing



1 like that.
2           MR. McKAY:  Yeah, I don't have anything
3 here, so I don't know.
4           THE VIDEOGRAPHER:  That might be me, but let
5 me -- let me try muting and see if that helps.
6           THE WITNESS:  Okay, yeah, because I can hear
7 like a --
8           MR. McKAY:  And I only hear it every once in
9 a while.  It's not like it's constant.  It's just every
10 once in a while.
11          THE WITNESS:  Yeah, I hear it every once in
12 a while too, it's like a do, do, do, some --
13 BY MR. McKAY:
14     Q.  So, Ms. Carter, your -- your allegation -- is
15 your allegation that every customer that came in on the
16 29th was being assigned to a specific waitress?
17     A.  Yes.
18     Q.  And are you saying all of them or just the ones
19 that you thought would pay?
20     A.  All of them.  At that -- that night, I didn't get
21 one ta- -- I didn't have one table, not one.
22     Q.  So it's your allegation that for weeks, even
23 before you filed your charge, if we just look at -- or
24 even -- well, let me step back and re-ask that.
25          For weeks --

1     A.  Okay.
2     Q.  -- you -- they -- the managers had been assigning
3 most of the good tables to specific waitresses, correct?
4     A.  Correct.
5     Q.  And that would have necessarily predated
6 December 21st then, correct?
7     A.  Correct.
8     Q.  So even before the notice of the charge was
9 served, they -- they were doing some of this assigning
10 tables to specific waitresses, correct?
11     A.  Oh, yes.
12     Q.  And that was the good tables, is your allegation,
13 correct?
14     A.  Correct.
15     Q.  Then on the 29th, it's your allegation that they
16 wouldn't give you any tables?
17     A.  Correct.
18     Q.  Who all was there --
19     A.  I was just standing there, like:  Umm, okay.
20 Like, literally just standing there.
21     Q.  Did you try going to any of the tables that were
22 sitting down?
23     A.  Yes.
24     Q.  And what happened?
25     A.  We already had somebody taking care of us.

1     Q.  Okay.  That was the customer that told you that,
2 though, correct?
3     A.  Yes.
4     Q.  Any -- any other things you heard from customers
5 that night?
6     A.  No.
7     Q.  You quit on that evening; we have already talked
8 about that, right?
9     A.  Correct.
10     Q.  You never did, then, go talk to Taylor about what
11 was going on that night, right?
12     A.  No, I didn't -- I didn't talk to Taylor, no.
13     Q.  You also never talked to Tommy about that --
14     A.  No.
15     Q.  -- what went on, on that night, correct?
16     A.  Correct.
17     Q.  The manager on duty that night, was it Dan?
18     A.  Correct.
19     Q.  And you talked to Dan briefly, but we've already
20 talked -- we've already talked about your conversation,
21 correct?
22     A.  Correct.
23     Q.  You didn't talk to Placide, did you?
24     A.  Not that night.
25     Q.  Did you -- do you allege you did talk to Placide

1 on some night?
2     A.  Correct.
3     Q.  When was that?
4     A.  I can't remember exactly when it was because he
5 just came from -- seem like he just came out the ground.
6 I know for a fact that it was after I had talked to Tommy.
7     Q.  Okay.  And what was the conversation with
8 Placide?
9     A.  Placide was basically telling me:  I grew up
10 around, you know, Tommy and Taylor, and there's no way
11 that they are racist, and I been knowing them for a long
12 time, and I was just like:  Okay.
13     Q.  Why did he -- why were you having that
14 conversation?  Did you go to him?  Was he coming to you?
15 What --
16     A.  No, he -- he was -- he came to me.  They brought
17 him in to specifically, I guess, talk to me and -- and try
18 to tell me that -- you know, that he had been hanging
19 around there for so long, and he knows them.  He grew up
20 with them, and they are not racist.
21     Q.  So they asked him to talk to you to help
22 alleviate the situation?
23     A.  Correct.
24     Q.  Was that the only time you talked to Placide
25 about the -- you know, anything related to these



1 allegations?

2     A.  Correct.

3     Q.  And what was your response when he told you that?

4     A.  I just basically told him:  Well, I mean, you're

5 telling me this like you're basically trying to convince

6 me that I didn't hear what I -- what I heard; I'm not

7 going through what I'm going through.  You're trying to

8 convince me that this didn't happen, which I know it did,

9 and you can't convince me that somebody isn't racist if

10 someone tells them:  Hey, this makes me uncomfortable, and

11 they continue to do it.  That just proves that they are

12 racist.

13     Q.  What was his response?

14     A.  He was, like:  Oh, I don't think it's like that,

15 you know.  They are really cool.  You know, just really

16 trying to convince me, you know, that -- that they are not

17 racist.

18     Q.  Okay.  Anything else in that conversation?

19     A.  No.  That was it.

20     Q.  Then the next few -- and let me pause for a

21 second because Kell just disappeared, and it's blue.  Blue

22 normally means they disconnected.  Black normally means

23 they turned off the video, so I don't want to go forward

24 without your counsel on.

25     A.  Okay.

1     Q.  So let's go ahead and go off the record for a

2 second.

3          THE VIDEOGRAPHER:  The time is approximately

4 12:42, and we are off the record.

5          (Brief recess taken.)

6          THE VIDEOGRAPHER:  All right.  We are back

7 on the record.  The time is approximately 12:56.

8          Counsel, you may proceed.

9 BY MR. McKAY:

10     Q.  So, Ms. Carter, if we look at paragraphs 13

11 through 14 -- actually 12 through 14, that's all just

12 talking about the night of December 29th, and we have

13 already talked about all of that, correct?

14     A.  Correct.

15     Q.  There's not something new that you see in the --

16 in those allegations that is something that we haven't

17 already talked about in general at least, right?

18     A.  Correct.

19     Q.  Okay.  Then what I'm going to do is I'm going to

20 go ahead and close this.  We don't have to worry about the

21 specific legal, you know, cause of action and the like.

22 I'll deal with that with your attorney.  We just need to

23 really talk about the facts.

24          One thing I do want to talk about, though,

25 if we go down to 24 before I close it out, and that --

1 it's paragraph 24.  It's going to be kind of straddling

2 page 6 of 8 and 7 of 8.

3     A.  Okay.  24, okay.

4     Q.  And these are the different types of damages you

5 have pled, and I just want to ask you brief questions

6 about each one.  Okay?

7     A.  Okay.

8     Q.  So past and future lost income, for that, it's my

9 understanding you stopped working on December -- you know,

10 in December of 2017, but you found a new position.

11          When did you find that new position?

12     A.  That was November of last year.

13     Q.  Okay.  So you weren't working for about a year

14 and a half?

15     A.  Correct.

16     Q.  And -- but you were receiving SSI benefits during

17 that entire time?

18     A.  Correct.

19     Q.  Before you worked at Foxy's, you were -- you were

20 at Foxy's about six months, right?

21     A.  Correct.

22     Q.  In the around three years before Foxy's, you had

23 actually only been working one to two days a week at Elks;

24 is that true?

25     A.  Correct.

1     Q.  Making 3- to $400 a week?

2     A.  Correct.

3     Q.  And now you're making $75 a day?

4     A.  Correct.

5     Q.  Are you doing five days a week?

6     A.  No.

7     Q.  Could you do five days a week?

8     A.  I could, but other things, you know, kind of --

9 life kind of gets in the way little bit.

10     Q.  I understand.  And that's even -- and then

11 there's COVID.

12          But without COVID, you, in theory, could do

13 it, but you're not right now?

14     A.  Oh, yeah, no, no right now.

15     Q.  So that's really all the earnings, wages, all

16 that, we'll deal with all that.

17          Did you have any benefits when you were

18 working as a server at Foxy's?

19     A.  No.

20     Q.  There's pleadings for other pecuniary losses.

21          Do you personally know of any as we sit

22 here, any pecuniary losses that you lost other than the

23 income?

24     A.  Yes.

25     Q.  What is that?



1     A. I lost my vehicle. I had to, you know, sell a
2 few things at the pawn shop. I almost got kicked out of
3 my apartment. I just had to scale back on a lot.
4     Q. What was your vehicle?
5     A. I had Fiat, a 2016 Fiat.
6     Q. And what did you do with it?
7     A. I let -- I had to let it go back.
8     Q. So you just stopped paying on it?
9     A. I couldn't afford to continue paying on it. When
10 I lost that income, I couldn't afford to continue paying.
11     Q. Did you ever go back to the Elks Lodge and see if
12 you can get a job back there?
13     A. Yes. I -- actually, I can go back. Well, due to
14 COVID, you know, they have a -- the codes and all that
15 kind of stuff, so I can go back, but when I went back, I
16 mean, it wasn't like it used to be, so...
17     Q. Does that mean you did go back for a short period
18 of time?
19     A. Yeah. But it wasn't --
20     Q. When was that?
21     A. It was maybe a week or so after Foxy's, but I --
22 it was -- yeah, I did one day, and like -- we know you're
23 not used to this, so, yeah, it wasn't enough to really do
24 anything.
25     Q. Are there any other places that you worked for a

1 short period of time that we haven't talked about after
2 Foxy's?
3     A. No.
4     Q. So it's just Elks club and then your current
5 position?
6     A. Correct.
7     Q. You've pled emotional pain and suffering.
8     Can you just describe the factual basis,
9 what -- what exact emotional pain and suffering you've
10 suffered?
11     A. Oh, I don't -- I don't -- emotionally, I don't
12 know if I can explain this to where y'all could understand
13 and I -- and I really want to -- want to break this down.
14     Emotionally, that -- that did a lot to me,
15 as just from a person. When you have to face something
16 like that, especially behind something that you can't
17 change, like the color of your skin, like, that did a lot
18 to me. I was having stomach issues. I didn't want go
19 anywhere. If I did go somewhere, you know, I had to watch
20 how I expressed myself around people so they won't look at
21 me a certain way or say that -- put me in the angry black
22 woman category. You know, I didn't want my daughter to go
23 anywhere. So, you know, just -- just in case someone
24 would say something like that to her or treat her like
25 that, like, the emotional toll that it took, and it takes

1 on me today is -- is something that I have to live with
2 for the rest of my life.
3     When I step into an establishment, the first
4 thing I think is: Okay. It's majority Caucasian people
5 in here. Are they going to look at me a certain way
6 because I am African American? Or are they going to treat
7 me different because I'm African American.
8     And I -- I've -- I actually face that. You
9 know, I go somewhere, going to a store or something like
10 that, it just set me back, especially in my mind: Am I
11 good enough? Am I -- you know, am I worthy enough?
12     It's -- and I'm not going to apologize. It
13 broke me down, and it made me think about a lot, and it
14 made me analyze a lot of things. And I would never ever
15 be okay with what happened. That is not okay. It's not.
16 I don't care if you grew up in a African American
17 household, that is not okay. Especially when someone
18 tells you, that's offensive to me, and then to treat me
19 like: Oh, okay, well it doesn't. Like, I feel like I was
20 nothing, like...
21     And I'm not apologizing. These are my tears
22 because this is my pain. This is something I have to deal
23 with every day, ever day. I can't take this off. This is
24 what I was born with, and nobody is going to treat me
25 differently because of it. Nobody's going to treat my

1 child different, my grandson. That's why I'm sitting here
2 in front of you because it's not right. It's not. And it
3 breaks people down. It breaks them down because they are
4 being judged by something that can't change. I cannot
5 change.
6     I'm sorry.
7     Q. You're -- you're fine. You answer how you need
8 to answer, and you take as long as you need.
9     A. It's just hard to -- to talk about it, but it has
10 to be -- no matter how uncomfortable it is, people have to
11 know, especially when you're in a work setting, this is
12 not -- that's not how you help me. That's not what you
13 do. I don't care if the -- the song is played a million
14 times, it's not okay for you to say it, especially when
15 you're making somebody feel uncomfortable.
16     I just felt like I wasn't worthy, like I --
17 like no matter what I did, it just wasn't enough. It
18 wasn't good enough, so I mean, I -- I just didn't want to
19 be around people and -- and let's just be real here, I --
20 I really didn't want to be around Caucasian people. Why?
21 So y'all could treat me this way? No.
22     It hurts. It hurt -- it's hurtful. It
23 hurts. It really, really hurts.
24     Q. Anything else or -- I -- I want to give you all
25 the time you need.

A. I mean, we can go on and on and on and on and on I could write a book, but, I mean, emotionally, you can see I'm scarred, and that -- that feeling never ever goes anywhere. It's part of your character and how you handle things and how you deal with people in certain situations, and I don't necessarily want it to be -- become a bad thing. I want it to become something good. I want it -- I want it to be something that I can say: Hey, I overcame that, and I want to make sure that that doesn't happen in Foxy's or -- or anywhere.

Q. I'm going to close this now and move to the charge. You just tell me whenever you're ready to continue.

A. You can go ahead.

Q. Just tell me when that comes up. I know it takes your end just a minute usually.

A. Okay. Okay. I can see it.

Q. Okay. You'll probably have to increase the size because this one is even smaller print.

A. Yes, sir.

Q. This charge was filed on 12/6/2017. Do you see that?

A. Yes.

Q. And if you go down to page 3, there's a second charge filed on 12 -- or filed on 2/1/18. Do you see

that?

A. Let me see. What page are we on again? 12 -- 2/1/18 -- let me see. No, I don't see -- okay, yeah, I see it. I see it.

Q. So there's two different charges that were filed in this case. Do you -- are you aware of that?

A. Yes.

Q. Okay. So the first charge, the one that we talked about in your complaint already, correct?

A. Correct.

Q. And it -- if you read the first paragraph, or the first two paragraphs, those track the same -- those are the same as your complaint, right?

A. Correct.

Q. So not really anything else more for us to talk about -- about those; is that fair?

A. Correct.

Q. Then the third paragraph -- I'm not sure if this was in the complaint, but it -- it does say that -- that the incident with Mr. Ratcliff, the discussion, that was in your first month, so that would have been in June, maybe July, in 2017; is that correct?

A. Correct.

Q. Then there's the discussion about the incident with Ashley using the word in October of 2017?

A. Correct.

Q. There's -- and we didn't really talk about this. It was in there. There's a -- a paragraph talked about a customer who heard Mr. Ratcliff use the word and you became upset.

Can you tell me about that?

A. Correct. It was just, you know, of course, one night, Taylor was speaking to someone else, the outside -- you know, the customer that, you know, heard him talking like that. And he was explaining something to the guy, and you know, of course he was saying, you know, acting like a nigga, and the customer was just looking like: Okay.

So by this time, I walked up to him, and I'm, like: Hey, you know, are you good? You know, whatever the case may be, and he's like: What's going on right here? Like, what is this? And I'm just, like: Hey, that's just what they do. You know, I -- I tried to say something about it, and he was just, like -- when he heard it again, he was like: No, and I kind of had to, like, hold his chest, like calm down, like that ain't going to get you nothing but kicked out. Ain't no telling what they are going to do to you, so just calm down. Like, of course we don't like them saying it, but I mean, this is their establishment, ultimately. Like, if you get

into it with him, they going to kick you out. You might go to jail. So just -- just chill. And he was like: No, that ain't -- that ain't cool. That's not cool at all. Why -- like: Why are you even working here? That ain't cool.

Q. Is this -- do you know who -- this customer, do you know who it is?

A. I forgot his name. He is somebody I would see, like, often, but I don't, like -- I'm pretty sure he told me his name, but I can't remember.

Q. To your knowledge, did that customer or you ever talk to Mr. Ratcliff or any of the managers about that?

A. No.

Q. You allege in the next paragraph that the -- the African American employees were made to do more menial work. Tell me about that allegation.

A. Oh, yeah, we were made to -- they had, like, let's see -- can y'all see this (indicating)?

Q. Kind of.

A. Okay. Can -- can you see it now? It's like a air-freshener thing.

Q. Okay.

A. I'm going to get to the example. They had candles kind of like this, and you can twist it and take the top off of it, so we were made to take -- actually

1 take the top off of the -- the candle thing, this part
2 right here (indicating) was glass. They would make us sit
3 and wipe them one by one while the -- while the -- of
4 course the other white waitresses were making money or
5 sitting down or drinking with their friends, which are
6 customers.
7          They would tell us to clean the chairs, like
8 the actual chairs. They would make us, you know, get a
9 rag, and they had, like, a little spray bottle, and they
10 would actually make us clean the chairs while the white
11 waitresses were sitting down, counting their tips or
12 talking or outside even.
13     Q. And it's your allegation that only the African
14 American servers were required to do this, and the white
15 servers or the Hispanic servers were not?
16     A. Well, the Hispanic servers, of course, they had
17 to do it too, but the -- the -- we would notice that the
18 Caucasian servers, they would do one and do this, barely
19 put it on there and walk off and do whatever they are
20 doing, and we are like: Okay. We thought everybody was
21 supposed to be doing this. And they'll go outside, or:
22 I'm going to get something to eat, or I'm doing this, or
23 I'm doing that and -- we are like: Okay. We are all
24 supposed to be doing this. And nobody would tell you
25 anything. Or the managers: Aren't we all supposed to be

1 cleaning up?
2     Q. Did you ever just not do it, then?
3     A. I mean, it was my job, so of course I did it.
4 Sometimes I didn't. Like, I'm going to be honest.
5 Sometimes I was, like: If they're not doing it, I'm not
6 doing it. Like: Why should I be forced to do something
7 that they're not doing? And actually, me and Kiara was,
8 like: No, we're not doing it.
9     Q. And what happened when you did that?
10     A. Oh, they -- they had us some sort of meeting
11 stating that: Oh, you know, this is the duties for
12 everybody, and we even said like: Okay. Well, everybody
13 needs to do it.
14     Q. Did they agree with that?
15     A. Yeah, they agreed, but did it happen? No.
16     Q. You were never -- you were never disciplined,
17 though, or written up, or given a verbal warning about
18 when you didn't do it, correct?
19     A. Not that I know of.
20     Q. Are you aware of anyone getting any verbal or
21 written warnings about not doing their share of the work?
22     A. Oh, yes.
23     Q. Who -- who did that occur to?
24     A. Kiara.
25     Q. When did that occur?

1     A. Almost every time on her shift.
2     Q. What exactly happened?
3     A. She refused to, you know, do the little -- I
4 don't know, side jobs, the necessary side jobs. They will
5 be, like: We are going to have to do it. Why are you
6 acting stupid? And: You're going to get written up.
7 And, you know, they usually just take, like, your days
8 from you. Like, the busy days, they will just say you
9 can't work that day.
10     Q. Are -- when exactly did that occur, and how
11 exactly, though? I'm not sure I understand.
12     A. What -- not understand what?
13     Q. When did this incident with -- like every time
14 Kiara would work, I don't understand.
15     A. It's most of the time when she worked, like,
16 during her shift, like, at the end of the night, if we
17 were made to do the little ashtray things or whatever, the
18 little candle things, whenever she refused to do, like,
19 they would talk to her, like, reckless and crazy.
20     Q. What do you mean when she would refuse? Would
21 she go and say: I'm not going do that?
22     A. Yeah. Like, she was, like, I'm not doing it
23 because they're not doing it. Like, why should I have to
24 do it if they're not doing it? Well, we told you to do
25 it. We're the managers, and this and that, and she is,

1 like: Okay. Well, we're all supposed to be doing it. We
2 are all waitresses.
3          And I think they would more so talk to her
4 like that, because, I don't know, she -- I don't know if
5 she didn't really too much speak up for herself, but I
6 mean, they kind of knew that I wasn't young like that. So
7 you know, I kind of had a voice for myself. But they --
8 they used to really, really talk to her like really,
9 really bad.
10     Q. Did you -- you never had a conversation like that
11 with them? They never came to you and -- and criticized
12 you, though, correct?
13     A. Well, I -- a few times, they would be like: Hey,
14 can you do this? And I'm like: Okay. Well, I did a few.
15 I'm not the only waitress here, so, you know, they can do
16 the -- the rest.
17     Q. And what did they say?
18     A. Okay. Well, it just has to get done before
19 everybody can leave, no matter who's doing it.
20     Q. And which exact managers do you allege were part
21 of these conversations with the two --
22     A. Oh, it would be mainly Taylor and Dave.
23     Q. Next, it's the November 4th, you talked to Tommy.
24 That's -- we've already talked about that, correct?
25     A. Correct.



**Page 122**

1　Q. Do you have anything else to add about that
2　conversation?
3　A. Now, what page are we on? I'm sorry.
4　Q. Page 2.
5　A. Oh, okay.
6　Q. And starts on November 4.
7　A. And that's Exhibit 2, right?
8　Q. Yes.
9　A. Okay. Now I see it. Look -- remember, I can't
10　see the other numbers, so I see 4 of 4.
11　Q. Okay. Yes. Yes?
12　A. Yeah, I can see the other little numbers.
13　Q. So on November 4 is a discussion about Tommy, and
14　we've talked about that, correct?
15　A. Correct.
16　Q. Anything more you can think of while we are
17　sitting here about that conversation that we haven't
18　talked about?
19　A. No, not that I can think of.
20　Q. Then there's November 7th, that's when your hours
21　had been cut. We talked about that a little bit, correct?
22　A. Correct.
23　Q. Is that when you allege you went down from five
24　days to three?
25　A. Correct.

**Page 123**

1　Q. And it's your allegation that Mr. Thomas told you
2　that you had posted something on Facebook about the club
3　and about racial discrimination, and that's why your hours
4　were cut?
5　A. Correct.
6　Q. You had not filed a EEOC charge on -- by
7　November 7th, though, correct?
8　A. Correct.
9　Q. And you -- you agree that you did post something
10　negative about the club on social media for the public,
11　correct?
12　A. It wasn't negative. It didn't even have their
13　name in it.
14　Q. What exactly did you post?
15　A. It was something along the lines that when people
16　are racist, and they think they can get away with stuff,
17　but they can't. That was all it said, and they took it as
18　I was talking about them. So just like my grandmother
19　used to say: A hit dog will holler. So if they took that
20　towards them, I didn't say any names, I didn't say the
21　club, I didn't say anything like that. They took that and
22　put it on them. I could have been talking about anything.
23　Q. Did you ask Dave about being able to work more
24　hours or more time getting back to your five-day-a-week
25　shift?

**Page 124**

1　A. Yes, I did.
2　Q. What did he say?
3　A. He -- he just told me: I'll get back with you.
4　That was it.
5　Q. Okay. And before you quit, you didn't have
6　another conversation about it?
7　A. No.
8　Q. The next paragraphs, they are not dated, but
9　since I made the report to Mr. Perkins, and there's
10　discussion. Is that -- that's the sort of thing we have
11　already talked about with Taylor using it.
12　And any other employee other than
13　Taylor that you can specifically remember using it was
14　Ashley; is that fair?
15　A. Yeah, Ashley and Erica.
16　Q. Erica.
17　A. Correct.
18　Q. What do you remember with Erica?
19　A. Oh, she -- it was one specific time, I was
20　working at the bar, and -- Ashley and Erica were friends,
21　and it was one specific time I was working at the bar, I
22　guess Ashley told Erica, you know, that I had had a
23　conversation with her about the "N" word, and I'm
24　literally standing at the bar right here. Erica comes up
25　singing a song, and she is: Nigga, nigga, nigga, nigga.

**Page 125**

1　I opened my face like this, like (indicating), and I'm
2　like: Okay. That's kind of threatening.
3　Me and her have -- have really kind of, you
4　know, had words, and when you get in somebody face doing
5　this, nigga, nigga, you know, that's kind of, you know,
6　aggressive to me so...
7　Q. Did you tell any of the managers about this
8　incident?
9　A. I knew -- I had -- at that point, I had knew
10　nothing was going to be done about it, so...
11　Q. So no?
12　A. No.
13　Q. It dropped off just a little bit.
14　A. Oh, no.
15　Q. You allege that Mr. Perkins was acting rudely to
16　you, knocking your phone out of your hand, and bumping
17　into you.
18　When exactly did that occur?
19　A. It was, I want to say, like, about a week before
20　I quit, I want to say roughly. The club, at that time, it
21　wasn't that crowded. I was, you know, standing there -- I
22　usually check, you know -- because I have a daughter, so I
23　usually, you know, check my messages and stuff before I
24　start working, and he walked by me so close, I -- I know
25　he felt like knocking my phone out my hand, and I was,



like -- and he just kept walking. I was, like: Wow, okay. There's nobody next to me; there's nobody in front of me; there's nobody behind me. Like: Why would you walk that close to me?
Q. Did you talk to anyone about this incident?
A. No. At that point, it was just -- I already knew what was going on, and there was no need for me to -- it's like -- it was just like talking to a brick wall. Like, I already knew that there was -- there was nothing going to be done.
Q. And that's the end of the factual allegations in this charge. Do you see that?
A. Correct.
Q. So if we go to the next page, there's the second charge.
A. Okay.
Q. You see it?
A. Correct.
Q. And then that talks about the December 29th incident?
A. Okay.
Q. Do you see that?
A. Correct, uh-huh.
Q. And we have already talked about all of these things, correct?

A. Correct.
Q. I'm going to close this.
A. Okay.
(Exhibit 3 was marked for identification.)
BY MR. McKAY:
Q. Tell me Exhibit 3 comes up for you.
A. Okay. I got it.
Q. And do you see that this is -- and it's actually two different ones, I believe -- yeah -- let me make sure the numbers. Yes.
If you look at the top left, they are EEOC charge numbers and there's two different charge numbers on the two different pages. Do you see that?
A. EEOC charge, okay, give me just a second to scroll on down. Yes.
Q. So if you look at the charge -- these -- these are documents that were issued by the EEOC on March 11, 2019, correct?
A. Correct.
Q. As a result of their investigation, they made a determination in both of the char- -- in both of the cases, correct?
A. Correct.
Q. And the determination was that, based upon its investigation, the EEOC is unable to conclude that the

information obtained establishes violations of the statutes, correct?
A. Correct.
Q. You received these from the EEOC, correct?
A. Correct.
Q. Once you received them, after that, at some point, you filed the lawsuit, correct?
A. Correct.
Q. Did you follow up with the EEOC about these determinations?
A. I can't remember. Oh, it went away.
Q. I -- I closed it.
A. Oh. I was like: Wait a minute. What did I do? I'm sorry.
Q. Did you -- did you, at any point, before the determinations, did you have a chance to talk to the investigator or anyone with the EEOC?
A. No.
Q. You just submitted -- I apologize.
You just submitted your written charges, and then they did whatever they do?
A. Correct.
Q. They didn't reach out to you for any -- to your knowledge, because you did have an attorney, they didn't reach out to you, to your knowledge, for any

clarification, anything like that?
A. No.
Q. Have you had an occasion to review the affidavits that were submitted by Taylor, Tommy, and Placide?
A. I saw them a little bit. Like, I was able to go over it a little bit.
Q. I'll go ahead -- I don't think I'll have many questions about them.
A. Okay.
(Exhibit 4 was marked for identification.)
BY MR. McKAY:
Q. But let me go ahead and mark them and show you.
I'll start with Taylor.
A. Okay.
Q. And the only thing really is, in paragraph 3, he denies that he used the "N" word or directed it at you.
You would disagree with that, correct?
A. Strongly disagree.
Q. For the reasons we have already talked about, though, correct?
A. Correct.
Q. Okay. Let me mark Tommy's.
(Exhibit 5 was marked for identification.)
BY MR. McKAY:
Q. If you read paragraph 3, he describes his



1 recollection of your interaction with him when you were --
2 reported issues?
3    A. Correct.
4    Q. If you'll read paragraph 3, it says that -- that
5 you reported that Taylor was using a racially charged
6 word, but to the best of his rec- -- recollection, you
7 didn't provide the context or state how it was used, and
8 she -- you requested that he discuss with Taylor; is
9 that correct?
10    A. Some of it is correct.
11    Q. What do you disagree with?
12    A. The part where you say: She could not provide a
13 context or state how the word was used.
14    Q. What do you believe you said?
15    A. I told him exactly what I told you guys.
16    Q. Okay.
17    A. How he used the word.
18    Q. He said that he told you he would discuss it with
19 Taylor; is that correct?
20    A. Correct.
21    Q. He then says he spoke with Taylor five to ten
22 minutes later and counseled Taylor against using that
23 word, and even though it's on the music, don't sing along.
24        Do you have any reason to disagree or
25 disbelieve that Tommy did that?

1    A. Yes.
2    Q. Why do you have a reason to disbelieve that?
3    A. Because he still used it. I still don't -- he
4 still made sure I heard him say that word.
5    Q. But you don't know -- you weren't there, and you
6 don't know whether Tommy did tell him not to, correct?
7    A. Yes. I have no idea, correct.
8    Q. And you never went back to Tommy and said: He is
9 still using the word, correct?
10    A. Correct.
11    Q. I'll go ahead and go to Placide now.
12        (Exhibit 6 was marked for identification.)
13 BY MR. McKAY:
14    Q. I have marked Placide's as 6.
15        Is that up for you?
16    A. Yes.
17    Q. And he is just saying, his perception, that he
18 has not seen race being used as a -- as a determiner in
19 how employees are treated.
20        Do you see that?
21    A. Yes.
22    Q. Is that consistent with what he told you when you
23 discussed the issue?
24    A. No.
25    Q. You're saying that's not what he told you when

1 y'all talked?
2    A. I'm sorry.
3    Q. And I'm not saying you agree with what he's
4 saying. What I'm -- what I'm asking is --
5    A. Yeah. Yeah -- yeah, that's -- yes, I'm sorry,
6 that's what we talked about. Yeah, I didn't agree with
7 it, but yeah, that's what he told me.
8    Q. Understood.
9        So he's never -- this -- this affidavit is
10 consistent with what he told you; you just disagree with
11 what he -- with what he -- with what his position is?
12    A. Yes. I'm sorry. I just can't -- it's just
13 something that's sitting in my spirit.
14    Q. Uh-huh.
15    A. That -- is it okay for me to -- can we go back
16 to -- to Tommy's?
17    Q. Absolutely.
18    A. Let me see. Is it okay --- I ask my attorney.
19        THE WITNESS: Is it okay for me to -- to say
20 something?
21        MR. SIMON: You can say whatever you want.
22 It's your deposition.
23        THE WITNESS: Okay. I'll just -- I just
24 want to say this: After I talked to Tommy, at the end of
25 the day, if -- I feel like if -- if you actually told him:

1 Hey, you know, she feels uncomfortable with you -- with
2 you saying this word, why would you proceed to say it?
3 That's just like telling a -- a child: If you do this
4 again, I'm going to take your -- your PlayStation away.
5 They are going to know not to do that because they're --
6 they are going to want to keep their PlayStation to play
7 with, so they are going to know not to do that again.
8        If Tommy indeed took the -- took the general
9 manager's role and said: Hey, you know, even if it's in
10 the music, you cannot say that, you know, I understand you
11 do it outside of work or whatever the case may be, but
12 being that I am the manager of this company, I cannot
13 allow you to say that, especially when it offends someone.
14 If he, in fact, actually did that, then Taylor wouldn't
15 have continued saying the word, whether he was singing
16 them or talking to, you know, someone else or -- or
17 addressing someone else. He still made sure I heard him
18 say that word, even when I spoke to Tommy. That's
19 how I feel like I know that Tommy maybe mentioned
20 something, but I'm pretty sure he didn't say it in that
21 context. I just wanted to say that. That was just
22 sitting on my heart to say that.
23 BY MR. McKAY:
24    Q. And I understand that. And I'm glad to have you
25 say whatever you need to say.



1         But -- but at the end of the day, you
2 weren't part of that conversation, and you don't know what
3 was said?
4         A.  Of -- of course.
5         Q.  And you -- you started by talking about children.
6 I got -- I have a six-year-old and a four-year-old.  I
7 know how many times I have told my children not do
8 something; they say they won't do it, and then they
9 immediately go back and do it.  And that's how -- some
10 people just do that, right?
11        A.  Okay.  Yeah, that's some people, but most
12 children, if you take something away from them or threaten
13 to take something away -- I got a nephew, I say:  Hey, you
14 better stop, or I'm going to take your game.  He is -- you
15 would think he was a angel that fell out of the sky
16 because they wants to get on Fortnite and be able to talk
17 to his friends, so he is not going to do -- that's --
18 that's what I was saying when I brought up, you know,
19 children.
20        If he knew that his job will be at stake,
21 you see what I'm saying, if he was to do -- continue these
22 actions, then he would have stopped doing it.
23        Q.  But you never went back to Taylor -- or I mean,
24 you never -- sorry.
25        You never went back to Tommy to talk to him

1 again, so you don't know what would have happened?
2         A.  Why -- why would I continue to keep saying the
3 same thing over and over again?  Like, that's not --
4 that's --
5         Q.  But what Tommy told you is he would put a stop to
6 it; he would talk to the guy and tell him to stop doing
7 it, correct?
8         A.  Correct.  And --
9         Q.  So the last he knew from you is that he had that
10 conversation with Taylor, and it stopped?
11        A.  No, he knew it didn't stop.
12        Q.  How do you say that?
13        A.  Trust me, he knew it didn't stop.  He knew it
14 didn't.  (Inaudible).
15        Q.  Do you have any occasion where you saw Tommy
16 there where he could hear it, and he heard Taylor using
17 that word?
18        A.  Millions.
19        Q.  So it's your allegation that Tommy would just be
20 standing there, would hear it, and wouldn't do anything
21 about it?
22        A.  Be -- sometimes being a part of the conversation.
23 Wow.
24        And I was even told -- let's put this on the
25 record, I'm sorry -- the -- the DJ, Sleepy, he came up to

1 me and told me -- I am under oath -- that man told me:
2 Tommy is more African American than you are.  I was like:
3 Oh, wow.  Oh...
4         Q.  That was the DJ who told you that?
5         A.  Yes.  I don't know where that came from, but he
6 told me:  Tommy is more African American than I am, and
7 that -- those were his words, and I quote that.
8         Q.  This is the person who was your friend, right?
9         A.  Yes, who was supposed to be my friend.
10        Q.  When did this occur?
11        A.  This occurred maybe -- maybe, like, a week or so
12 after I talked to Tommy.
13        Q.  So let me pull up the dates.
14        So that would have been, kind of, the second
15 week of November, plus or minus?
16        A.  Yes.
17        Q.  Okay.  And you don't know the context of why he
18 did that?
19        A.  Of course, I'm pretty sure -- because I don't
20 even know how he'd know about, you know, what I discussed
21 with Tommy, and he came up to me and he was like:  You
22 know, you need to chill and this and that, and Tommy is
23 more African American than you.  And I'm like:  How are
24 you going to tell somebody that's African American that
25 somebody that's not African American is more African

1 American than them?
2         Q.  And -- and that DJ, you said, he was Puerto
3 Rican?
4         A.  Yes.
5         Q.  Do you tell anyone about that conversation?
6         A.  I told my daughter.
7         Q.  Anyone at the club?
8         A.  Oh, yes, Kiara know about it.
9         Q.  Anyone else?
10        A.  No.
11        I'm sorry.  Got something in my tooth.  Oh,
12 I got it.
13        Q.  We talked earlier about other, you know, jobs you
14 applied for, et cetera.
15        Do you remember exactly when you applied for
16 any of those jobs, how many jobs you applied for, things
17 like that?
18        A.  I don't --
19        Q.  Other than the ones we talked about?
20        A.  No, because -- no, not other than what we talked
21 about.
22        Q.  And so over the year and a half, plus or minus,
23 that you were out of work, those are the jobs that you
24 applied for in that span of time, correct?
25        A.  Correct.

**Page 138**

1  Q.  Have you applied for any jobs since you started
2  your current position?
3  A.  I actually tried to apply for -- at -- it's
4  called Bare now.  It was formally Babe's and they closed
5  it down, and then they reopened it and renamed it.  And I
6  put in a application there -- let me try to get the -- the
7  dates right.  It was -- I know it was last year around
8  March -- March or April-ish, and I went in there to put
9  the application.  I actually saw Erica, the waitress from
10  Foxy's, was there, so I didn't even go apply with them.
11  Q.  Have you ever been involved in any other
12  lawsuits?
13  A.  No.
14  Q.  Other than your divorce?
15  A.  No.
16  Q.  No one ever remembers the divorce.
17  A.  [Laughter.]
18  Q.  It is technically a lawsuit.
19        Any other claims that you've been a part of?
20  Any other EEOC charges you've ever filed?
21  A.  No.
22  Q.  I think we've gone over, you know, kind of the
23  entire timeline, and I think we've talked all the events.
24        Are there any other details -- I think we've
25  gone through them enough times that we've gotten all the

**Page 139**

1  details.
2        But are there any other details of any of
3  those events that you haven't mentioned that you're
4  thinking:  Oh, I need to mention or that I missed or
5  anything like that?
6  A.  No, not that I can think of.  I think -- yeah, we
7  went over everything.
8  Q.  Then I appreciate your time today.  While, as you
9  know, I disagree, and my client disagrees.  I still wanted
10  to be here and be respectful and hear your story, and I'm
11  glad we have had that opportunity today, and again, while
12  we disagree on what you're alleging here, we do wish you
13  the best -- or at least I certainly do wish you the best,
14  and I hope you can complete your RN and move forward.  But
15  thank you for your time.
16        MR. McKAY:  And I'll pass the witness.
17        MR. SIMON:  And we'll reserve our questions
18  for the time of trial.
19        MR. McKAY:  Thank you, Ms. Carter.  We are
20  done.
21        THE VIDEOGRAPHER:  All right.  The time is
22  approximately 1:47, and this concludes today's deposition.
23        (Deposition concluded at 1:47 p.m.)
24            * * * * *
25

**Page 140**

1        CHANGES AND SIGNATURE
2          TANGALA CARTER
3        Friday, October 16, 2020
4
  PAGE/LINE  |  CHANGE        REASON
6  _____  |  _____
7  _____  |  _____
8  _____  |  _____
9  _____  |  _____
10  _____  |  _____
11  _____  |  _____
12  _____  |  _____
13  _____  |  _____
14  _____  |  _____
15  _____  |  _____
16  _____  |  _____
17  _____  |  _____
18  _____  |  _____
19  _____  |  _____
20  _____  |  _____
21  _____  |  _____
22  _____  |  _____
23  _____  |  _____
24  _____  |  _____
25  _____  |  _____

**Page 141**

1        I, TANGALA CARTER, have read the foregoing
2  deposition and hereby affix my signature that same is true
3  and correct, except for the changes noted above.
4
5  _____
6  TANGALA CARTER
7
8
9
10  COUNTY OF:  _____  $
                              $
11  STATE OF: _____  $
12
13  Before me, _____, on
   this day personally appeared TANGALA CARTER, known to me
   (or proved to me under oath or through _____ ) to be
14  the person whose name is subscribed to the foregoing
   instrument and acknowledged to me that they executed the
15  same for the purposes and consideration therein expressed.
16
        Given under my hand and seal of office this
17  _____ day of _____, _____.
18
19
20  _____
        NOTARY PUBLIC IN AND FOR
21        THE STATE OF _____
22
        My Commission Expires: _____
23
24
25



**Page 142**

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION
 3   TANGALA CARTER,            )
                                )
 4        Plaintiff,            )
                                )
 5   VS.                        )  C.A. NO. 1:19-CV-588
                                )
 6   CALIFORNIA GRILL, LLC      )
     d/b/a FOXY'S CABARET,      )
 7                              )
          Defendant.            )
 8
 9
10              REPORTER'S CERTIFICATION
             ORAL & VIDEOTAPED DEPOSITION OF
11                  TANGALA CARTER
                FRIDAY, OCTOBER 16, 2020
12
13
         I, Kari J. Behan, CSR, RPR, CRR, and in and for the
14   State of Texas, do hereby certify that the facts as stated
     by me in the caption hereto are true;
15
         That there came before me the aforementioned named
16   person, who was by me duly sworn to testify the truth
     concerning the matters in controversy in this cause;
17
         And that the examination was reduced to writing by
18   computer transcription under my supervision; that the
     deposition is a true record of the testimony given by the
19   witness.
20       I further certify that I am neither attorney or
     counsel for, nor related to or employed by, any of the
21   parties to the action in which this deposition is taken,
     and further that I am not a relative or employee of any
22   attorney or counsel employed by the parties hereto, or
     financially interested in the action.
23
24
         Given under my hand and seal of office on this 4th
25   day of November, 2020.
```

**Page 143**

```
 1
 2
 3   KARI BEHAN, CSR, CCR, RPR, CRR
     Texas CSR NO. 8564;
 4   Expiration Date: 7-31-2022
     GOUCHER PARKER SPIVEY LLC
 5   9243 Dove Meadow
     Dallas, Texas 75243
 6   CRF - 1446
     (214) 347-4781
 7   www.gps.llc
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



### Exhibits

**Ex 1** 3:10 10:18 11:22
**Ex 2** 3:12 122:7
**Ex 3** 3:13 127:4,6
**Ex 4** 3:15 129:10
**Ex 5** 3:16 129:23
**Ex 6** 3:18 131:12

### $

**$12** 59:22
**$2** 57:2
**$300** 63:24
**$400** 29:8 109:1
**$75** 34:15,19 109:3
**$800** 32:22

### 1

**1** 3:10 10:18 11:22
**10** 3:10 81:16 82:5,6
**100** 24:20 30:19 95:22
**10:04** 4:2,5
**10:59** 41:3
**11** 3:14 100:3 127:17
**111** 2:5
**12** 107:11 114:25 115:2
**12/6/2017** 114:21
**1200** 32:13
**122** 3:12
**127** 3:13

**129** 3:15,16
**12:05** 81:5
**12:42** 107:4
**12:56** 107:7
**13** 107:10
**131** 3:18
**1325** 14:16
**14** 12:24 20:15 107:11
**140** 3:5
**142** 3:6
**15433** 14:16
**16** 4:2
**16th** 4:4
**17** 21:18
**1800** 2:11
**1833** 15:12
**1:19-CV-588** 4:8
**1:47** 139:22,23

### 2

**2** 3:12 64:9 81:6 82:9,12,
   23,25 122:4,7
**2.10** 28:19 32:7
**2.25** 28:15
**2/1/18** 114:25 115:3
**20** 77:3,14,16,18,20
**2000s** 23:10 26:3
**2006** 24:1
**2006ish** 25:23
**2010** 18:3,14 27:9,12,14
   40:11

**2011** 39:22
**2013-2014** 32:4
**2014** 28:2,3,5
**2016** 110:5
**2017** 16:8,10,11,14 18:15,
   16 31:6 43:10 83:24 100:4
   108:10 115:22,25
**2018** 35:12,13,14
**2019** 3:14 34:2 35:10
   127:18
**2020** 4:2,4
**2022** 19:18
**21st** 100:7,14 103:6
**23** 15:7
**24** 107:25 108:1,3
**25** 59:3 77:3 101:5,7
**29th** 100:17 101:8,11
   102:16 103:15 107:12
   126:19

### 3

**3** 3:13 12:24 32:8,15
   81:15,21 82:3,5,7,13,14
   114:24 127:4,6 129:15,25
   130:4
**3-** 109:1
**30** 59:3
**35** 2:4
**350** 28:25 29:8

### 4

**4** 3:4,15 122:6,10,13
   129:10



**4.25** 56:18,24 59:1,8

**40** 26:11,12

**400** 28:25 32:8

**4th** 3:12 121:23

---

**5**

**5** 3:16 129:23

**50** 64:10,12

**512 898-9019** 2:6

---

**6**

**6** 3:18 108:2 131:12,14

---

**7**

**7** 89:2 100:4 108:2

**7-** 32:22

**713 951-4250** 2:12

**77056** 2:11

**78702** 2:5

**7th** 122:20 123:7

---

**8**

**8** 82:7,9,12,23 95:6 108:2

---

**9**

**9** 93:19

**9.25** 26:9

**924** 15:17

**99-2000** 23:6

**9th** 20:8

---

**A**

**A's** 35:16

**a.m.** 4:2,5 41:3

**abandoning** 73:9,22

**abandonment** 73:21

**ability** 6:3

**above-mentioned** 4:18

**Absolutely** 132:17

**ACC** 18:9 19:3

**acceptable** 88:5 90:25 91:20

**access** 86:6

**accidentally** 21:3

**Achilles** 26:20

**act** 6:1

**acting** 116:11 120:6 125:15

**action** 11:13 107:21

**actions** 134:22

**actual** 19:13 35:24 44:24 118:8

**add** 122:1

**adding** 26:4

**address** 17:3 89:11 90:25 93:10

**addressed** 93:21

**addressing** 91:17 133:17

**adds** 34:23

**Adecco** 22:21

**Adobe** 11:25

**adult** 85:8

**advised** 49:19

**affecting** 9:16

**affidavit** 3:15,17,18 132:9

**affidavits** 129:3

**afford** 110:9,10

**African** 67:9,10 77:9 88:5 90:2 91:17 92:9,12,25 97:9 112:6,7,16 117:15 118:13 136:2,6,23,24,25

**agencies** 23:25

**agency** 22:18,20 23:3

**aggressive** 125:6

**agree** 83:13,24 86:9,15 87:12,16,20 119:14 123:9 132:3,6

**agreed** 119:15

**agreements** 53:10

**ahead** 5:3,12 9:6 10:10,13 40:15,19 47:24 50:16 59:11 88:21 95:20 107:1, 20 114:14 129:7,12 131:11

**air-freshener** 117:21

**allegation** 55:8 68:1 77:7, 13,22 89:6,10 97:20 100:17,23 102:14,15,22 103:12,15 117:16 118:13 123:1 135:19

**allegations** 13:13 38:13 76:2,19 80:21 83:3 95:6 99:7 106:1 107:16 126:11

**allege** 47:3 48:11,15 75:5, 25 78:14 97:6 104:25 117:14 121:20 122:23



125:15

**alleged** 37:25 39:10 100:13

**alleging** 77:1 139:12

**alleviate** 105:22

**altercation** 66:2

**American** 67:9,10 77:9 88:6 91:17 92:9,12,25 97:9 112:6,7,16 117:15 118:14 136:2,6,23,24,25 137:1

**Americans** 90:2

**amount** 40:9,10,13 50:7

**analyze** 112:14

**and/or** 42:17

**angel** 134:15

**angry** 111:21

**annunciate** 24:22

**answers** 6:24 10:3 62:20 63:11

**anticipate** 13:12

**anymore** 6:18

**anyone's** 80:16

**apartment** 14:18,22 15:10,14,16,19 16:18,19 110:3

**apologize** 6:25 112:12 128:19

**apologizing** 112:21

**application** 138:6,9

**applications** 35:8

**applied** 35:3,4,15 137:14, 15,16,24 138:1

**applies** 5:19

**apply** 138:3,10

**approximately** 4:5 41:3 81:5 107:3,7 139:22

**April-ish** 138:8

**area** 56:16,17 57:24 64:7 97:8

**areas** 46:13

**artists** 86:10

**Ashley** 67:8 89:14,19,22, 24,25 92:20 94:3,16 115:25 124:14,15,20,22

**ashtray** 120:17

**assaulted** 65:25 66:3

**assemble** 23:22

**assigned** 46:12 47:11,17, 18 55:18 57:20 76:24 77:4 101:12 102:16

**assigning** 47:20 70:8 100:18 103:2,9

**assignment** 22:15 51:6 55:20

**assistance** 27:1

**assisting** 22:6

**assume** 7:18

**assumed** 48:9

**attached** 11:6

**attacked** 66:4

**attention** 88:22

**attorney** 36:7,13,23 38:5 107:22 128:24 132:18

**attorney's** 38:8

**audio** 9:24 49:15 50:4,8

**August** 16:2

**Austin** 2:5 4:9 14:16 15:11,13 17:12 19:9

**automatically** 50:7

**average** 28:24 32:16,19, 23 64:6,8,9

**avoid** 8:8

**aware** 90:20 115:6 119:20

---

**B**

---

**Babe's** 138:4

**Baby** 35:16

**back** 14:3 15:22 16:17 18:17 22:9 24:4 25:24 27:12,13 28:5 29:20,22 30:1,18,22 32:4 35:21 40:24 41:2 45:23 50:22 51:12 55:24 62:16 63:12 68:1 76:22 80:22 81:1,4 83:21 85:4 86:21 90:6 94:23 95:1 96:18 97:2 98:25 102:24 107:6 110:3, 7,11,12,13,15,17 112:10 123:24 124:3 131:8 132:15 134:9,23,25

**background** 13:10 81:15, 22 82:12 86:2 87:1 88:6 101:23

**backgrounds** 85:16

**bad** 24:10 25:9,14 32:14 114:6 121:9

**balance** 18:20

**balancing** 6:1

**bandwidth** 50:5,7



bar 12:6 55:22 56:9,15,16, 17,18,22,23 57:1,13,15, 17,18,24 58:12,18,25 59:6,10 60:2,3,8,16,18,22, 24 61:2,14,23,24 62:7,8 64:7,15,19,22 67:13 124:20,21,24

Bare 35:4 138:4

barely 118:18

BARGER 2:10

bars 24:17 45:6

bartender 56:16

base 84:23

based 127:24

baseline 85:3

basic 43:15

basically 7:9 23:23 38:7, 18 41:24 42:23 43:25 44:3,17 73:8 95:15 96:8 98:20 105:9 106:4,5

basis 61:5 111:8

baskets 20:18

bear 25:20

beer 44:16

began 48:11 83:23 84:5,6

beginning 25:12 46:12 58:4 81:6

Behan 4:13

believed 53:11 90:24

benefit 6:17

benefits 12:14 27:23,25 108:16 109:17

Benoit 3:18

bet 101:18

big 45:17 49:22 63:21

bigger 82:1,2 95:3

bit 13:10 16:13 19:5 24:2 25:14 29:23 49:11 51:11, 12 67:25 69:15,24 71:15 75:11,13 84:1 94:21 101:16 109:9 122:21 125:13 129:5,6

black 45:5 75:1,2 93:3 96:5 106:22 111:21

blacked 6:19

blah 12:25 13:1

Blaskopf 2:15 4:11

blatant 76:10

Blaylark 41:12

blue 106:21

body 49:15

bolded 82:25

book 114:2

born 112:24

bottle 60:5,13 118:9

bottom 11:20 24:13 82:4, 15

Boulevard 2:10

bounce 23:13

break 13:24 14:3,6 40:19 80:24 111:13

breaks 113:3

brick 126:8

briefly 104:19

bring 32:13 44:15 60:4

bringing 47:15 51:6 52:2

broke 112:13

brother 78:18,24 95:10

brought 105:16 134:18

browser 10:7 12:1,2 45:19

bucks 59:3

bumped 76:11

bumping 125:16

business 70:8

busy 120:8

button 45:19

buy 21:12 60:6

BYOB 60:3

## C

Cabaret 11:12

California 4:7 11:11

call 34:6,7 35:20 48:5

called 21:20 41:22,23 138:4

calling 38:15

Calls 91:2 100:10

calm 116:21,23

candle 118:1 120:18

candles 117:24

care 9:2 25:25 48:2,3 75:3 103:25 112:16 113:13

care/home 24:4

career 19:20 20:5

careful 35:23



**Carter** 3:2 4:6,7,17,23 5:5,6 11:11 15:9 41:6 45:4 81:9 96:12 102:14 107:10 139:19

**Carter's** 96:11

**case** 4:7 11:18 13:13 30:13 111:23 115:6 116:16 133:11

**cases** 127:22

**cash** 21:11

**casual** 90:13

**category** 111:22

**caters** 84:19

**Cathey** 39:23

**Caucasian** 39:11 67:8,9,18 68:25 71:9 77:7,10,12,15,21 88:6 112:4 113:20 118:18

**cell** 24:16

**CERTIFICATION** 3:6

**certifications** 18:5

**Certified** 4:19

**cetera** 137:14

**chairs** 118:7,8,10

**chance** 9:5 128:16

**change** 6:16 8:16 12:3 47:7,8 54:9 58:13 111:17 113:4,5

**changed** 47:1,3,5,6

**changing** 63:3

**char-** 127:21

**character** 114:4

**charge** 3:14 71:19 73:16,18 80:21 99:14 100:4,6 102:23 103:8 114:12,21,25 115:8 123:6 126:12,15 127:12,14,16

**charged** 130:5

**charges** 76:16 83:8,15 99:12 115:5 128:20 138:20

**check** 21:10 37:14 44:18 53:23 62:16 125:22,23

**Cheddar** 15:12 16:21,24

**Cheese** 20:19

**chest** 44:15 116:21

**child** 39:25 113:1 133:3

**children** 17:23 24:22 134:5,7,12,19

**Chili's** 35:16

**chill** 117:2 136:22

**choppy** 25:14 29:24 95:21

**chose** 74:9 85:5

**chosen** 86:21

**Christmas** 16:14

**chronological** 51:11

**Chuck** 20:19,21

**civil** 11:13

**claims** 138:19

**clarification** 129:1

**class** 18:14 19:3,10,12

**classes** 18:22

**clean** 8:12 9:6 38:15 44:22 118:7,10

**cleaning** 119:1

**clear** 8:12,16 24:21,23 25:5 62:9,13,20 63:11

**client** 139:9

**close** 66:14 71:10 107:20,25 114:11 125:24 126:4 127:2

**closed** 29:11,12,14 30:25 128:12 138:4

**closer** 32:18,20

**club** 21:20 28:8 48:7 54:21 56:2 69:5 70:6 71:3 74:24 75:24 77:18 84:19,25 85:8,24 86:6 87:17,21 100:7,14 111:4 123:2,10,21 125:20 137:7

**clubs** 42:23 87:10,14 88:13

**codes** 110:14

**College** 19:2,8,10

**color** 111:17

**comfortable** 14:3 96:3 97:7 98:22

**common** 87:13 91:16

**communicate** 10:23 12:19 37:10

**community** 19:9 91:17,18

**company** 133:12

**complain** 98:2

**complaining** 89:2

**complaint** 11:18 47:4 48:13 62:19 75:9 81:10 83:3,11 89:1 93:19 99:7,19 115:9,13,19

**complaints** 38:10 39:9,12



**complete** 18:11 19:4,10, 12 139:14

**completed** 17:17

**complies** 50:18

**concerned** 48:25

**concerns** 55:7

**conclude** 127:25

**concluded** 139:23

**concludes** 139:22

**conditions** 76:3

**confirmed** 62:7

**confused** 8:20

**connection** 24:10 50:6

**consistent** 131:22 132:10

**consists** 20:20

**constant** 102:9

**contact** 36:25 38:19,20, 22,24 72:19 75:21 79:14

**contemporaneously** 83:10

**context** 130:7,13 133:21 136:17

**continue** 90:7 106:11 110:9,10 114:13 134:21 135:2

**continued** 76:10 133:15

**contract** 72:1,2

**conversation** 8:1 41:15 70:11,18 78:11,13,15 97:5 98:15 99:9 104:20 105:7, 14 106:18 121:10 122:2, 17 124:6,23 134:2 135:10, 22 137:5

**conversations** 78:5 121:21

**convince** 106:5,8,9,16

**cool** 89:25 95:9,23 106:15 117:3,5

**cooler** 66:16

**correct** 39:25 43:3,6 51:16,17 53:11 57:24 59:23 60:25 61:5 62:2 63:22 65:16 73:25 74:7, 13,14 84:11,14,21 85:9, 10,16,17,23 86:3,4,8,13 87:14,15 91:21 92:18 93:22 94:24 97:13 100:4, 5,7,9,15,16,24 101:23 103:3,4,6,7,10,13,14,17 104:2,9,15,16,18,21,22 105:2,23 106:2 107:13,14, 18 108:15,18,21,25 109:2, 4 111:6 115:9,10,14,17, 22,23 116:1,7 119:18 121:12,24,25 122:14,15, 21,22,25 123:5,7,8,11 124:17 126:13,18,23,25 127:1,18,19,22,23 128:2, 3,4,5,7,8,22 129:17,20,21 130:3,9,10,19,20 131:6,7, 9,10 135:7,8 137:24,25

**Correspondence** 3:12

**costs** 44:13

**counsel** 4:14 41:4 45:12 46:1 50:19 81:7 96:10 106:24 107:8

**counseled** 130:22

**counting** 28:22 118:11

**country** 85:1,2

**couple** 5:10 13:5 15:22 20:5 26:1 35:22 41:19

57:9

**court** 4:9,12,15,19 5:23,25 6:17 8:3,25 9:8 11:10 80:11

**cover** 61:21

**covering** 61:23

**COVID** 13:19 19:23 109:11,12 110:14

**crazy** 78:17 120:19

**criticized** 121:11

**critiquing** 99:6

**crossed** 19:21

**crowded** 52:10 60:15 64:1,3 66:13 125:21

**Cue** 21:20

**current** 15:10 111:4 138:2

**customer** 34:8 44:11 46:14,15 47:13 53:17,18 65:25 75:22 78:12 101:15 102:15 104:1 116:4,9,12 117:6,11

**customer's** 75:16

**customers** 44:1,8,10 46:19 47:10,15 48:3 56:19 68:20 69:13,20 70:3,9,14, 15,20 73:8 74:16,18 75:4 76:23 77:1,3,14,17 78:6,9 84:23,24 87:17,21 88:14, 16,18,23,24 100:18 101:1, 5,12,13 104:4 118:6

**cut** 29:23 59:12,14 69:24 91:6 98:7,8 122:21 123:4

**cuts** 50:7,12

**cutting** 101:16,18



## D

daily 26:19

damages 108:4

Dan 49:3,5 73:1,2,3,4,5 94:5,7 104:17,19

dance 85:9

date 4:4 15:24 94:10,11, 14

dated 124:8

dates 136:13 138:7

daughter 15:2,6 17:21 36:17 111:22 125:22 137:6

daughter's 15:8

Dave 48:17 62:11,12 63:9 68:24 78:11 121:22 123:23

day 21:7 26:12 31:18 34:15 43:6 61:18 68:19 90:3 94:13 95:11 109:3 110:22 112:23 120:9 132:25 134:1

days 31:15,17 34:17 54:6, 11,15,16,22,23,25 55:9,11 57:9 76:20 108:23 109:5,7 120:7,8 122:24

de- 60:2

dead 32:17

deal 45:17 49:22 52:8,19 107:22 109:16 112:22 114:5

December 16:13,14 58:5 100:4,7,14,17 101:8,11 103:6 107:12 108:9,10

126:19

decide 31:12 85:18

decided 21:1

decisions 86:23

defend 66:20

DEFENDANT 2:8

defended 66:1

delay 49:12

deliver 34:7

denies 129:16

depend 63:23 64:13

depended 26:8

depending 14:2 53:20 84:22 86:5

depends 14:9 88:2

depos 12:12

depose 80:3

deposition 3:11 4:6,10 5:6,24 8:2 36:3,14,16,20 132:22 139:22,23

descent 92:9

describe 111:8

describes 129:25

detail 72:19 83:6,15

details 26:18 30:13 36:8 138:24 139:1,2

determination 127:21,24

determinations 128:10,16

determiner 131:18

difference 58:22 59:18

differential 59:22

differently 112:25

direct 11:11 13:1

directed 74:16 129:16

directing 68:2 77:14

directly 29:5

disability 27:3

disagree 84:3,4 129:17,18 130:11,24 132:10 139:9, 12

disagrees 139:9

disappeared 106:21

disbelieve 130:25 131:2

disciplined 119:16

disclose 79:4,11

disconnected 106:22

discrimination 37:25 39:10 123:3

discuss 38:4 130:8,18

discussed 39:24 131:23 136:20

discussion 96:22 115:20, 24 122:13 124:10

disrespect 76:11

distractions 20:1

District 4:9 11:10

diverge 37:18

Division 4:10

divorce 138:14,16

DJ 65:14 85:14,21,25 86:22 135:25 136:4 137:2

DJ'ING 41:16,17

DJS 85:7



do- 23:17

document 10:17 12:18 82:16,17

documents 10:11,12 36:10,19 81:1 99:25 127:17

dog 123:19

dollars 40:13

Don 79:2

door 20:16 68:14 69:1,17, 20 77:23

doubt 80:16

downside 12:18

draw 9:4

drinking 118:5

drinks 28:10

drop 9:23 10:5 20:7 34:22

dropped 125:13

drops 50:6

due 110:13

duly 4:18

duplex 17:1,6,7,9

duties 44:1 119:11

duty 104:17

**E**

earlier 59:14 81:11,25 100:25 101:4 137:13

early 23:8,10 35:10,13,14 68:6

earnings 109:15

easier 9:20 10:15

east 17:12

eat 118:22

EEOC 3:14 13:14 100:4 123:6 127:11,14,17,25 128:4,9,17 138:20

Elks 28:6,7,13 29:10 30:22,24 31:4,5,7,13,14, 24 32:6 33:9,11 108:23 110:11 111:4

emotional 111:7,9,25

emotionally 111:11,14 114:2

employee 124:12

employees 117:15 131:19

employment 13:11

empty 57:6 60:1 66:16

end 16:6 29:20 32:18,20 39:21 44:2,19 52:2 58:4,7 68:17 80:11 95:16 114:16 120:16 126:11 132:24 134:1

ended 39:22

enjoyed 20:25 21:22

enter 19:13 40:14

entertainer 86:1

entertainers 85:9,11,15

entire 15:1 42:12 108:17 138:23

entrance 72:8

Erica 43:16 67:8 124:15, 16,18,20,22,24 138:9

escorted 71:4

ESQ 2:3,9

essentially 26:4 53:4,12 67:21 90:9 97:7

establishes 128:1

establishment 22:1 42:21 112:3 116:25

establishments 88:13

estimate 14:8

et al 4:7

ethnicities 85:16

ethnicity 86:25

evening 104:7

evenings 61:24

event 63:17

events 138:23 139:3

Eventually 27:2

evidence 90:15

exact 23:4 30:11 76:2 94:10,11,14 111:9 121:20

EXAMINATION 3:2 4:21

examined 4:19

examples 70:25

excuse 76:12

exhibit 3:10,12,13,15,16, 18 10:18 11:21,22 122:7 127:4,6 129:10,23 131:12

exhibits 3:9 13:5

expect 13:20

experience 70:2

explain 7:13 111:12

explaining 93:15 97:24 116:10



**expressed** 111:20

**eye** 72:19

---

### F

**face** 75:18 111:15 112:8 125:1,4

**Facebook** 55:6 123:2

**fact** 48:17 91:16 105:6 133:14

**factor** 6:15

**facts** 99:8 107:23

**factual** 81:15,22 82:12 111:8 126:11

**fair** 36:23 51:8 53:7,8,14, 24 58:17 66:21 73:13,14 92:16 97:11 115:16 124:14

**faster** 10:22

**federal** 5:23,25 8:25 80:10

**feedback** 19:5

**feel** 83:19,20 96:2 112:19 113:15 132:25 133:19

**feeling** 73:5,6,12 114:3

**feels** 133:1

**fell** 134:15

**felt** 38:18 66:14 76:22 94:21 99:2 113:16 125:25

**fewer** 19:9

**Fiat** 110:5

**field** 21:2

**fight** 8:6

**figure** 10:8 32:16

**filed** 4:24,25 11:18 100:3 102:23 114:21,25 115:5 123:6 128:7 138:20

**filing** 13:14

**fill** 41:23 73:9

**find** 33:18,20 91:19 108:11

**fine** 32:12 50:2 79:10 80:5 113:7

**finger** 19:21

**fingers** 6:23

**finish** 6:9,11,24 7:1 13:25 18:17,24

**finished** 21:14

**fired** 65:23,24 66:2,25 67:21,22

**five-day-a-week** 123:24

**fix** 10:6 24:24 49:1

**fixes** 45:18 50:17

**fizzling** 24:2

**Flextronics** 22:11

**Flip** 72:15

**floor** 44:24 46:8 55:25 56:3,12,13,19 57:3,5,13 58:19 59:2 60:8,14,24 61:2 64:10,23

**flow** 52:13

**FM** 14:16

**focus** 19:24

**focusing** 76:18

**follow** 7:4 128:9

**follow-up** 14:1

**food** 28:10

**forced** 35:9 119:6

**forgot** 43:17,18 67:11 75:17 94:13 117:8

**form** 9:1,2 86:11 91:22 92:17 100:20

**formally** 138:4

**Fortnite** 134:16

**forward** 106:23 139:14

**found** 108:10

**four-year-old** 134:6

**Foxy's** 4:24 11:12 13:12 15:23,25 16:12,20 31:8, 13,21 32:2,9 33:1,3,7,8, 13,15,17 35:9 37:1 38:1, 20 39:10 40:5,8,14,21 41:7,23 42:5,13,20,22 43:12 54:1,7,12,15 55:12 58:9 65:11,18,21 67:2,3 71:25 84:11,16,17 87:9 89:10 108:19,20,22 109:18 110:21 111:2 114:10 138:10

**frankly** 12:16

**free** 53:5

**frequently** 48:7

**friday** 4:2

**friend** 41:8,11 86:23 136:8,9

**friend's** 20:24 22:6

**friends** 78:17 88:8 90:10, 12,24 92:3,4,8 93:3,8 96:5 97:9 118:5 124:20 134:17

**front** 113:2 126:2



**full** 5:24 6:11 9:17 30:17, 18 77:18

**fully** 6:3

**fun** 21:25 27:5

**future** 108:8

## G

**game** 134:14

**games** 98:22

**gas** 21:5,12

**gave** 41:21 43:13 59:7

**GED** 17:25

**general** 48:19 49:3 63:1,5 74:11 84:16 98:12 107:17 133:8

**generally** 13:20 22:25 26:18 46:19 71:20 73:11

**genre** 86:16

**girl** 37:4 38:24 43:17 61:25 67:10 75:1,2

**girls** 63:9 78:20

**give** 8:22 9:5 10:14 13:21 43:23 44:4 67:6 70:25 79:17 80:11 103:16 113:24 127:14

**giving** 9:16

**glad** 7:12 133:24 139:11

**glass** 118:2

**God** 45:14 75:20

**good** 6:21 11:16 13:7 24:18 32:13 49:12 54:19 80:11 96:25 103:3,12 112:11 113:18 114:7 116:15

**good-looking** 7:3

**GPS** 4:12,13

**grab** 51:24

**grabbed** 42:10

**grade** 17:18 20:8

**graduate** 17:15

**grandmother** 22:7 123:18

**grandson** 113:1

**great** 6:8 7:22 9:20 83:19

**great-grandmother** 20:25

**green** 24:17,18

**greeter** 20:16

**greeting** 90:13 92:12 93:14

**grew** 96:4 97:8,17 105:9, 19 112:16

**Grill** 4:7 11:11

**groceries** 21:12

**gross** 29:7

**ground** 5:10 105:5

**group** 74:21

**grow** 17:11

**guard** 71:12

**guards** 71:5,23 72:2,7,11

**guess** 8:5 34:8 66:1,14 69:3 105:17 124:22

**guy** 41:18 65:25 78:16,17, 23,25 116:10 135:6

**guy's** 41:22

**guys** 50:23 74:21 130:15

## H

**H-E-B** 20:15

**half** 14:23 15:1 16:15 17:6 54:16,23,25 108:14 137:22

**hall** 21:19

**hand** 66:16,17 69:1 125:16,25

**handle** 44:1,8,10 54:20 79:23 114:4

**handled** 46:11,14

**handling** 23:13,16,18

**hands** 66:19 72:20

**hanging** 105:18

**happen** 9:22 10:6 68:4,12 71:16 89:24 106:8 114:9 119:15

**happened** 48:12 63:13 64:14 68:5 73:11 75:7 78:14 91:21,25 103:24 112:15 119:9 120:2 135:1

**happening** 48:12 74:12

**hard** 7:4,7,8 18:20,22 34:12,13 51:21 52:4 63:25 113:9

**harder** 9:21 14:11 29:3

**HARTLINE** 2:10

**he'll** 79:19,20

**head** 8:4,7 17:4 43:6 72:20,21

**heading** 81:22

**health** 24:4 25:24



**healthcare** 20:24 25:25 26:7,13

**hear** 9:24,25 10:1 45:4,7 50:13 61:8 70:10,12 78:5 86:17 87:3,13,24 88:8,15 93:9 95:18 102:6,8,11 106:6 135:16,20 139:10

**heard** 4:8 22:12 25:8 42:20,23 53:3,4 78:11,13 84:7 88:7,18 89:3 95:22, 23,25 104:4 106:6 116:4, 9,20 131:4 133:17 135:16

**hearing** 25:6 84:6

**heart** 133:22

**HEB** 20:17

**held** 4:10 76:22

**helping** 22:9 27:24 76:23

**helps** 60:19 102:5

**hey** 21:1 41:17 44:12 47:15,25 48:24 53:22,23 62:6 63:1,25 64:4 65:15 69:3,12 70:7,21 78:18 92:24 98:21 106:10 114:8 116:15,18 121:13 133:1,9 134:13

**high** 17:13,14 18:6 32:18, 20

**high-level** 83:13

**highlight** 8:19 13:21 59:14

**hint** 88:4

**hinting** 88:4

**hip-hop** 84:18,20 86:9,17 87:10

**hire** 35:19 62:23 63:2 65:16

**hired** 41:24 43:2,12 67:21

**hiring** 42:3

**Hispanic** 92:10 118:15,16

**history** 8:23 13:18 20:7 22:24 23:8

**hit** 45:19 123:19

**hold** 10:23 20:11 116:21

**hole** 21:19

**holler** 123:19

**home** 14:17 20:24 25:24 26:7,13 64:6

**honest** 9:17 119:4

**hope** 19:22 20:4 139:14

**horrible** 43:18 75:17

**hospital** 22:7

**hot** 20:22

**hour** 14:6 26:9 40:15 56:24 57:2

**hours** 26:10,11,12 31:17 34:16,19 44:25 59:20,21 122:20 123:3,24

**house** 77:18

**household** 112:17

**Houston** 2:11 15:3,5

**hurt** 113:22

**hurtful** 113:22

**hurts** 113:22,23

**husband** 39:21

---

**I**

**ice** 44:15

---

**idea** 35:20 131:7

**identification** 127:4 129:10,23 131:12

**ignore** 9:7

**IH** 2:4

**imagine** 56:1

**immediately** 134:9

**impactful** 30:16

**important** 6:2,15 11:24 12:11

**impossible** 7:10

**inaudible** 63:10 101:15 135:14

**incident** 115:20,24 120:13 125:8 126:5,20

**include** 36:7

**including** 13:13 18:5

**income** 31:22 108:8 109:23 110:10

**increase** 65:7 114:18

**independent** 12:1

**independently** 12:17

**indicating** 7:25 90:6 117:18 118:2 125:1

**individual** 86:1

**individuals** 89:9 91:17 92:8,12

**industry** 35:1

**information** 38:8 75:21 79:15 99:5 128:1

**initial** 75:9

**initially** 51:22



injure 26:17

injured 26:15

injury 30:12

inside 69:5 72:4

Instacart 33:22,23,25 34:4,5

instructed 52:18

instruction 8:22

insurance 26:8

interact 69:19

interaction 130:1

interfering 101:24

interrupt 96:11

interviews 35:18

investigation 127:20,25

investigator 128:17

involved 27:5 49:2 138:11

issue 25:4 56:7,8 80:17 131:23

issued 127:17

issues 9:22 25:15 29:12 30:5 49:21 111:18 130:2

items 34:21

**J**

Jackson 79:12

jail 117:2

Janelle 67:9

job 20:13,15,19 21:16,17 29:16 33:18 40:2 41:17 55:17,20 60:14 73:9,21,22 110:12 119:3 134:20

jobs 20:11,14,23 22:13 31:10 34:25 35:6 120:4 137:13,16,23 138:1

judge 7:17 80:7,8

judged 113:4

juice 60:4

July 16:2 115:22

June 16:1 83:24 84:3 115:21

jury 7:18 13:1

**K**

Kari 4:13 101:18,21

Ke- 43:3

Kell 2:3,4 8:6,25 37:14 79:18,23 80:7 106:21

kell@kellsimonlaw.com 2:6

Kevin 41:22,25 42:12 43:3

key 6:13

keyboard 23:21

Kiara 37:4 39:1 67:9 119:7,24 120:14 137:8

kick 117:1

kicked 110:2 116:22

kidding 95:13

kind 10:5,14 11:12,25 12:1 13:12,22 15:21 18:22 20:12,20 21:1,3,20 22:13, 22 23:5,14 24:1,13 25:3 28:8 30:8 31:20 33:12 34:12,13,20,22,23,24 44:23 46:7 49:11 51:21 52:3 53:1,9,11 56:20

60:22 63:25 66:17,18 68:2 77:25 78:2,17 80:19 81:23 82:16 84:23 91:6 94:5,21 95:1,9,17 101:16 108:1 109:8,9 110:15 116:20 117:19,24 121:6,7 125:2, 3,5 136:14 138:22

knew 29:17 31:19,21 40:8 47:21 54:3,4,20,21 56:22 65:14 67:19 77:23 121:6 125:9 126:6,9 134:20 135:9,11,13

knocking 125:16,25

knowing 105:11

knowledge 117:11 128:24,25

**L**

lagging 75:10

lags 75:12

laid 30:14

language 76:10 96:8

late 26:3 68:5

Latino 77:9

Laughter 138:17

Lauren 38:24 39:2 67:8

Lauren's 39:2

LAW 2:4

lawsuit 4:24 37:22 128:7 138:18

lawsuits 138:12

lazy 78:20

leading 76:20



**learn** 41:6,13,14

**lease** 14:20

**leave** 16:12 17:19 29:10 30:4 33:11 35:9 42:15 65:18 67:2,3 73:16,20,24 121:19

**led** 76:13 99:23

**Lee** 39:23

**left** 18:6 33:7,8,14,17 40:4 42:17 65:10,21 67:6 70:15 74:4 82:15 127:11

**legal** 4:11 107:21

**library** 86:7

**life** 5:14 20:2 109:9 112:2

**lines** 38:10 123:15

**lingo** 90:1

**listed** 57:23

**listen** 9:5 35:24 84:20

**literally** 103:20 124:24

**live** 14:15,24 15:11,18 16:24 112:1

**lived** 15:1,2,10,12

**lives** 20:1

**living** 17:1 18:20

**LLC** 4:7 11:12

**LLP** 2:10

**lo-** 34:16

**load** 10:23

**loaded** 10:24

**loading** 10:19 81:17

**loads** 10:22 81:13

**local** 71:2

**locked** 19:23

**lodge** 28:6,7,13 29:10 31:16 33:9,11 110:11

**long** 13:5 14:5,22 15:18 17:9 19:16 21:18 22:1,3,4, 14 24:5 26:21 27:5 28:13 29:22,25 30:2,14,15 31:4 50:13 54:14 59:19 61:8 81:20 105:11,19 113:8

**longer** 14:12 30:1 40:16

**looked** 34:25 59:12 90:6

**Loop** 15:12,13 16:21,25

**lose** 50:20

**losses** 109:20,22

**lost** 45:13 49:25 96:11 108:8 109:22 110:1,10

**lot** 9:20 14:9,12 21:21 31:22 33:12 57:4,5 60:18 74:18,23 83:6 86:15 97:9 98:22 110:3 111:14,17 112:13,14

**loud** 84:14

**low** 32:18

**lower** 40:12,13

**Lucia** 65:22 67:12,24

**luck** 35:6

**Luckily** 80:14

**lurk** 78:4

**lying** 8:13

**lyrics** 88:10

---

### M

**made** 13:13 20:21 21:21 47:4 58:22 62:19 63:24

72:19 90:10 93:12 112:13, 14 117:15,17,25 120:17 124:9 127:20 131:4 133:17

**majority** 56:21 64:2 112:4

**make** 7:19 8:12 10:15 12:10,20 21:6 25:12 28:22,23,25 30:23 31:20 32:22 33:14 34:14,23 37:14,24 52:15 56:3,21 59:2,7 60:2,9 61:1 64:10, 16 71:20 80:3 82:1,2 83:12 88:10 90:8 95:6 114:9 118:2,8,10 127:9

**makes** 7:7 9:20,21 49:12, 14 65:13 106:10

**making** 26:5 32:6,10 33:12 34:19 38:15 44:21 56:23 57:1 59:1 86:22 99:16 109:1,3 113:15 118:4

**man** 66:18 136:1

**management** 52:18,20 60:23 62:4 66:1 93:24

**manager** 41:25 42:1,2,4,5, 7,8 43:20 47:14 48:19 63:1,5,9 68:24 69:23,25 70:1,21 74:11 78:9 98:12 104:17 133:12

**manager's** 69:11 133:9

**managers** 42:9 47:10 48:15 49:7 51:7 52:23,24 53:4 68:2 69:19 70:3,4 72:22 74:12,25 77:13,22 89:7,17 98:3 100:18 101:1 103:2 117:12 118:25 120:25 121:20 125:7

**manger** 49:3



**March** 3:14 127:17 138:8

**mark** 129:12,22

**marked** 10:17 127:4 129:10,23 131:12,14

**marriage** 39:21,22

**married** 39:16,18

**material** 23:13,16,17

**matter** 4:6,8 9:2 63:21 113:10,17 121:19

**may-** 14:8

**Mckay** 2:9 3:4 4:22,23 37:13,17,19 40:23 41:5 45:16,24 46:3,4 50:21,24 51:1,3,4 79:13,22,25 81:8 86:14 90:19 91:5,9,13 92:1,15,19 96:12,17,25 97:2,3 98:7,10 100:12,22 101:21 102:2,8,13 107:9 127:5 129:11,24 131:13 133:23 139:16,19

**means** 106:22

**meant** 8:5

**mechanical-assembly-type** 22:13

**media** 81:6 123:10

**medication** 9:14

**meet** 21:24 36:9,22

**meeting** 36:7,12 119:10

**members** 28:8

**menial** 117:15

**mention** 139:4

**mentioned** 48:21,23 49:4, 8 72:18 97:4 133:19 139:3

**mercy** 56:20

**messages** 125:23

**met** 41:11

**Michael** 41:12

**middle** 32:17

**million** 113:13

**Millions** 135:18

**mind** 12:23 66:19 112:10

**mine** 41:8

**minimum** 28:16

**minus** 136:15 137:22

**minute** 6:19 62:17 114:16 128:13

**minutes** 40:20,24 130:22

**missed** 139:4

**missing** 99:16

**Misstates** 90:14

**mistake** 90:11

**mix** 60:7

**mixed** 68:6

**mixers** 44:17 60:13

**mixing** 99:22

**Monday** 57:9 59:3,19 63:18,24 64:1,7

**Mondays** 55:15,18,22 56:1,9,13 57:8,10,11 58:14,17 59:5 61:12,14,24 63:7 64:2,18 67:14

**money** 21:5,6 26:24 31:20 33:12,15 40:4 47:16,21 48:2,9,10 56:3,13,21 58:22 59:5,18 74:23 76:24 77:19,20,24 78:3 118:4

**money-making** 63:21

**month** 54:16,23 115:21

**months** 22:2,16 30:3,17, 18 32:25 48:13 108:20

**motions** 69:1

**mouse** 12:5

**move** 20:5 90:15 114:11 139:14

**moved** 15:2,5 42:23

**movement** 49:15

**moving** 6:23

**music** 84:8,14,16,17,21 85:1,3,6,12,18,24 86:16, 17 87:10,18,21 88:14 89:4 94:20 130:23 133:10

**muting** 102:5

**mutual** 41:11

**N**

**named** 37:4 41:11 65:22

**names** 43:18 67:6 72:10, 11 75:18,19 79:18 123:20

**narrative** 80:19

**necessarily** 30:11 103:5 114:6

**neck** 66:17

**needed** 42:10 44:1 46:5 61:16

**negative** 123:10,12

**negatives** 12:15

**neighborhood** 96:5

**nephew** 134:13



**nigga** 90:4 95:12 96:2 97:24,25 98:1 116:12 124:25 125:5

**night** 32:11,13,14,22 44:2, 18,20 49:6,9 51:7 53:20 59:6,19 71:16 72:16,17 74:13 75:25 76:4,5 101:7, 11 102:20 104:5,11,15,17, 24 105:1 107:12 116:8 120:16

**nightclub** 84:11

**nights** 28:9,10 33:15 58:22

**Ninth** 17:18

**No-** 52:23

**Nobody's** 112:25

**nod** 8:4,7

**normal** 5:14,15 6:20 7:25 26:19 27:6 56:2 69:19 75:12

**North** 2:4

**noted** 4:14

**notice** 3:11 68:14 100:6, 14 103:8 118:17

**noticed** 100:18

**november** 3:12 34:1,2 58:4 68:6 108:12 121:23 122:6,13,20 123:7 136:15

**number** 5:16 15:16 22:24 37:8 39:4,5,6 41:21 42:9 65:7 79:14 82:15

**numbers** 79:17,19 122:10, 12 127:10,12

**nurse** 18:10 19:19

**nursing** 19:11,13,16 21:2

## O

**Oak** 2:10

**oath** 5:16 136:1

**object** 9:1 100:20

**Objection** 86:11 90:14 91:2,22 92:14,17 100:8

**objects** 9:2,3

**obtain** 17:25 18:5

**obtained** 128:1

**occa-** 50:2

**occasion** 129:3 135:15

**occasionally** 8:10 49:23 53:24 92:10

**occasions** 74:15

**occur** 94:25 97:22 119:23, 25 120:10 125:18 136:10

**occurred** 58:6 71:22 75:5 77:2 136:11

**occurring** 70:24 71:1

**October** 4:2,4 68:9,10 115:25

**off-record** 96:22

**offended** 8:20 25:5

**offends** 133:13

**offensive** 93:1 112:18

**office** 36:13 73:9,15,19

**OFFICES** 2:4

**Ohh** 32:11

**Ooh** 65:4

**open** 22:2,4 28:9

**opened** 125:1

**opening** 29:18

**operations** 44:24 46:7

**opportunities** 19:25

**opportunity** 21:5,6 41:7, 14 59:7 73:13 139:11

**order** 34:13 61:20

**orient** 22:22

**originally** 57:14 89:3

**overcame** 114:8

**overlay** 82:16

**overview** 43:23

## P

**p.m.** 81:5 139:23

**pages** 127:13

**pain** 111:7,9 112:22

**Palazio** 35:5

**paperwork** 41:24

**Pappadeaux** 35:16

**paragraph** 12:24 84:5 93:19 95:2,6 108:1 115:11,18 116:3 117:14 129:15,25 130:4

**paragraphs** 107:10 115:12 124:8

**part** 44:6 48:23 55:14 56:6 68:17 75:11 80:1,19 91:14 95:4,18,19,24,25 99:22 114:4 118:1 121:20 130:12 134:2 135:22 138:19

**parts** 99:5



pass 139:16

past 108:8

Pat 96:17,25

Patrick 2:15 4:11

pause 45:22 106:20

paused 75:11

pauses 8:24 59:15 75:12

pawn 110:2

pay 26:6 28:15 29:7 34:11 59:23 102:19

paying 88:22 101:13 110:8,9,10

payment 40:3

payments 27:3

pecuniary 109:20,22

penalty 5:19

people 7:9 14:11 20:16 21:23,24 31:19,21 34:13 38:21 42:3 45:1 47:17,21 48:1,6 52:12 59:4 60:5,17, 19 61:20 64:3 65:15,16 69:1,6,9,17 76:12 80:12 84:6,8,19 87:24 91:18 92:10,25 95:9 97:16,17 111:20 112:4 113:3,10,19, 20 114:5 123:15 134:10, 11

percent 24:21 30:19 77:3, 14,16,18,20 95:22 101:5,7

percentage 77:1 101:12

perception 91:1 131:17

perfectly 25:5

period 22:25 26:23,24 27:19,20 54:14 110:17

111:1

periods 30:24

perjury 5:19

Perkins 3:17 124:9 125:15

person 7:9 41:25 51:21 52:6,11 64:19,22,24 66:23 67:15 70:22 111:15 136:8

personal 30:5,12 38:9 88:8

personally 72:12 92:2 109:21

perspective 66:22

phone 24:16 37:8 39:4 125:16,25

phonetic 41:12

pick 47:23,25

picking 44:21

piece 23:22

place 65:14

places 26:5 32:3 78:2 110:25

Placide 3:18 104:23,25 105:8,9,24 129:4 131:11

Placide's 131:14

PLAINTIFF 2:2

planning 18:17

platform 12:16 80:15

play 85:2,14,19,21,22 86:3 87:10 133:6

played 85:25 87:13 88:14 113:13

playing 84:14,17,25 87:17,21 98:22 101:25

Playstation 133:4,6

pleadings 109:20

pled 100:13 108:5 111:7

plus/minus 12:2 81:25

point 9:3 13:24 14:10 16:19 18:18 31:24 63:14 68:1 73:24 74:9 88:11 93:12 94:25 97:15 99:2 101:2 125:9 126:6 128:7, 15

pool 21:19

pop 86:16

popular 86:16,17

position 23:3 34:4,5 108:10,11 111:5 132:11 138:2

positions 23:10

post 2:10 123:9,14

post-foxy's 13:17

posted 55:6 123:2

potentially 6:4

predated 103:5

preference 86:2

pregnant 17:20

prepare 36:2,6,13,19

prerequisites 19:2,9

presume 20:8 28:15

pretty 5:15 72:1 79:16 80:11 87:12 88:23 117:9 133:20 136:19

prevent 9:16

previous 48:7



**print** 114:19

**prior** 90:14

**private** 24:4 25:25 30:8 31:16

**problem** 25:1 81:18 93:4

**proceed** 4:16 41:4 81:7 107:8 133:2

**proceedings** 4:1 45:22

**process** 27:5

**program** 18:11,25 19:4, 11,14,16 82:18

**proves** 106:11

**provide** 130:7,12

**provided** 31:22

**public** 28:9 123:10

**Puerto** 67:11 87:2 137:2

**pull** 136:13

**purpose** 95:2

**pushed** 66:5,6,12,17,22, 23

**put** 23:22 34:18 35:7 61:18 66:19 74:20 75:6 111:21 118:19 123:22 135:5,24 138:6,8

**Q**

**quantify** 58:21

**question** 6:9,11 7:1,11,16 9:7 14:1 26:4 35:24,25

**questioning** 10:16

**questions** 10:2 35:22 49:16 83:14 108:5 129:8 139:17

**quick** 14:10 80:23

**quickly** 50:17

**quit** 74:2,4,9 75:25 76:4 104:7 124:5 125:20

**quitting** 76:14,21

**quote** 75:1 136:7

**quote/unquote** 63:8

**R**

**R&b** 84:18,20 87:10

**race** 67:7 131:18

**races** 85:15

**racial** 123:3

**racially** 130:5

**racist** 105:11,20 106:9,12, 17 123:16

**rag** 118:9

**random** 71:4

**range** 23:5

**Rap** 84:18

**rapidly** 6:22

**rapper** 71:2,24 72:7,12

**Ratcliff** 3:15 115:20 116:4 117:12

**rate** 28:15

**re-ask** 7:12 10:2 25:19 90:21 102:24

**reach** 55:6 100:7 128:23, 25

**reached** 100:14

**read** 11:15 73:17 74:2 115:11 129:25 130:4

**ready** 46:2 73:7 80:18 81:19 96:24 114:12

**Reagan** 17:14

**real** 10:16 41:9 113:19

**reanswer** 101:18

**reason** 9:15 60:17 61:19 84:3,4 91:14 130:24 131:2

**reasons** 129:19

**rec-** 130:6

**recall** 16:1,3

**receive** 35:20 40:9 43:14

**received** 40:3 43:13 128:4,6

**receiving** 27:22,25 40:10 108:16

**recess** 41:1 81:3 107:5

**reckless** 120:19

**recollection** 62:14 130:1,6

**record** 4:3,15 5:4 8:12,17 9:6 41:3 46:2 81:5 96:24 107:1,4,7 135:25

**recovering** 30:15,17

**red** 45:6

**reduced** 20:1 76:2

**refer** 91:18

**referring** 82:14 91:15

**refresh** 45:19 50:11,16

**refreshing** 10:7 96:13

**refuse** 120:20

**refused** 120:3,18

**registered** 18:9 19:19

**regular** 56:2 70:3



**GPS LLC**
gpscalendar@gps.llc ~ 214.347.4781

**regulars** 48:4,5

**rejoin** 27:10 28:1

**rejoined** 28:2

**related** 105:25

**remember** 15:25 16:20 17:3 22:20 28:18 30:2 35:17 41:15 42:18,25 43:5,23,24,25 48:21,22 51:6 58:1,9 70:24 74:15 75:16,19 94:10,11,12,14 98:16,17 99:10 105:4 117:10 122:9 124:13,18 128:11 137:15

**remembers** 138:16

**remote** 12:12

**remotely** 4:10

**renamed** 138:5

**renting** 17:6

**reopened** 29:21 138:5

**repeat** 19:7 56:4,5 87:19 95:17

**rephrase** 7:12

**replace** 67:22

**reply** 94:22

**report** 124:9

**reported** 130:2,5

**reporter** 4:13,15,19 8:3 98:5 101:22

**reporter's** 3:6 6:17

**Reporting** 4:12

**represent** 4:23 46:18 99:4

**representing** 4:12

**requested** 130:8

**required** 118:14

**resay** 49:17

**reserve** 139:17

**resharing** 81:10

**resigned** 74:2

**respectful** 139:10

**responded** 66:23 97:7

**response** 7:24 93:2 94:17 106:3,13

**responsible** 44:20

**rest** 55:12 88:10 112:2 121:16

**restate** 10:2 49:23

**restaurant** 35:6

**restaurants** 35:14

**result** 127:20

**retaliation** 48:25

**review** 129:3

**Rican** 67:11 87:2 137:3

**rmckay@hartlinebarger.com** 2:12

**RN** 139:14

**Road** 15:13

**Rock** 17:1,2

**role** 133:9

**Rose** 35:4

**rotation** 87:7

**roughly** 19:17 22:2 26:9 28:25 32:7 34:14 40:12 64:12 125:20

**round** 17:1,2 51:19

**Roy** 2:9 4:23

**rudely** 125:15

**rules** 5:10

**run** 19:16

**Rundberg** 21:20

**ruptured** 26:20

---

**S**

**satisfied** 94:21

**scale** 110:3

**scarred** 114:3

**schedule** 55:15 61:2,15, 20,22 62:7

**scheduled** 55:23 56:8 57:13,17,18,20 62:6

**schedules** 61:13

**school** 17:13,14,19 18:6, 21 27:14,18,19,20

**schooling** 18:4 21:15

**schools** 18:5

**scratch** 33:7

**screen** 6:19 12:13 45:5

**scroll** 11:17 12:5,6 127:15

**seat** 44:11 60:20

**secret** 23:20

**section** 44:13 47:14 82:25 99:8

**secure** 60:19 80:14

**security** 26:25 71:5,12,23 72:2,6,11

**seeking** 30:12



**GPS LLC**
gpscalendar@gps.llc ~ 214.347.4781

selected 85:11

self-explanatory 44:3

sell 110:1

send 23:15,21,22

sense 7:19 34:24 60:9 65:13

September 31:6 68:5,9,10

serve 46:21 51:19,22 52:22 70:22

served 46:20,21 103:9

server 28:11,16 46:20 52:21 57:23 65:22 67:22 69:17 78:10 109:18

servers 29:3 57:21 64:18 65:3,6,10,18 67:2,5,7 78:6 118:14,15,16,18

serves 51:15

service 25:8 34:8 44:25 45:6

serving 34:25 56:16,17

set 61:1,2,15,19,22 85:13, 19 112:10

setting 113:11

seven-ish 67:5

share 10:11 12:13 119:21

shared 10:17

she'll 93:16

shift 59:20 60:24 61:1,22 63:2,3 84:7 120:1,16 123:25

shifts 63:18,21

shook 72:20,21

shop 34:7,21 110:2

short 110:17 111:1

shortly 100:1

shoulder 53:17

show 129:12

showed 55:16 95:11

shut 75:14

side 8:7 12:6 17:12 68:18, 22 120:4

SIGNATURE 3:5

similar 84:20

SIMON 2:3,4 37:16 79:7, 10,21 86:11 90:14 91:2, 11,22 92:14,17 100:8,10, 20 132:21 139:17

sing 87:18,21 130:23

singing 84:8 87:25 88:2, 15,23 89:3 124:25 133:15

sir 114:20

sit 60:11,19,22 64:14 75:15 78:4 109:21 118:2

sites 23:16

sitting 103:22 113:1 118:5,11 122:17 132:13 133:22

situation 105:22

situations 114:5

six-year-old 134:6

size 114:18

skin 111:17

skip 33:4 88:9

skipped 95:1,2

skipping 83:19

sky 134:15

slave 96:4

slaves 38:16

Sleepy 41:8,13,16 135:25

slight 25:13

slinged 66:18

slow 59:6

small 81:23

smaller 114:19

Smith 37:7

social 20:1 26:25 123:10

soda 60:4

sodas 44:17

Solectron 22:12

song 86:6,9,10 87:3,6 88:1,2,8,9 113:13 124:25

songs 85:2,14,20 86:20 87:5,13

sooner 55:7

sort 20:11 23:10 80:11 84:16,17 87:14,21 119:10 124:10

sorts 85:24

sound 52:17

sounds 84:7

source 40:4

span 137:24

Spanish 67:12

speak 42:10 62:21 70:1,7 89:16 98:13 121:5

speaking 93:14 116:8



**GPS LLC**
gpscalendar@gps.llc ~ 214.347.4781

**specific** 42:6,7,8 46:13 48:15 63:9 70:25 74:15,16 102:16 103:3,10 107:21 124:19,21

**specifically** 42:4 48:6 51:5 52:19 73:10 86:20 105:17 124:13

**specifics** 38:12 44:5

**speculate** 91:3 100:11

**speed** 7:8

**spend** 47:16,21 48:2,9 59:5 78:3

**spending** 57:5 76:23 77:19,20,24

**spent** 74:23

**spirit** 132:13

**spoke** 49:3 98:4,8,9,16,18 99:17 130:21 133:18

**spray** 118:9

**spreading** 80:17

**spring** 18:15

**SSI** 27:2,23,25 40:6,7 108:16

**staff** 42:7,9 43:19,21 44:25

**stage** 85:9,13,20

**stake** 134:20

**stamp** 75:6

**standing** 68:23 70:15,21 71:10 72:3 103:19,20 124:24 125:21 135:20

**start** 10:13 13:8 20:8 26:3 31:12 33:25 40:20 51:14 52:1 59:16 80:21 81:9,10,

15 95:20 125:24 129:13

**started** 15:22,25 18:14 19:1,8 20:24 23:14 24:1 26:4 27:14 28:6 46:24 47:20 48:12,14 54:1,8,19 58:10,11 63:23 65:6 68:2 84:2,3 134:5 138:1

**starting** 89:2

**starts** 122:6

**state** 5:3,23 130:7,13

**states** 11:10 84:6

**stating** 73:9 119:11

**statutes** 128:2

**stay** 9:5 14:16,19 52:11 55:11

**stayed** 22:2,8

**stays** 50:8

**stenographic** 4:15 98:5 101:22

**step** 51:12 85:4 86:21 102:24 112:3

**stepped** 68:22 71:12

**stick** 21:13

**sticker** 11:21

**stomach** 111:18

**stood** 71:6 72:7

**stop** 23:24 41:20 134:14 135:5,6,11,13

**stopped** 26:13 99:1 108:9 110:8 134:22 135:10

**store** 34:21 112:9

**story** 139:10

**straddling** 108:1

**straight** 59:22

**strange** 60:16

**strike** 66:22 90:15

**striking** 66:23

**Strongly** 129:18

**studying** 18:9

**stuff** 13:14 23:14 26:19 40:24 110:15 123:16 125:23

**stupid** 38:15 120:6

**stuttery** 9:23,24

**submitted** 128:19,20 129:4

**suffered** 38:1 111:10

**suffering** 111:7,9

**suit** 13:14 20:21

**Suite** 2:5,11

**summary** 97:11

**summer** 16:4,5,6 43:10

**summons** 11:13

**sums** 40:4

**supposed** 55:22 118:21, 24,25 121:1 136:9

**surgery** 30:6,7,16,20 31:2, 4

**swear** 4:15

**sworn** 4:18

**symbol** 24:13

---

**T**

---

**ta-** 102:21



**table** 14:1 47:17 51:15,16, 20,22,23,25 52:1,9,19 53:13,23 60:20 64:14 69:7,11 102:21

**tables** 44:21,22 46:11,13 51:6,15 53:7 68:2,19 69:8, 12 76:1,8,9,18,20 101:3 103:3,10,12,16,21

**takes** 14:11 50:5 111:25 114:15

**taking** 8:3 81:20 103:25

**talk** 13:10,11,12,16 20:13 21:24 33:3 36:16 38:25 46:10 48:19 62:10 63:3,9, 12,15,16 70:5 72:22 74:11 75:14 76:6,15 79:24 80:2, 20 81:1 83:17 89:8,18 92:20 94:3,18 95:5 97:4 98:19,24 99:14 100:1 104:10,12,23,25 105:17, 21 107:23,24 113:9 115:15 116:2 117:12 120:19 121:3,8 126:5 128:16 134:16,25 135:6

**talked** 16:17,18 17:21 37:20,22 39:8 42:11 62:11 63:10 65:5 67:25 70:14 72:16,17,18 73:1 76:5 77:8 80:19 81:10 94:5,11, 15 99:13 100:25 101:4 104:7,13,19,20 105:6,24 107:13,17 111:1 115:9 116:3 121:23,24 122:14, 18,21 124:11 126:24 129:19 132:1,6,24 136:12 137:13,19,20 138:23

**talking** 7:9 14:2 22:23 35:10 40:20 59:16 61:12 63:18 68:24 69:2,16 70:21 71:15,20 78:9,17,25 83:7 89:7 93:18 96:3 101:1 107:12 116:9 118:12 123:18,22 126:8 133:16 134:5

**talks** 7:9 126:19

**tall** 20:21

**Tangala** 3:2 4:6,7,17 5:5 11:11 90:16

**tap** 51:23

**taps** 53:17

**Tatiana** 67:10

**taxes** 29:1,5

**Taylor** 3:15 48:17 89:8,18, 20,21 95:2,5,6,8,12,23 97:4,5 98:21,25 104:10,12 105:10 116:8 121:22 124:11,13 129:4,13 130:5, 8,19,21,22 133:14 134:23 135:10,16

**tears** 112:21

**technical** 9:22 49:21

**technically** 138:18

**technological** 25:4

**telling** 8:15 69:3 78:16,18 83:17 105:9 106:5 116:22 133:3

**tells** 9:3 82:17 106:10 112:18

**Temple** 19:1,8,10,13

**temporary** 22:15,17 23:3, 12,25

**ten** 130:21

**tendon** 26:20

**terminated** 74:6

**termination** 76:21

**testified** 4:19

**testify** 6:2

**testimony** 5:20,25 6:4,5 9:17 46:7 80:10 90:15

**Texas** 2:5,11 4:9 11:11 14:16 17:12

**theoretically** 9:1

**theory** 109:12

**thing** 5:22 9:19,21 10:10, 21 11:24 12:11 16:3 36:22 38:8 45:18 69:16 76:14 83:9,23 87:7 94:19 107:24 112:4 114:7 117:21 118:1 124:10 129:15 135:3

**things** 5:13 8:1 9:20,21 13:17,19 23:12 25:19 31:17,23 38:9,15 43:16 44:4,16 46:11 49:23 60:4 76:13,18 83:18 84:13 99:22 104:4 109:8 110:2 112:14 114:5 120:17,18 126:25 137:16

**thinking** 90:12 139:4

**tho-** 72:6

**Thomas** 123:1

**thought** 58:18 82:13 97:9, 18 102:19 118:20

**threaten** 134:12

**threatening** 125:2

**three-year** 26:23,24

**threw** 72:20

**time** 4:4,14 8:23 20:9 21:6,18 22:11,25 23:5 25:2,21 27:17,19,21 28:18



30:24 31:10 32:2,3 34:10,
22,23 37:20 41:3 42:2,8,
12 50:19 51:5 54:9,14
55:12 61:16,18,21 63:5,8
64:21,22 65:8,10 71:21
75:18 81:5 93:4 94:15
96:13 105:12,24 107:3,7
108:17 110:18 111:1
113:25 116:14 120:1,13,
15 123:24 124:19,21
125:20 137:24 139:8,15,
18,21

**timeline** 138:23

**times** 48:7 68:6 74:18
75:7 84:13 113:14 121:13
134:7 138:25

**timestamp** 74:20

**tip** 85:14

**tipped** 60:7,8

**tips** 21:21 28:20,22 29:4
32:7 56:20 57:2 59:2,10,
25 60:3 118:11

**today** 4:4 5:16 6:4 7:12
9:15,16,17 112:1 139:8,11

**today's** 36:2 139:22

**told** 28:22 38:3 41:23 47:6
52:20,24 53:11 55:5,7,25
56:12 60:23 65:14 69:8
71:3 73:5,8,12 74:4,19,24
78:22 80:13 92:24 93:7
94:5 97:6,11 98:20 104:1
106:3,4 117:9 120:24
123:1 124:3,22 130:15,18
131:22,25 132:7,10,25
134:7 135:5,24 136:1,4,6
137:6

**toll** 111:25

**Tommy** 3:17 39:22 98:9,
11,13,16,23,25 104:13
105:6,10 121:23 122:13
129:4 130:25 131:6,8
132:24 133:8,18,19
134:25 135:5,15,19 136:2,
6,12,21,22

**Tommy's** 129:22 132:16

**tooth** 137:11

**top** 12:2 17:4 23:20 43:5
81:25 82:10,22 117:25
118:1 127:11

**topics** 40:17

**total** 54:4

**touched** 66:3

**town** 64:4 94:12,13

**track** 115:12

**trade** 18:5

**trailed** 95:16

**training** 43:13,14,15,16,
19,22,23 44:23 46:7

**transcript** 7:3,5 80:15

**Travigon** 15:9

**treat** 111:24 112:6,18,24,
25 113:21

**treated** 131:19

**treating** 38:16

**trial** 5:24 6:5 139:18

**trip** 99:15

**Trudy's** 35:16

**true** 5:22,25 42:20 48:7
51:18 84:9 108:24

**Trust** 135:13

**truth** 8:15

**truthfully** 6:3

**turn** 40:23

**turned** 66:17 106:23

**TV** 101:23

**twist** 117:24

**two-and-a-half** 22:16

**type** 7:8 30:7 84:17,23,24
96:7

**types** 84:20 108:4

**typically** 21:9

**typing** 6:23

---

**U**

**U.S.** 4:8

**uh-huh** 7:24 101:6 126:23
132:14

**uh-uh** 7:24

**ultimately** 116:25

**Umm** 103:19

**unable** 127:25

**uncertainty** 84:1

**uncomfortable** 94:1
106:10 113:10,15 133:1

**uncommon** 86:17,19
87:7,17,20,23,24 90:12,18
91:15

**understand** 5:1,13,17 6:6,
20 7:11,13,16 30:23 36:4
46:17 47:22 52:15 53:2
57:10 71:14 76:17 77:19
80:14 85:5 90:1,8 99:18
109:10 111:12 120:11,12,



14 133:10,24

**understanding** 46:17,18
47:19 74:6,8 108:9

**understood** 7:18 10:20
17:5 18:23 27:8,15 29:19
30:9 39:7 59:9 88:12 92:6
132:8

**United** 11:10

**unknown** 91:16

**unpack** 69:15

**up-and-down** 8:7

**upload** 10:12

**upset** 66:2 116:5

**urban** 96:5

---

### V

**variable** 57:3

**varies** 34:12

**vehicle** 110:1,4

**verbal** 7:23 119:17,20

**versus** 4:7 11:11

**video** 9:19,23 25:13 45:13
49:12,25 50:5,8,12 59:12
61:7 96:11 106:23

**video-recorded** 4:5

**violations** 128:1

**VIP** 44:12,13,14 71:4,5
72:8 73:11

**virtually** 36:9

**voice** 121:7

---

### W

**wa-** 39:20

**wage** 28:16

**wages** 28:23 109:15

**wait** 21:9,10 42:7,9 43:19,
21 44:25 45:2 128:13

**waiting** 73:7

**waitress** 42:5 47:11,13,17
51:15,19 53:10,22 54:19
60:14 64:20 69:4 70:9,14
74:16 76:25 77:5 78:12,
19,21 83:24 102:16
121:15 138:9

**waitresses** 41:19 47:20,
25 52:24 53:9 54:2 68:3,
25 71:9 74:25 77:15,21
89:3 101:12 103:3,10
118:4,11 121:2

**waitressing** 21:4,14,16,17

**walk** 20:12,16 60:16,18
71:12 73:17 83:1 118:19
126:4

**walked** 69:2,5,20 71:9
77:23 78:8,12 116:14
125:24

**walking** 66:12,15 99:21,24
126:1

**walkthrough** 10:14

**wall** 21:19 68:15,16 126:8

**wanted** 12:10 31:23 56:22
62:21 71:20 85:19,25
95:3,4 133:21 139:9

**wanting** 59:5

**warning** 74:5 119:17

**warnings** 119:21

**watch** 111:19

**waved** 70:13

**waving** 101:1

**ways** 9:20 19:24

**week** 26:10,11,12 28:24
29:8 31:15,16,17 54:6,11,
23 55:9,11 63:12 76:6
108:23 109:1,5,7 110:21
125:19 136:11,15

**weekends** 65:1,3

**weekly** 61:5

**weeks** 37:21 54:18 58:9,
15,16 61:11,13,16,22
76:6,7,20 102:22,25

**weird** 8:1 34:20,24 50:3

**well-off** 97:8

**Wesley** 72:14

**Western** 4:9 11:10

**Weston** 72:14

**wha-** 15:24 32:18

**whatsoever** 61:17

**Whe-** 23:2

**wher-** 33:17

**whim** 59:4

**white** 92:10 118:4,10,14

**wipe** 118:3

**wireless** 24:13

**witnesses** 14:9 82:21

**woman** 66:19 111:22

**women** 77:8,9,11,12

**word** 7:3,4 11:25 25:20



**GPS LLC**
gpscalendar@gps.llc ~ 214.347.4781

38:14 84:7 86:10,18 87:4,
13,25 88:1,3,9,11,15 89:4,
11 90:3,13 91:19 92:24
93:10,16,17,22,25 94:4,
16,20 97:6 98:21 99:1
115:25 116:4 124:23
129:16 130:6,13,17,23
131:4,9 133:2,15,18
135:17

**word-based** 7:23

**worded** 38:16

**words** 6:23 7:2 25:4 52:19
90:5 95:17 125:4 136:7

**work** 8:24 9:25 10:8 13:9,
17 19:19 20:7 22:1,5,10,
14,24 25:12,23 26:13,15,
21 27:13 28:5,13 30:21
33:21 34:16 37:4 40:3
42:21 54:15 55:16,17,18,
22,23,25 56:8,12,15 62:6
65:1 68:13 90:2 93:8
95:11 113:11 117:16
119:21 120:9,14 123:23
133:11 137:23

**worked** 8:23 20:14 28:14
31:5 32:3 37:1 38:20
41:22 43:2,16 46:8,13,19,
23,25 54:16 80:23 89:9
96:13 108:19 110:25
120:15

**workforce** 27:10 28:1 32:4

**working** 13:18 15:22,25
16:20 18:20 20:8 22:17
23:2,8,11,24,25 27:17
28:6 31:7,8,12,13,24,25
32:9 33:15,25 51:7,25
54:1,7,11,12,24 55:11
56:18 64:7,18 65:3,11
67:13 76:3 83:23 84:5

108:9,13,23 109:18 117:4
124:20,21 125:24

**works** 36:25 38:20 41:18
51:14 79:23

**worried** 79:24

**worry** 49:13 99:25 107:20

**worse** 101:2

**worthy** 112:11 113:16

**wow** 126:1 135:23 136:3

**write** 114:2

**write-up** 73:25

**written** 57:20 74:5 119:17,
21 120:6 128:20

**wrong** 16:2 73:18 101:21

---

**X**

**XTC** 35:5

---

**Y**

**y'all** 22:12 44:15 45:25
75:2 78:1 111:12 113:21
117:18 132:1

**Ye-** 18:19 53:25

**year** 14:23 15:1,20 16:7,
15 17:10,17 23:3,5 34:1
108:12,13 137:22 138:7

**years** 15:22 16:17 19:17
20:5 22:24 23:8 24:6,7
26:1,22 28:14 108:22

**yell** 24:22

**Yellow** 35:4

**yes'** 8:14

**Yockey** 39:3

**You-all** 53:24

**young** 121:6

---

**Z**

**zoom** 2:2,8 12:3,12



**GPS LLC**
gpscalendar@gps.llc ~ 214.347.4781